UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br>Plaintiff,<br><br>v.<br><br>**ADEPT MANAGEMENT, INC., et al.,**<br>Defendants. | Case No: 1:16-cv-00720-CL<br><br>FINDINGS OF FACT AND CONCLUSIONS<br>OF LAW |

# TABLE OF CONTENTS

I.  INTRODUCTION TO THE FEDERAL TRADE COMMISSION ACT ................................... 10

II. SUMMARY.................................................................................................................... 11

III. FINDINGS OF FACT ................................................................................................... 18

   A. PRIOR RULINGS ...................................................................................................... 18

   B. THE STANDARD MAIL SUBSCRIPTION BUSINESS ............................................... 18

      i)   The standard mail subscription business involves legitimate relationships
           between the mailing operation and publishers................................................ 18

   C. THE DEFENDANTS' DECEPTIVE MAILING OPERATION ...................................... 21

      i)   Prior to 2010, the Defendants used similar deceptive mailers, operated through
           multiple companies, ignored cease and desist letters, and were involved in
           repeated litigation........................................................................................... 21

      ii)  Starting in 2010, the Defendants used the Corporate Defendants to perpetuate
           their deceptive scheme. .................................................................................. 23

   D. THE CORPORATE DEFENDANTS ............................................................................ 27

      i)    Reality Kats oversaw the deceptive mailing operation................................... 27

      ii)   H&A oversaw the deceptive mailing operation............................................. 28

      iii)  Maximillian coordinated the flow of funds among the Corporate Defendants.
            ....................................................................................................................... 29

      iv)   Liberty sent deceptive mailers and received orders and payments................. 29

      v)    Express sent deceptive mailers and received consumer orders and payments.
            ....................................................................................................................... 30

      vi)   United sent deceptive mailers and received consumer orders and payments. 31

      vii)  Associated sent deceptive mailers and received consumer orders and
            payments. ....................................................................................................... 32

      viii) HCG LLC owned several Corporate Defendants and coordinated the transfer
            of funds among them. .................................................................................... 32

      ix)   HCG Inc. was the parent company of Express. ............................................. 33

      x)    Adept managed mailing, receiving and processing operations for the
            Corporate Defendants. .................................................................................. 33

xi)    Crown managed mailing, receiving, and processing operations for the
       Corporate Defendants. .................................................................... 33

xii)   Atlas transferred consumer funds to Lovrien. ................................... 34

xiii)  North West Data performed customer service work for the operation. .......... 34

xiv)   PPP NY performed call center operations, managed the website and
       responded to consumers. ................................................................ 34

xv)    PPP OR was formed in August 2015, with a registered address at the White
       City Building. ............................................................................ 36

xvi)   PPP Magazines appeared on the internet website printed on Defendants'
       mailers. .................................................................................... 36

xvii)  CPE submitted orders and sent switch notices to consumers. ................ 36

xviii) CAS submitted orders to publishers. ............................................... 37

xix)   MCE submitted orders to publishers. ............................................... 37

xx)    Magazine Link sent switch notices to consumers. ............................... 38

xxi)   SHA submitted orders to publishers and sent switch notices to consumers. ... 38

xxii)  Wineoceros submitted orders to publishers. ...................................... 39

xxiii) Anchor sent orders to Bacon's and Kaylor's companies and paid them to
       submit the orders to publishers. ..................................................... 39

xxiv)  Clarity Group hired employees who performed worked for CAS, MCE, and
       Magazine Link. .......................................................................... 39

xxv)   Specialties was a conduit for payments to Bacon. ............................... 40

E.   THE INDIVIDUAL DEFENDANTS ............................................................. 40

i)     Simpson, through Reality Kats, managed, controlled, and received the profits
       of the deceptive mailing operation. ................................................. 40

       (1)   Simpson was an integral part of the formation and continuation of the
             deceptive mailing operation. .................................................. 40

       (2)   Simpson designed the mailers, identified consumers to solicit, and
             provided direction to the Defendants. ....................................... 41

       (3)   Simpson developed the insert card system used by the Defendants... 43

       (4)   Simpson oversaw the finances of the operation and profited
             handsomely from the deceptive mailers. .................................... 44

    (5)     Simpson was aware the mailers were deceptive. ................................ 46

ii)    J. Hoyal, through H&A, managed, controlled, and received the profits of the deceptive mailing operation. ........................................................................... 47

    (1)     J. Hoyal helped form and continue the deceptive mailing operation through the Corporate Defendants. ..................................................... 47

    (2)     J. Hoyal supervised and oversaw the deceptive mailing operation. ... 50

    (3)     J. Hoyal received regular reports about all aspects of the operation. . 50

    (4)     J. Hoyal directed the financial operations of the enterprise and profited handsomely from the deceptive mailers. ............................................ 52

    (5)     J. Hoyal reviewed and approved the deceptive mailers sent by the operation. .......................................................................................... 53

    (6)     J. Hoyal oversaw call center operations, the submission of orders to publishers, and switching consumers to unordered subscriptions. ..... 54

    (7)     J. Hoyal was aware the mailers were deceptive and provided direction on how to respond to consumer complaints....................................... 55

iii)    L. Hoyal managed consumer money from the deceptive mailing operation through H&A. ....................................................................................................... 58

    (1)     L. Hoyal transferred funds from H&A to related Hoyal entities and to Reality Kats.......................................................................................... 59

    (2)     L. Hoyal was a primary financial beneficiary of the operation. ......... 60

    (3)     L. Hoyal participated in prior iterations of the deceptive mailing operation. .......................................................................................... 60

iv)    Parducci used the Corporate Defendants to transfer consumer funds among the Defendants. ....................................................................................................... 61

    (1)     Parducci used Maximillian to funnel consumer funds between the Defendants, including to herself. ........................................................ 61

    (2)     Parducci performed bookkeeping functions for Reality Kats. ............ 62

    (3)     Parducci acted as manager of HCG LLC, signing documents and performing tasks integral to the continued success of the deceptive mailing operation. ............................................................................. 63

    (4)     Parducci held signatory authority over numerous other Corporate Defendants and performed various tasks on their behalf.................... 64

    (5)     Parducci was integral in the operation of the interrelated entities as a common enterprise......................................................................... 64

v)    Pugsley managed the mailing and receiving operation through multiple Corporate Defendants. ...................................................................................... 66

    (1)     Pugsley reviewed mailer proofs and was part of the process that sent

them to consumers. ............................................................................ 66

(2)    Pugsley managed the operations of the mailing entities. .................... 67

(3)    Pugsley sent subscription orders to Bacon to submit to publishers and coordinated the submitting and switching of consumer orders. ......... 69

(4)    Pugsley provided reports to Simpson, J. Hoyal, and Parducci on "absolutely everything." ................................................................... 70

(5)    Pugsley managed the financial operations of the mailing entities and profited from the deceptive mailers. .................................................. 70

(6)    Pugsley was the corporate officer of Adept and Crown. .................... 71

(7)    Pugsley was aware of consumer complaints...................................... 72

vi)    Lovrien oversaw the mailing and receiving operations and responded to consumer complaints. ...................................................................................... 75

(1)    Lovrien managed the mailing and receiving operations. .................... 75

(2)    Lovrien responded to numerous consumer complaints and received fraud alerts and cease and desist letters. ............................................ 77

(3)    Lovrien's in-depth knowledge of the subscription operation. ............ 80

vii)    Strickler controlled and operated mailing and submitting defendants............ 81

(1)    Strickler's work on behalf of Orbital. ................................................ 81

(2)    Strickler's mailing and receiving work as President of Express.......... 82

(3)    Strickler submitted orders through Wineoceros. ................................ 83

(4)    Strickler's attempts to deceive publishers and clearinghouses. .......... 83

viii)    Babb was a corporate officer and performed receiving and processing work for the deceptive mailing operation. ............................................................. 84

ix)    Bacon submitted orders and managed the call center through multiple Corporate Defendants. ...................................................................................... 85

(1)    Bacon oversaw all aspects of the call center....................................... 86

(2)    Bacon knew that some consumers thought the mailer looked like a bill. ................................................................................................. 87

(3)    Bacon created and managed multiple Corporate Defendants that submitted orders to publishers and switched consumers to unordered subscriptions. ..................................................................................... 87

(4)    Bacon was integrally involved in the process of submitting orders to publishers. ......................................................................................... 89

(5)    Bacon oversaw the filling out of insert cards and the use of mail drops. ................................................................................................. 89

(6)    Bacon oversaw the process of switching consumers to publications

they did not order. ..................................................................... 90

    (7)    Bacon was aware of cease and desist letters from publishers. ........... 90

    x)    Kaylor submitted orders and managed the call center. .................................. 91

        (1)    Kaylor managed the call center for the mailing operation, ran
             Corporate Defendants that submitted orders to publishers, and was
             aware of the deceptive nature of the mailer. ........................................ 91

        (2)    Kaylor continued to send orders to publishers or switch publications
             after the operation received cease and desist letters from newspapers
             and rejected orders. ................................................................................. 95

        (3)    Kaylor profited from the deceptive mailers. ........................................ 96

F.    THE CORPORATE DEFENDANTS CONDUCTED THE DECEPTIVE MAILING OPERATION AS A
COMMON ENTERPRISE ............................................................................................................ 96

    i)    The Corporate Defendants exhibited common control, including shared
        owners and officers. .................................................................................... 96

    ii)    The Corporate Defendants operated as a "maze of interrelated companies.". 98

    iii)    The Corporate Defendants shared operating and business addresses. .......... 100

    iv)    The Corporate Defendants shared personnel. ................................................ 101

    v)    The Corporate Defendants used common marketing materials and services.
        ........................................................................................................................ 102

    vi)    The Corporate Defendants were economically interdependent. ................... 103

G.    RESTITUTION FINDINGS .......................................................................................... 103

    i)    Consumer injury. .......................................................................................... 103

    ii)    Defendants' other expenses do not constitute reimbursements to consumers
        and are not accurate. .................................................................................... 104

        (1)    Expenses related to submitting orders to publishers (remits) do not
             constitute money reimbursed to consumers. ..................................... 104

        (2)    Prior to this litigation, Defendants paid $250,000 into the Oregon
             consumer restitution fund and $3 million to the State of Oregon in
             2015. .................................................................................................. 105

IV. CONCLUSIONS OF LAW ............................................................................................ 105

A.    JURISDICTION AND VENUE ..................................................................................... 105

B.    THE DEFENDANTS' MAILERS ARE DECEPTIVE ........................................................ 106

C. THE CORPORATE DEFENDANTS ARE LIABLE AS A COMMON ENTERPRISE ....................... 106

D. INJUNCTIVE AND MONETARY RELIEF ........................................................................... 107

    i) All Defendants are liable for injunctive relief. ............................................. 108

        (1) Direct participation ........................................................................... 109

        (2) Authority to control........................................................................... 113

    ii) Defendants Simpson, J. Hoyal, L. Hoyal, and the Corporate Defendants are liable for monetary relief. ............................................................................. 116

E. THE FTC DOES NOT NEED TO PROVE "BAD FAITH" TO ESTABLISH LIABILITY .............. 119

F. REMEDIES ................................................................................................................... 120

    i) Comprehensive injunctive relief is warranted. ............................................. 120

    ii) Monetary relief........................................................................................... 123

V. CONCLUSION................................................................................................................. 124

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Allee v. Medrano*, 416 U.S. 802 (1974) .................................................................................................. 121

*FTC v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965) ....................................................................... 121, 122

*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) ........................................................................................... 121

*Gray v. Sanders*, 372 U.S. 368 (1963) ................................................................................................... 121

*Siegel Co. v. FTC*, 327 U.S. 608 (1946) ................................................................................................. 121

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ........................................................................... 120

*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985) ......................................................... 122


**Federal Court of Appeals Cases**

*Am. Home Prods. Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982) ............................................................... 122

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) .................................................................................. 115

*Del. Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) (per curiam) ....................................................... 107

*Fedders v. FTC*, 529 F.2d 1398 (2d Cir. 1976) ..................................................................................... 121

*Feil v. FTC*, 285 F.2d 879 (9th Cir. 1960) ..................................................................................... 119, 120

*FTC v. Affordable Media, LLC*, 179 F.3d 1228 (9th Cir. 1999) ........................................................... 117

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989) ................................................ 114, 117, 120

*FTC v. Dantuma*, 748 F. App'x 735 (9th Cir. 2018) ............................................................................ 124

*FTC v. Evans Prod. Co.*, 775 F.2d 1084 (9th Cir. 1985) ....................................................................... 120

*FTC v. Freecom Communs, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ........................................................ 114

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) ........................................................ 120

*FTC v. Gill*, 265 F.3d 944 (9th Cir. 2001) ......................................................................... 122, 123, 124

*FTC v. Grant Connect, LLC*, 763 F.3d 1094 (9th Cir. 2014) ........................................................ passim

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ........................................................ 120, 121, 123

*FTC v. Inc21.com Corp.*, 475 F. App'x 106 (9th Cir. 2012) ................................................................ 123

*FTC v. Ivy Capital, Inc.*, 616 F. App'x 360 (9th Cir. 2015) ................................................................ 115

*FTC v. MacGregor*, 360 F. App'x 891 (9th Cir. 2009) ........................................................................ 109

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) ............................................................................... 106

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) .................................................................. 108, 123

*FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168 (9th Cir. 1997) .............................................. passim

*FTC v. Publishers Bus. Servs., Inc.*, 540 F. App'x 555 (9th Cir. 2013) .............................................. 124

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) ..................................................... 11, 121

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009) ......................................................... 108, 115, 123

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) (per curiam) ............................................ 115

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ........................................................ 113, 115

*FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir. 1988) ............................... 119, 120

*Jay Norris, Inc. v. FTC*, 598 F.2d 1244 (2d Cir.), cert. denied, 444 U.S. 980 (1979) ......................... 122

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) .......................................................................... 122, 123

*Litton Indus., Inc. v. FTC*, 676 F.2d 364 (9th Cir. 1982) .................................................................... 123

*Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294 (7th Cir. 1979), cert. denied, 445 U.S. 950, (1980) ................ 122

*Sears, Roebuck and Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) ..................................................... 121, 122

*SEC v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343 (D.D.C. 1980) ......................................................... 108

*SEC v. Manor Nursing Center, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ................................................ 11, 121

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ..................................................................................... 121

*Standard Educators, Inc. v. FTC*, 475 F.2d 401 (D.C. Cir. 1973) ....................................................... 114

*Telebrands Corp. v. FTC*, 457 F.3d 354 (4th Cir. 2006) ............................................................... 121, 122

*United States v. Reader's Digest Ass'n*, 662 F.2d 955 (3d Cir. 1981) ................................................. 123

**Federal District Court Cases**

*AMG Services, Inc.,* Case No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416 (D. Nev. Sept. 30, 2016)....120, 121

*CFTC v. Co Petro Mktg. Grp., Inc.,* 502 F. Supp. 806 (C.D. Cal. 1980), *aff'd,* 680 F.2d 573 (9th Cir. 1982)), *aff'd,* 910 F.3d 417 (9th Cir. 2018)..................................................................................................120

*FTC v. 1st Guar. Mortg. Corp.,* No. 09-CV-61840, 2011 WL 1233207 (S.D. Fla. Mar. 30, 2011) ...............122

*FTC v. Am. Standard Credit Sys., Inc.,* 874 F. Supp. 1080 (C.D. Cal. 1994).........................108, 109, 114, 121

*FTC v. AMG Services, Inc.,* No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416 (D. Nev. Sept. 30, 2016).115, 124

*FTC v. AMG Servs., Inc.,* No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416 (D. Nev. Sept. 30, 2016), *aff'd sub nom. FTC v. AMG Capital Mgmt., LLC,* 910 F.3d 417 (9th Cir. 2018)..................................................115

*FTC v. Benning,* No. C 09-03814 RS, 2010 WL 2605178 (N.D. Cal. June 28, 2010)......................................110

*FTC v. Braswell,* No. CV 03-3700 DT (PJWX), 2005 WL 4227194 (C.D. Cal. Sept. 27, 2005)...................120

*FTC v. Bronson Partners, LLC,* No. 3:04-CV-1866, 2006 WL 197357 (D. Conn. Jan. 25, 2006).................108

*FTC v. Commerce Planet, Inc.,* 878 F. Supp. 2d 1048 (C.D. Cal. 2012)..........................................................120

*FTC v. Consumer Alliance, Inc.,* No. 02 C 2429, 2003 U.S. Dist. LEXIS 17423 (N.D. Ill. Sept. 30, 2003)..109

*FTC v. Dinamica Financiera LLC,* No. CV-09-03554 MMM (PJWx), 2010 WL 9488821 (C.D. Cal. Aug. 19, 2010)....................................................................................................................................................122

*FTC v. DirecTV, Inc.,* Case No. 15—01129-HSG, 2015 WL 9268119 (N.D. Cal. Dec. 21, 2015)...............109

*FTC v. DiscountMetalBrokers, Inc.,* No. 2:16-cv-2112-ODW(JC), 2017 U.S. Dist. LEXIS 164878 (C.D. Cal. Oct. 4, 2017) .......................................................................................................................................117

*FTC v. Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502 (S.D.N.Y. 2000)............................................................122

*FTC v. Gill,* 71 F. Supp. 2d 1030 (C.D. Cal. 1999), *aff'd,* 265 F.3d 944 (9th Cir. 2001) ...............................120

*FTC v. Good Ebusiness,* LLC, No. 2:16-CV-01048, 2016 WL 3704489 (C.D. Cal. July 12, 2016) ..............122

*FTC v. Grant Connect, LLC,* 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011), *aff'd in relevant part,* 763 F.3d 1094 (9th Cir. 2014)..............................................................................................................................106

*FTC v. Hang-Ups Art Enters., Inc.,* No. CV 95-0027 RMT (JGx), 1995 WL 914179 (C.D. Cal. Sept. 27. 1995)....................................................................................................................................................109, 120

*FTC v. Ideal Fin. Solutions, Inc.,* No. 2:13-cv-00143-JAD-GWF, 2015 WL 4032103 (D. Nev. June 30, 2015) ..........................................................................................................................................................109

*FTC v. Inc21.com Corp.,* 745 F. Supp. 2d 975 (N.D. Cal. 2010)......................................................................122

*FTC v. Infinity Grp. Servs.,* No. SACV 09-00977 DOC (MLGx), 2009 WL 10672410 (C.D. Cal. Dec. 11, 2009)....................................................................................................................................................119

*FTC v. Int'l Computer Concepts, Inc.,* No. 5:94CV1678, 1995 WL 767810 (N.D. Ohio Oct. 24, 1995).......122

*FTC v. Ivy Capital, Inc.,* No 2:11-CV-283 JCM (GWF), 2013 WL 1224613 (D. Nev. Mar. 26, 2013), *remanded on other grounds,* 616 F. App'x 360 (9th Cir. 2015)................................106, 109, 114

*FTC v. J.K. Publ'ns, Inc.,* 99 F. Supp. 2d 1176 (C.D. Cal. 2000)............................................108, 109, 114, 117

*FTC v. John Beck Amazing Profits LLC,* 888 F. Supp. 2d 1006 (C.D. Cal. 2012).............................................122

*FTC v. Johnson,* 156 F. Supp. 3d 1202 (D. Nev. 2015) .....................................................................................106

*FTC v. Kitco of Nevada, Inc.,* 612 F. Supp. 1282 (D. Minn. 1985).....................................................................109

*FTC v. Lights of Am., Inc.,* No. SACV10-01333 JVS (MLGx), 2013 U.S. Dist. LEXIS 133040 (C.D. Cal. Sept. 17, 2013)........................................................................................................................................117

*FTC v. Loewen,* No. C12-1207 MJP, 2013 WL 5816420 (W.D. Wash. Oct. 29, 2013) ...................................117

*FTC v. Medicor, LLC,* No. CV 01-1896 CBM (EX), 2002 WL 1925896 (C.D. Cal. Jul. 18, 2002)...............122

*FTC v. N.E. Telecomms., Ltd.,* No. 96-CV-6081, 1997 WL 599357 (S.D. Fla. June 23, 1997).........................108

*FTC v. Nat'l Urological Grp.,* 645 F. Supp. 2d 1167 (N.D. Ga. 2008), aff'd, 356 F. App'x 358 (11th Cir. 2009)....................................................................................................................................................106, 114

*FTC v. Neiswonger,* 494 F. Supp. 2d 1067 (E.D. Mo. 2007)..............................................................................122

*FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104 (S.D. Cal. 2008), *aff'd,* 604 F.3d 1150 (9th Cir. 2010), *amended and aff'd,* 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010)..........................................106, 110, 114, 117

*FTC v. Neovi, Inc.,* No. 06-CV-1952 JLS (JMA), 2010 U.S. Dist. LEXIS 101583 (S.D. Cal. Sept. 27, 2010) ..........................................................................................................................................................121

*FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520 (E.D. Penn. 2013) ..................................................... 106

*FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) .................................................. 108, 109, 114, 115

*FTC v. Stefanchik*, No. 04-1852, 2004 WL 5495267 (W.D. Wash. Nov. 12, 2004), *aff'd*, 559 F.3d 924 (9th Cir. 2009) ..................................................................................................................................... 122

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ...................................... 114

*FTC v. U.S. Oil & Gas Corp.*, No. 83-1702-CIV-WMH, 1987 U.S. Dist. LEXIS 16137 (S.D. Fla. July 10, 1987) ....................................................................................................................................... 106

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012), *aff'd*, 2013 U.S. App. LEXIS 1078 (11th Cir. Jan. 16, 2013) ........................................................................................................... 106

*FTC v. Wellness Support Network, Inc.*, No. 10-CV-04879-JCS, 2014 WL 644749 (N.D. Cal. Feb. 19, 2014) ........................................................................................................................................... 123

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995) ....................................................................... 109

*FTC v. Windward Mktg., Ltd.*, No. Civ.A. 1:96-CV-615-F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997). 107

*In re Nat'l Credit Mgmt. Grp., LLC*, 21 F. Supp. 2d 424 (D.N.J. 1998) ................................. 114, 115

*United States v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528 (E.D. Cal. 1992) .......................... 108

**Statutes**

15 U.S.C. § 45(a) ............................................................................................................................. 105

15 U.S.C. § 53(b) ............................................................................................................................. 105

28 U.S.C. § 1331 .............................................................................................................................. 105

28 U.S.C. § 1337(a) ......................................................................................................................... 105

28 U.S.C. § 1345 .............................................................................................................................. 105

28 U.S.C. § 1391(b) ......................................................................................................................... 105

28 U.S.C. § 1391(c) ......................................................................................................................... 105

## I.    INTRODUCTION TO THE FEDERAL TRADE COMMISSION ACT

Section 5(a) of the Federal Trade Commission Act ("FTC Act") prohibits "unfair or deceptive acts or practices in or affecting commerce" and empowers the FTC to prevent such acts or practices. 15 U.S.C. § 45(a)(1), (2). Under section 13(b) of the FTC Act, the FTC "may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086 (9th Cir.1985). "This provision gives the federal courts broad authority to fashion appropriate remedies for violations of the Act," *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir.1994), including "any ancillary relief necessary to accomplish complete justice," *FTC v. H.N. Singer*, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982)). The district court is given the authority to grant such relief "even [when] the Commission does not contemplate any administrative proceedings." *Id.* at 1111.

A permanent injunction is justified if there exists "some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or "some reasonable likelihood of future violations," *CFTC v. Co Petro Marketing Group, Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), aff'd, 680 F.2d 573 (9th Cir.1982). The Court examines the totality of the circumstances involved and a variety of factors in determining the likelihood of future misconduct. *Co Petro Marketing Group*, 502 F. Supp. at 818; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980). Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendant's recognition of his own culpability and sincerity of his assurances, if any, against future violations. *Murphy*, 626 F.2d at 655; *FTC v. Magui Publishers, Inc.*, No. 89–3818, 1991 WL 90895, at *15–16 (C.D. Cal. Mar. 28, 1991). "A large-scale systematic scheme tainted by fraudulent and deceptive practices gives rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint." *FTC v.*

*Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982)) (quoting *SEC v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

The FTC Act is designed to protect consumers from economic injuries. *F.T.C. v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009). To effect that purpose, the Ninth Circuit has held that district courts may award restitution to redress consumer injury. *F.T.C. v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("We have held that restitution is a form of ancillary relief available to the court in these circumstances to effect complete justice."); *F.T.C. v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) ("[D]istrict courts have the authority to award restitution under § 13 of the FTC Act."). Restitution may be measured by the "the full amount lost by consumers rather than limiting damages to a defendant's profits." *Stefanchik*, 559 F.3d at 931 (affirming restitution of over $17 million for the full amount of consumer loss); *see also FTC v. Febre*, 128 F.3d 530, 536 (7th Cir.1997) (affirming restitution for more than $16 million against company and officer as consumer loss under section 13(b)). Consumer loss is calculated by "the amount of money paid by the consumers, less any refunds made." *FTC v. Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d 202, 213–14 (D. Mass. 2009), aff'd, 624 F.3d 1 (1st Cir. 2010); *see also Stefanchik*, 559 F.3d at 931; *Gill*, 265 F.3d at 958.

## II.   SUMMARY

Defendants Dennis Simpson and Jeffrey Hoyal operated a magazine and newspaper mail subscription business together for the last twenty years or more. Under their supervision, subscription "mailers" would get sent out to a massive list of consumers throughout the United States. The names and addresses of these consumers were carefully and comprehensively compiled and analyzed by Simpson to target people who were likely to respond.

The deceptiveness of the mailers has been discussed at length by this Court already. A copy of the mailer, as provided in the FTC's Complaint as Exhibit A, is attached to this opinion. In essence, the impression given by the mailer was that it was either coming from or authorized by the

newspaper publication in question, that any current subscription would be "renewed" automatically, and that the consumer was being offered the lowest price available. These impressions were false.

Many consumers, when they received the mailer, believed they were receiving a notice from the newspaper or magazine itself alerting them that their subscription was due for renewal. Many consumers simply wrote a check and "renewed" their orders, never realizing that instead of renewing, they were placing a separate and distinct order with a third-party agent. A significant portion of defendants' business operations was devoted to attempting to place new subscription orders with the publications at issue in order to fulfill the "renewal" orders sent in by consumers. This is a process often referred to as "clearing" an order.

Other consumers did realize the independent nature of defendants' business, and many of these called to complain and to request they be removed from the mailing list. Another significant portion of the defendants' operation was devoted to fielding these calls, as well as calls from other unhappy consumers who never received their order or received it months and months delayed. This branch of the operation is often referred to as "the call center."

Keeping track of the different types of consumer responses received was yet another significant branch of the business operation. These functions are referred to as "data entry" or "data processing." The data processing was operated in conjunction with the sending and receiving of the mailers, and the receipt of orders generated by the mailers.

The various roles and operations of the business functioned through a complicated maze of entities that were interrelated but had distinct corporate identities. Some of the entities operated the call center, while others performed the logistics of formatting, printing, and sending the mailers, while still others opened mail and performed data entry. Still other entities attempted to clear the orders received, while others functioned solely to create invoices and write checks, moving money from entity to entity, until it reached its ultimate destination: the entities owned by Simpson and

Hoyal.

Simpson and Hoyal were the driving force behind the entire operation. Simpson compiled and analyzed the limitless data involved, and he closely monitored any work that involved the mailer. Simpson closely supervised every detail of the design, formatting, and content of every mailer sent to consumers. At trial, the mailer was often referred to as "his baby." Hoyal supervised the employees and the operational aspects of the call center, the clearing efforts, and the receipt of orders. Despite their distinct functions, the two men were equal partners in this venture. Through their corporate identities, each man received approximately 15 million dollars for magazine and newspaper sales from April 2011 to April 2016, which is the relevant 5-year time period prior to the filing of this complaint.

Although not admitting legal liability, Defendant Hoyal, to his credit, accepted responsibility at trial for the operational side of the business. The Court also appreciated that Hoyal supported the other defendants at trial – particularly those referring to themselves as the "worker defendants," most of whom had a longstanding employment relationship with Hoyal. Simpson, on the other hand, who lives in southern California, claimed at trial that he was simply a data scientist, completely separate from the rest of the Oregon-based operation. This was a preposterous claim. Simpson developed and made the decisions about the deceptive mailer, controlled the critical database, regularly reviewed reports from Oregon and had almost daily contact with Hoyal and other employees about significant business decisions.

All defendants either had authority to control or directly participated in the deceptive mailing operation sufficient to support the injunctive relief requested by the Federal Trade Commission. The deceptive mailing operation spanned decades, evolving over multiple iterations but maintaining the same business structure and using the same or a very similar mailer. The deceptive mailing operation continued despite countless consumer complaints, government and private lawsuits, and

multiple cease and desist letters from publishers dating back to at least 2010 through 2015. The defendants ignored these complaints and cease and desist letters until ultimately the State of Oregon forced them to shut down in 2015. Yet, the defendants remained defiant through trial and adamant that they did nothing wrong. Simpson continues to be involved in sending out mailers, and there is evidence that other defendants considered resuming the operation, all despite signing the Oregon Assurance of Voluntary Compliance ("AVC") prohibiting such conduct. There is therefore a reasonable likelihood of recurrence unless there is a national permanent injunction to prevent the practices engaged in by the defendants.

All the defendants also either knew or should have known the mailers were deceptive to support individual liability. The Court need not find that defendants intended to defraud consumers, but the Court finds no support for defendants' argument that they had no reason to know that the mailer was deceptive. The defendants were recklessly indifferent, at the very least, to a long list of red flags. This includes a long history of litigation with private companies and governmental regulators, a large amount of Attorney General, Better Business Bureau, and consumer complaints, repeated cease and desist letters from publishers, multiple banks closing bank accounts, and a remarkable practice known as the "card clearing process." This process involved recruiting different people, once even from the local retirement home, to pull subscription cards out of the folds of magazines and newspapers and hand-write the consumer information for hundreds of orders into each one. They were careful to use different hand writing, different ink colors, and to mail the bundles from different locations around the country so that the publication would not realize that all the cards came from one third-party agent, instead of from individual consumers. This amount of effort shows a level of awareness and intent to circumvent the proper procedures that is undeniable.

Despite all of this, defendants claim that they operated a legitimate mail subscription business well within industry standards. They claim they had the blessing of the State of Oregon

based on a 2004 Consent General Judgment, and they contend that the State and the FTC lured them into thinking their operation was fine by failing to initiate any significant enforcement action from 2004 to 2015. There are numerous problems with these defenses.

First, there is indeed an industry practice where third-party companies solicit magazine subscriptions for publishers. They may not have a direct relationship with a publisher. They obtain authorization through clearinghouses that regularly publish lists of publications with what are referred to as UMC (Universal Magazine Code) numbers with a remit price and other subscription information to the publisher. This is called "agency sales," and the practice supports publisher circulation levels critical for advertising revenue. The third party then solicits subscriptions from consumers at a mark-up price, which in many cases is higher than a customer could get directly from the publisher. Defendants historically operated to some extent within this framework. However, defendants strayed from this authorization path, particularly as it related to the Wall Street Journal and New York Times, which comprised a very large share of defendants' newspaper revenue for the time period at issue. Specifically, along with the card clearing process described above, defendants created "in-house" clearing companies. These entities, in the face of multiple publisher cease and desist letters, would seek oral authorizations from low-level phone operators at these publications without even disclosing their identity or other important information. Such "creative" clearing processes do not conform to the traditional industry practices.

Second, and probably even more significant, the mailers were deceptive, designed to appear as if they were coming directly from the publishers. The State of Oregon, as part of the 2004 Consent Judgment, mandated, among other things, that the language "INDEPENDENT AGENT NOT A BILL KEEP THIS PORTION FOR RECEIPT OF OFFER" appear in AT LEAST 7-POINT font on the front of the mailer. None of the defendants, or exhibits, provided a credible explanation for why this language did not appear on the front of the mailer.

There was also no contemporaneous, written evidence that defendants were ever really relying on the 2004 Consent Judgment. Their attorney testified he was not even aware of the 2004 Consent Judgment until 2015. The defendants also completely ignored cease and desist letters, which makes it clear defendants were not deterred and did not respect the legal process.

Finally, there was no evidence at trial that either the State of Oregon or the FTC agreed to "look the other way," no matter what defendants were doing. The 2004 Consent Judgement specifically states:

> Defendants shall not imply that that plaintiff [the State of Oregon] approves of defendants' past business practices, current efforts to reform their practices, or any future practices defendants adopt. Plaintiff's settlement of this case does not constitute approval for past, present, or future business practices.

¶8.

There was no convincing evidence offered at trial that the FTC formally signed off on the 2004 State of Oregon Judgment. Defendants' behavior escalated over time, relating in part to the lack of authorization from publications and, with aggressive instructions from Simpson, finally sought to solicit subscriptions for regional newspapers with nothing even close to authorization. It may well have been this escalation and greed that caused, or significantly contributed to, defendants' ultimate downfall.

The court finds that even if the defenses of waiver, laches and estoppel can be applied against the government, there is no support for these defenses in this case.

It is true that defendants' subscription business had legitimate business operations including a customer service or call center that at times provided consumer refunds and that many consumers ultimately received their ordered publications from publishers. This does not ameliorate the deceptive nature of the mailers that was harmful to consumers.

This case is brought by the FTC in equity, which gives the Court discretion in fashioning a

fair remedy, including any monetary award. This is the most difficult part of the case for the Court. None of the defendants are blameless. Defendant Simpson has continued participating in the subscription business, brazenly ignoring the 2015 injunction entered by the State of Oregon. He had little credibility at trial. Hoyal made a more credible witness, and although the Court perceives real risk to be prevented by an injunction, there was no evidence at trial that Hoyal has so far continued in the subscription business. Simpson and Hoyal, along with Lori Hoyal as 50% owner of Hoyal & Associates, reaped millions of dollars from the subscription operation. The Court finds that they are jointly and severally liable, along with all defendant companies for the monetary award in this case.

The challenge for the Court is the remedy to be imposed on the "worker" defendants, which include Laura Lovrien, Linda Babb, Lydia Pugsley, Noel Parducci, William Strickler, Shannon Bacon, and Colleen Kaylor. The Court found all of them to be smart, likable, hardworking, and loyal to a fault to the subscription business. These defendants, with appreciated assistance from counsel for Hoyal, did a good job representing and conducting themselves throughout the trial. The loyalty they showed, however, unfortunately included, at the request of Hoyal and legal counsel, agreeing to become officers of many of the companies involved in the operation. But it was clear that, at all times, they were working as employees under the control of Simpson and Hoyal. They did not have the authority to make, and did not make, significant independent decisions for the mailing operation as a whole. Some of them were very well-compensated, but they did not share in the profits of the operation. They seem to the Court to be good people who created their own reality to ignore the deceptive mailers being used by the operation, even in the face of an avalanche of "red flags." They were active and willing passengers on a ship driven by others that, as its speed increased, was most certainly going to crash. They should have seen it coming. However, while the Court finds an injunction against them is appropriate, ultimately justice would not be served by holding them individually liable for the monetary award in this case.

The FTC is seeking a monetary award of $12,161,774.02, which represents defendants' revenue from newspaper sales minus stop payments and refunds. Defendants seek a deduction for remittance amounts paid to publishers and amounts paid to the State of Oregon as part of the 2015 Judgment. The FTC did already reduce the monetary relief requested by $31,000 based on the amount it claims should be counted from the 2015 Judgment, but it did not deduct the full $3,250,000. The Court is convinced that operational expenses like the remittance amounts to publishers are not a legally proper deduction, but that consumer restitution amounts paid to the State of Oregon are a proper deduction in the amount of $3,250,000. This results in a net monetary judgment of $8,942,774.02.

## III. FINDINGS OF FACT

### A. PRIOR RULINGS

1. On August 7, 2017, the Court entered an order striking the Answer of Adept Management, Inc., Anchor Publishing Group, Inc., Associated Publishers Network, Inc., Atlas Business Consulting LLC, Clarity Group, Inc., Consolidated Publishers Exchange, Inc., Crown Resource Management LLC, Customer Access Services, Inc., Express Publishers Service, Inc., HCG Inc., Henry Cricket Group, LLC, Liberty Publishers Service, Inc., Magazine Clearing Exchange, Inc., Magazine Link, Inc., Maximillian, Inc., North West Data Services LLC, PPP Magazines, Inc., Publishers Payment Processing, Inc. (a New York corporation), Publishers Payment Processing, Inc. (an Oregon corporation), Specialties, Inc., Subscription House Agency, Inc., United Publishers Exchange, Inc., and Wineoceros Wine Club, Inc. ("Defaulting Defendants"). (Dkt. 187.) That same day, at the Court's direction, the Clerk entered defaults against the Defaulting Defendants. (Dkt. 189.)

2. In its Summary Judgment Order, the Court determined that Defendants' mailers were deceptive as a matter of law, that they were likely to and did mislead reasonable consumers, and that the misrepresentations were material. (Dkt. 469 (Opinion and Order on Summary Judgment) at 3-7.)

### B. THE STANDARD MAIL SUBSCRIPTION BUSINESS

#### i) The standard mail subscription business involves legitimate relationships between the mailing operation and publishers.

Expert Witness Gordon Haight has over 45 years of experience in publication management as a publisher, group publisher, Executive Vice President, President and Editor-in-Chief for newspapers, consumer magazines, trade magazines and information technology magazines. Haight

Exp. Report 2. At trial, he provided an explanation of the magazine and newspaper subscription industry, and the standard form of operations for a business involving agency sales, clearing houses, and direct mail subscriptions. Some of his testimony focused on the dynamic between publishers, clearing houses, and independent agents who solicit subscriptions directly from consumers. Mr. Haight highlighted how this relationship is generally mutually beneficial. Publishers have very specific circulation needs due to their advertising structure. If they receive too many subscriptions for a particular issue, they lose money on printing and mailing costs, but if they receive too few subscriptions, they will not meet their obligation to their advertisers to fulfill their contract. Thus, striking the right balance is crucial for a publication's continued success.

For the Court, the most important part of Mr. Haight's testimony involved the relationships between the publisher, and the independent sales agent. A publisher often relies on a variety of subscription avenues, and this includes independent sales by "direct mail" marketing businesses. Sometimes publishers must heavily rely on these independent agents, either individually or through clearing houses, in order to meet their circulation targets.

> Publishers in need of subscriptions from sales agents will notify the agents of the particular offering that is available: the name of the publication, the length of the subscription(s) offered (such as six-months, 1-year, 2-years, etc.), and the "remit" price at which the publisher will accept the subscriptions. Publishers may notify the agent directly or through their clearing houses. Because they will work with multiple agents and publishers, clearing houses can efficiently inform multiple agents of a subscription opportunity.

Haight Exp. Report 8. The negotiations between the parties typically initially take place between the circulation director for the publication and the agent or clearing house. Others at the publication may receive direction about whether to accept subscriptions from the agent as time goes on, but the initial agreement between the parties is generally established by someone in management or with authority to make circulation decisions.

This relationship benefits the publisher because the publisher avoids the high up-front cost of

direct-mail solicitations. The sales techniques are often at the sole prerogative of the agency, as is the price offered by the agency. While the up-front cost and risk for the agency is quite high, the mark-up for the subscription price often reflects that risk.

Mr. Haight testified, however, that even when a publisher uses an independent agent, or a clearing house with multiple agents, the parties will stay in contact to update and check in with each other regarding the circulation target.

> Publishers and agencies negotiate subscription remit price, term, revenue commissions, use of artwork and logos, subscriber renewal efforts, etc. Relationships between publishers and agents can be written or oral, depending upon the history between the companies, the need for immediate promotion activity (such as to meet a circulation deadline), or other factors. Critically, understandings between publishers and agents can frequently be amended multiple times during the course of an agreement based on changing market conditions, publisher needs, response rates or marketing campaign analysis. To accelerate campaign results, changes are often verbally agreed upon by both parties, either in person or by telephone.

*Id.* at 10.

The Court found Mr. Haight's report and testimony helpful in establishing a baseline for the mail subscription industry. It was clear from the testimony that even when publishers are in dire need of direct marketing efforts by independent agents in order to drive up circulation, the publisher maintains an interest in communicating with and directing the agent regarding that circulation target. Communication could be on-going and evolving with circulation needs, thus it could be an oral relationship instead of a written contract. However, Mr. Haight testified that he would not expect an independent agent to send a direct-mail subscription mailer without prior authorization and a specific circulation target from the publisher.

Finally, Mr. Haight noted that an occasional unscrupulous publisher might abruptly refuse to honor a previously given price to a sales agent, or it might purport to terminate the authorization because a marketing campaign was "too successful" and generating too many subscription orders,

over and above the circulation target. However, he also testified that he would not expect a

publisher to send a cease and desist letter to an agent if the publisher had legitimately authorized that

agent for third party direct-mail sales efforts.

### C. THE DEFENDANTS' DECEPTIVE MAILING OPERATION

> **i)** **Prior to 2010, the Defendants used similar deceptive mailers, operated through multiple companies, ignored cease and desist letters, and were involved in repeated litigation.**

3.  Dennis Simpson ("Simpson") began sending subscription mailers to consumers in 1993 or 1994. (Simpson Tr. 2499:14-18.) The first mailing entity Simpson operated was Publishers Marketplace. (Simpson Tr. 2500:9-18.)

4.  Simpson developed the mailers he used to solicit Publishers Marketplace subscriptions. (Simpson Tr. 2508:22-2509:15, 2510:8-25, 3234:9-3251:6, 3300:3-19, 3302:6-15; Exh. 2164 (compilation of mailers).)

5.  In 1997 or 1998, Jeffrey Hoyal ("J. Hoyal") joined Simpson's operation to provide operations management. (J. Hoyal Tr. 2024:3-7, 2237:7-14, 2495:3-9; Exh. 3298 at 2-3, ¶ 5.) Together, Simpson and J. Hoyal oversaw an operation that, between 1998 and 2009, acted through a series of interrelated corporate entities owned or controlled by them (*see generally* Exh. 3298 at 2-3, 5-6, ¶¶ 5, 16-18), including:

    5.1.  IC Marketing, Inc. ("IC Marketing"), which sent mailers to consumers between 1997 and 2004. (J. Hoyal Tr. 2031:18-19, 2032:12-2034:16; Simpson Tr. 2500:19-2502:1, 2505:6-17, 2506:13-2507:1, 2507:22-2508:4; Exh. 3298 at 3, ¶ 6.)

    5.2.  RJS Group, Inc., formed to handle support functions, including customer service and clearing, for IC Marketing. (J. Hoyal Tr. 2024:14-25, 2025:3-12, 2072:18-2075:15, 2479:19-25, 2480:12-14; Simpson Tr. 2993:23-2995:9.)

    5.3.  American Consumer Publishing Association, Inc. ("ACPA"), which handled customer service and clearing for IC Marketing, replacing RJS Group, Inc. (J. Hoyal Tr. 2028:23-2030:9, 2034:17-23; Simpson Tr. 2503:20-2504:11, 3023:21-3024:7.) Shannon Bacon ("Bacon") and Colleen Kaylor ("Kaylor") worked for the ACPA call center. (J. Hoyal Tr. 2035:19-22; Bacon Tr. 3597:16-22; Simpson Tr. 3023:7-25; Kaylor Tr. 1618:21-1619:1, 1691:5-6.)

    5.4.  Raybor Management, Inc. ("Raybor"), which acquired IC Marketing and ACPA. (J. Hoyal Tr. 2030:24-2031:1, 2031:16-17, 2238:9-12; Simpson Tr. 2502:2-17, 2502:22-2503:1, 2507:11-21; Exh. 75 at 1, 15, 17, 48; Exh. 3298 at 3, ¶ 6.)

    5.5.  Mail Industries, Inc. ("Mail Industries"), the financial reporting company for the companies that sent subscription mailers to consumers. (J. Hoyal Tr. 2037:22-2038:16; Exh. 376.) Lori Hoyal ("L. Hoyal"), J. Hoyal's wife (Parducci Tr. 556:11-13), was President. (L. Hoyal Tr. 1122:22-1123:1, 1123:21-23; Exh. 376.)

5.6.     Certified List Management, LLC, a company formed by L. Hoyal in 2005 to facilitate Simpson's consumer list purchases. (L. Hoyal Tr. 1121:21-1122:21; Exh. 375.)

5.7.     Global Data Services, Inc. ("GDS"), which operated a call center and data processing facility at 355 Industrial Circle and took over many of the operations from Mail Industries, including financial operations and receipt of the mailer data from Simpson. (J. Hoyal Tr. 2037:22-2038:16, 2041:9-14; Simpson Tr. 3025:16-23; Exh. 3298 at 5, ¶ 17.) Bacon and Kaylor also worked for the GDS call center. (J. Hoyal Tr. 2043:23-2044:9, 2045:18-2046:7; Bacon Tr. 3597:19-3598:2; Simpson Tr. 3023:7-25, 3039:22-3040:9; Kaylor Tr. 1620:19-20, 1622:8-13; Exh. 3298 at 10, ¶ 39.)

5.8.     National Magazine Services, Inc., which sent mailers to consumers between 2006 and 2009. (Lennon Tr. 2723:17-22, 2820:8-9, 2820:19-25.)

5.9.     Associated Business Development, Inc. ("ABDI"), a company Lydia Pugsley ("Pugsley") helped operate. (Pugsley Tr. 117:17-119:21). In early 2010, ABDI closed and Orbital Publishing Group, Inc. ("Orbital") began operating. (Pugsley Tr. 125:14-16.)

5.10.    American Publication Services, Inc. ("APS"), a company that submitted orders to publishers. (J. Hoyal Tr. 2051:3-7, 2160:4-8, 2478:4-19, 2485:16-2486:5; Lennon Tr. 2726:17-20; Pugsley Tr. 191:5-19, 249:19-250:5.)

6.   Simpson designed the mailers used between 1998 and 2010. (Simpson Tr. 2508:22-2509:15, 2510:8-2511:9, 3234:9-3251:1, 3300:3-19, 3302:6-15; Exh. 521; Exh. 2164 (compilation of mailers).) Between 1998 and 2010, the mailers used by the operation were all substantively similar. (J. Hoyal Tr. 2040:7-18; Kaylor Tr. 1619:2-7; Pugsley Tr. 407:25-408:6.)

7.   J. Hoyal oversaw operations management for Simpson's mailers between 1998 and 2010. (J. Hoyal Tr. 2035:1-7, 2055:20-23, 2037:22-2038:7, 2040:7-10, 2239:1-2240:17; Exh. 3298 at 5, 6-7, ¶¶ 16-17, 25.)

8.   Between 1998 and 2009, the operation received or had notice of cease and desist letters from publishers, some of which were provided to J. Hoyal and Simpson. (J. Hoyal Tr. 2037:4-15.) These letters demanded that the operation cease sending fraudulent renewal notices to consumers. (Exh. 553 at 5-6, ¶ 4.6 ("fraudulent 'renewal notice'"); Exh. 553 at 7, ¶ 4.11 (notice of cease and desist letters from McGraw-Hill); Exh. 556 at 8-9, ¶¶ 38, 40 (notice that Crain Communications demanded the operation cease and desist sending mailers alleged to misrepresent that they are from or authorized by the publisher).)

9.   Between 1996 and 2009, the operation was the subject of law enforcement actions alleging that the mailers were deceptive, including:

9.1.     On July 16, 1996, the U.S. Postal Service issued a cease and desist order that prohibited Simpson and Publishers Marketplace from "falsely representing, directly or indirectly, in substance and effect, whether by affirmative statements, implications, or omissions, that: [t]he addressee of Respondents['] unsolicited invoice direct mailing has incurred a debt/obligation that is currently owed and due to the respondent." (Simpson Tr. 3227:24-3228:9; Exh. 2003.)

9.2. On June 24, 2004, a Consent General Judgment ("2004 Oregon Consent Judgment") was entered in *State of Oregon v. IC Marketing, Inc., dba Publishers Services Exchange*, Case No. 01C 17647. (Exh. 555; Exh. 2007.) The judgment required the defendants to clearly and conspicuously disclose on the front of the mailer, in at least 7-point font and contrasting red color, the phrase "INDEPENDENT AGENT NOT A BILL KEEP THIS PORTION FOR RECEIPT OF OFFER." (Exh. 555 at 6).

10. Between 1999 and 2010, the operation was the subject of litigation with publishers, in which the mailers were alleged to be deceptive because they appeared to be from or authorized by the publishers, including:

10.1. In 1999, McGraw-Hill brought suit alleging that the operation sent mailers that were fraudulent and misleading because they appeared to be from the publisher. (J. Hoyal Tr. 2201:22-2202:17, 2421:16-20; Exhs. 552-553.) The mailer at issue in the 1999 McGraw-Hill litigation is similar to the mailers used between 2010 and 2015. (J. Hoyal Tr. 2206:22-2207:17; Exh. 553 at 20.) Despite a permanent injunction, Simpson and IC Marketing continued to send mailers for McGraw-Hill publications. (J. Hoyal Tr. 2208:21-2210:12; Exh. 552 at 5.)

10.2. In 2001, Amos Press alleged, both in fraud alerts and in subsequent litigation, that the operation sent mailers that were deceptive and not authorized by the publisher. (J. Hoyal Tr. 2210:13-2211:10.)

10.3. In 2003, Taunton Press alleged, both in fraud alerts and in subsequent litigation, that the operation sent mailers that were deceptive and not authorized by the publisher. (J. Hoyal Tr. 2212:18-2214:6.)

10.4. In 2003, Outdoor Empire alleged, both in fraud alerts and in subsequent litigation, that the operation sent mailers that were deceptive and not authorized by the publisher. (J. Hoyal Tr. 2212:18-2214:6.)

10.5. In 2006, Crain Communications brought suit alleging that the operation sent mailers that misrepresented that they were sent by or authorized by Crain Communications. (J. Hoyal Tr. 2216:3-2218:11; Exh. 556.)

### ii) Starting in 2010, the Defendants used the Corporate Defendants to perpetuate their deceptive scheme.

11. In 2010, Simpson and J. Hoyal restructured and consolidated their deceptive mailing operation into a network of companies that sent subscription mailers, fulfilled orders, and provided customer service. (J. Hoyal Tr. 2052:17-20, 2244:23-2245:18, 3542:4-12; Exh. 3298 at 5-6, ¶¶ 16-18, 21-22.) Simpson maintained control over the mailing operations and J. Hoyal maintained control over the operational support functions for the mailings. (Exh. 3298 at 5-7, ¶¶ 18, 25-26.) This iteration of the mailing operation included L. Hoyal, Noel Parducci ("Parducci"), Pugsley, Laura Lovrien ("Lovrien"), William Strickler ("Strickler"), Linda Babb ("Babb"), Bacon, Kaylor, and dozens of entities:

11.1 **Sending Deceptive Mailers.** Simpson, J. Hoyal, Lovrien, and Pugsley, acting through Orbital, Liberty Publishers Service, Inc. ("Liberty"), Express Publishers Service, Inc. ("Express"), United Publishers Exchange, Inc. ("United"), and Associated Publishers Network, Inc. ("Associated"), sent deceptive mailers to consumers at various times between 2010 and 2015. (Pugsley Tr. 147:7-11, 148:2-3, 162:14-163:4, 163:24-164:16, 209:24-210:18, 211:17-24, 216:4-13, 239:1-240:25, 255:12-24, 370:10-12; J. Hoyal Tr. 2105:11-14; Lovrien Tr. 833:3-13, 855:1-856:2, 862:14-23, 870:15-872:13; Dkt. 34 (Answer of Bacon and Kaylor) at 13, ¶ 45; Dkt. 76 (Answer of Reality Kats LLC and Simpson) at 10, ¶ 45; Dkt. 91 (Amended Answer of J. Hoyal and Hoyal & Associates, Inc.) at 12, ¶ 45; Dkt. 131 (Amended Answer of Pugsley, Parducci, Lovrien, Babb, and Strickler) at 2 n.1, 13, 15, ¶¶ 45, 58.)

       11.1.1 Between 2010 and 2015, the mailing operation used the same sort of mailer used prior to 2010. (Simpson Tr. 2508:1-4, 2510:16-2511:19; 3030:6-17, 3301:3-9; *see also* Exh. 553 at 20 (1998 mail piece); Exh. 521 (February 2003 mail piece).)

       11.1.2 Between 2010 and 2015, the form of the mailer did not change substantially. (J. Hoyal Tr. 3543:8-12; Simpson Tr. 3091:10-3092:17.)

11.2 **Receiving Consumers' Mail Orders and Payments.** Lovrien, Pugsley, Babb, and Strickler, acting through Orbital, Liberty, Express, United, Associated, Atlas Business Consulting LLC ("Atlas"), North West Data Services LLC ("North West Data"), Adept Management, Inc. ("Adept"), and Crown Resource Management Services, LLC ("Crown"), received orders and payments sent by consumers through the mail in response to the deceptive mailers. (Lovrien Tr. 837:19-838:7, 838:22-839:22, 843:19-844:1, 845:14-847:9; Dkt. 131 (Amended Answer of Lovrien, Pugsley, Babb, Strickler, and Parducci) at 2 n.1, 15, ¶ 58.)

11.3 **Receiving Consumers' Telephone/Internet Orders and Payments.** Bacon and Kaylor, acting through Publishers Payment Processing, Inc. (a New York corporation) ("PPP NY") and PPP Magazines, Inc. ("PPP Magazines") operated a call center that processed telephone and internet orders and payments made by consumers in response to the deceptive mailers. (Pugsley Tr. 434:18-19; Kaylor Tr. 1623:7-9, 1624:5-12, 1626:8-10; Bacon Tr. 1227:2-3, 1236:16-24, 1238:21-1239:3; Simpson Tr. 2519:13-14; J. Hoyal Tr. 2158:7-9; Lovrien Tr. 847:21-848:3; Exhs. 500-501 (website captures); Dkt. 34 (Answer of Bacon and Kaylor) at 2 n.1, 15, ¶ 58; Dkt. 131 (Amended Answer of Babb, Lovrien, Parducci, Pugsley, and Strickler) at 2 n.1, 15, ¶ 58.)

11.4 **Submitting (or "Clearing") Orders to Publishers.** Bacon, Kaylor, and Strickler, acting through Consolidated Publishers Exchange, Inc. ("CPE"), Customer Access Services, Inc. ("CAS"), Magazine Clearing Exchange, Inc. ("MCE"), Subscription House Agency, Inc. ("SHA"), and Wineoceros Wine Club, Inc. ("Wineoceros"), submitted subscription orders to publishers. (Dkt. 34 (Answer of Bacon and Kaylor) at 2 n.1, 15, ¶ 58; Dkt. 131 (Amended Answer of Pugsley, Parducci, Lovrien, Babb, and Strickler) at 2 n.1, 15, ¶ 58.) Pugsley and Babb, acting through Anchor

Publishing Group, Inc. ("Anchor"), sent orders to, and paid, the submitting entities. (Pugsley Tr. 282:24-283:14, 299:9-10; Babb. Tr. 729:5-9, 729:21-23; Bacon Tr. 1299:7-9, 1300:6-7, 1313:19-20.)

11.5 **Bacon and Kaylor Switched Subscriptions**. When publishers rejected an order, Bacon or Kaylor, acting through CPE, SHA, and Magazine Link, Inc. ("Magazine Link"), would send the consumer a "switch notice," informing the consumer that she would be automatically switched to a replacement publication unless she requested a refund by a specified date. (*See* FOF ¶¶ 518, 519, 551, 551.1, 551.3, 551.4, 552.1.)

11.6 **Bacon Provided Administrative Support**. Bacon, through Clarity Group, Inc. ("Clarity Group") and Specialties, Inc. ("Specialties"), provided administrative support to the entities that submitted orders to publishers and received payment for submitting orders to publishers. (Bacon Tr. 1304:1-8, 1323:6-25, 1327:10-25, 1328:1-15, 1330:12-23, 1335:5-14; Exh. 430; Exh. 1043 at 37-60; Exh. 1072; *see also* Dkt. 34 (Answer of Bacon and Kaylor) at 2 n.1, 15, ¶ 58.)

11.7 **Parducci and L. Hoyal Managed Finances**. Parducci, acting through Maximillian, Inc. ("Maximillian"), tracked the financial operations of the mailing operation, coordinated the flow of funds among the various companies that made up the mailing operation, and disbursed the profits of the mailing operation equally to, through Reality Kats, LLC ("Reality Kats") and Hoyal & Associates, Inc. ("H&A"), Simpson and J. Hoyal,. (J. Hoyal Tr. 2079:23-2083:1, 2084:10-2086:16, 2090:1-23, 2100:17-2101:9; Parducci Tr. 547:3-24, 548:15-25, 556:15-557:23, 558:22-559:24, 565:11-25, 567:10-570:13, 666:17-667:24, 678:6-13; Exh. 109; Exh. 1072; Exh. 3298 at 6, ¶¶ 18-19.) L. Hoyal, acting through H&A, directed the flow of funds from the mailing operation to H&A and transferred those funds to related Hoyal entities and to Reality Kats. (L. Hoyal Tr. 1108:8-19, 1115:12-1116:12, 1118:6-1119:4, 1120:11-22; Exh. 339; Exhs. 341-346; Exh. 1042 at 5-75, 77-89.) L. Hoyal also trained Parducci to track and report finances of the predecessor mailing operation and to distribute funds from that operation. (L. Hoyal Tr. 1130:22-1131:7; Parducci Tr. 599:19-23; Exh. 379.)

11.8 **J. Hoyal Oversaw Operations**. J. Hoyal, through H&A, oversaw operations and management of the deceptive scheme, including the creation of new entities, hiring and setting compensation for personnel, directing invoicing and payments among Corporate Defendants, providing logistical support, and handling "all of the operational aspects of the functioning and coordination of the different entities." (Simpson Tr. 2520:4-22; J. Hoyal Tr. 2055:20-2058:13, 2058:25-2059:5, 2107:14-16, 2137:15-2139:7, 2144:12-16, 3542:4-23; Exh. 3298 at 7, ¶ 26.)

11.9 **Simpson Oversaw Marketing**. Simpson, through Reality Kats, designed and determined the form of the mailers used by the deceptive mailing operation between 2010 and 2015, which were substantially similar to the mailers they used between 1998 and 2009. (Simpson Tr. 2508:1-4, 2510:16-2511:19; 3030:6-17, 3189:11-3191:5, 3301:3-9; J. Hoyal Tr. 2206:22-2207:17, 2032:18-2034:16, 3542:25-3543:12; Pugsley Tr. 361:5-6, 407:25-408:6, 418:18-420:9; Lovrien Tr. 898:21-899:1; Exh. 3298 at 6-7, ¶ 25; *see also* Exh. 553 at 20 (1998 mail piece); Exh. 521

(February 2003 mail piece).) Simpson also determined which consumers received mailers, the dba name that appeared on the mailer, which publication was offered, for what term, and at what price. (Simpson Tr. 2573:16-2575:3, 3325:25-3326:6, 3384:14-3385:12; Pugsley Tr. 167:7-171:7; Exhs. 561-562 (examples of data files); Exh. 1056.)

12. Defendants operated through a maze of these 25 interrelated Corporate Defendants that shared common control, owners and officers, locations, employees, advertising, and services. They were economically interdependent and distributed profits as an integrated entity. (*See* FOF ¶¶ 559-621.)

13. Between 2011 and 2015, the mailing operation sent "millions and millions" of deceptive mailers to consumers, generally sending between 25 and 50 million mailers every year, totaling more than 135 million mailers between 2011 and 2015. More than 7 million of the mailers were for newspapers. (Pugsley Tr. 470:4-5; J. Hoyal Tr. 2379:3-12; Simpson Tr. 2585:14-2586:4.) The mailers were sent to consumers around the country. (Simpson Tr. 2586:25-2586:4.)

14. On March 31, 2015, the state of Oregon brought an enforcement action, *Oregon v. Henry Cricket Group, LLC et al.*, Marion County Circuit Court No. 15CV07765, in which Oregon alleged that the individual and corporate defendants sent misleading subscription mailers to consumers. (Exh. 2013.) This case was resolved with an Assurance of Voluntary Compliance ("AVC"), entered on June 23, 2015. (Exh. 2020.) The AVC was signed by:

14.1 Simpson, personally and on behalf of Reality Kats. (Exh. 2020 at 13-14.)

14.2 J. Hoyal, personally and on behalf of H&A. (Exh. 2020 at 15-16.)

14.3 Parducci, personally and on behalf of Henry Cricket Group, LLC ("HCG LLC"), Maximillian, Orbital, Liberty, Express, Associated, and United. (Exh. 2020 at 8.)

14.4 Pugsley, personally and on behalf of Adept. (Exh. 2020 at 9.)

14.5 Lovrien, personally. (Exh. 2020 at 17.)

14.6 Kaylor, personally and on behalf of CAS, MCE, Magazine Link, and CPC Solutions, Inc. ("CPC Solutions"). (Exh. 2020 at 9.)

14.7 Bacon, personally and on behalf of SHA, PPP NY, Clarity Group, and CPE. (Exh. 2020 at 9.)

14.8 Babb, personally and on behalf of Anchor. (Exh. 2020 at 10.)

14.9 Strickler, personally and on behalf of Wineoceros. (Exh. 2020 at 11-12.)

15. Several other states also brought enforcement actions against Defendants in March 2015. (Lennon Tr. 2748:1-7.)

16. In July 2015, J. Hoyal and Simpson approved the sale of the assets of HCG LLC and the other Corporate Defendants it owned to Bright Advertising LLC, a company owned by J. Hoyal's nephew, Ryan Azares. (J. Hoyal Tr. 2116:24-2118:24, 2119:4-8, 2126:2-5, 3562:19-3563:2; Exh. 74.) These assets included business names used by the Corporate Defendants, outstanding consumer orders, undeposited consumer checks, computers, and the underlying records "to effectively run and maintain a subscription agency business." (J. Hoyal Tr. 2121:10-2124:14; Exh. 74 at 14.)

17. In 2015, after signing the AVC with the state of Oregon, J. Hoyal and Simpson discussed restarting the deceptive mailing operation. (J. Hoyal Tr. 2455:1-2456:11.) J. Hoyal approached Pugsley to propose this action. (Pugsley Tr. 329:24-331:1, 504:8-10.) Pugsley discussed J. Hoyal's proposal with Lovrien and Babb. (Pugsley Tr. 329:24-331:1, 510:19-513:10.) In or around October 2015, J. Hoyal, Simpson, Pugsley, and Parducci received copies of proposed subscription mailers for the revamped deceptive mailing operation. (Pugsley Tr. 504:11-13, 509:16-511:3.)

18. Since 2015, Simpson has been providing data from the Reality Kats' database to a mailing operation conducted by one of Simpson's and Hoyals' former business partners. (*See* FOF ¶ 180.)

### D. THE CORPORATE DEFENDANTS

#### i) Reality Kats oversaw the deceptive mailing operation.

19. Reality Kats, LLC ("Reality Kats") was formed on July 8, 2005, as an Oregon entity and used the Hoyals' residential address of 3976 Bellinger Lane, Medford, Oregon 97501, as its registered and mailing address. (Simpson Tr. 2512:23-2514:6; L. Hoyal Tr. 1224:9-18, 1085:2-24; Exh. 537 at 1-4; Exh. 1038 at 23-30.)

20. Simpson is the manager and sole employee of Reality Kats. (Simpson Tr. 2514:11-18, 2515:3-5, 2558:2-3; Exh. 537 at 4.) Reality Kats is owned by Scenic Trust. (Simpson Tr. 2514:11-18, 2515:3-5.) J. Hoyal was trustee of Scenic Trust between January 2006 and November 2015. (J. Hoyal Tr. 2066:6-15; Simpson Tr. 2514:25-2515:2.)

21. Simpson, though Reality Kats, "managed subscription product marketing, modeling, database management, analysis" for the deceptive mailing operation. (Simpson Tr. 2560:12-2563:1; Exh. 1282 at 1-2.)

22. Simpson, though Reality Kats, managed and analyzed the database of consumer information, which included consumer names and addresses and information about the subscriptions they ordered, for the mailers sent by the deceptive mailing operation between 2010 and 2015. (Simpson Tr. 2557:22-2558:16; 2563:2-17.)

23. Simpson, though Reality Kats, and J. Hoyal, through H&A, made the major decisions about the deceptive mailing operation. (J. Hoyal Tr. 2235:5-2236:12, 2409:17-2410:15; *see also* Simpson Tr. 3041:12-25.)

24. Reality Kats and H&A received funds transfers from Maximillian in substantially equal amounts, reflecting the equal profit share from the deceptive mailing operation. (J. Hoyal Tr.

2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; Parducci Tr. 565:11-15; L. Hoyal Tr. 1202:23-1204:13; Exh. 3298 at 7, ¶ 28.)

25. Between January 2011 and March 2015, Reality Kats received approximately $15 million from the deceptive mailing operation, through Maximillian. (Simpson Tr. 2542:11-2543:2; Exh. 559 ($14.99 million); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; Parducci Tr. 565:11-15; L. Hoyal Tr. 1202:23-1204:13.)

26. Beginning in at least 2010, Reality Kats owned the building at 355 Industrial Circle, White City, Oregon (the "White City Building"). (Simpson Tr. 2517:11-2518:7; J. Hoyal Tr. 3527:9-14.)

27. The call center, corporate counsel, the mailing entities, Wineoceros, and entities operated by Bacon and Kaylor, including CPE, CAS, MCE, Magazine Link, Clarity Group, and SHA, operated from the White City Building. (Simpson Tr. 2518:20-2519:22 (corporate counsel, call center, Bacon and Kaylor entities, mailing companies); Lovrien Tr. 883:8-25 (mailing entities, call center); Lennon Tr. 2816:13-2817:2 (corporate counsel); J. Hoyal Tr. 1977:7-23, 3544:22-3545:6 (Wineoceros); Bacon Tr. 1288:16-17, 1308:21-1309:11 (CPE, SHA, Clarity Group, PPP NY); Kaylor Tr. 1678:3-5, 1700:14-15, 1716:15-17, 1719:19-20 (CPE, CAS, MCE, Magazine Link, Clarity Group).)

### ii) H&A oversaw the deceptive mailing operation.

28. J. Hoyal formed H&A in the early 1990's as a sole proprietorship (J. Hoyal Tr. 2019:18-20, 2019:25-2020:20), and incorporated it as Hoyal & Associates, Inc. ("H&A") on October 27, 2008. (Exh. 293.)

29. H&A operated from the Hoyals' residential addresses, including 3976 Bellinger Lane, Medford, Oregon 97501 and 4184 Bellinger Lane, Medford, Oregon 97501. (L. Hoyal Tr. 1085:2-24, 1086:13-21; J. Hoyal Tr. 2020:18-25, 2021:19-21; Exh. 293; Dkt. 91 (Amended Answer of J. Hoyal and H&A) at 6-7, ¶ 19.)

30. J. Hoyal is 50% owner, President, and Registered Agent of H&A. (L. Hoyal Tr. 1086:6-12, 1089:22-1090:6; J. Hoyal Tr. 2019:3-8; Exh. 293; Dkt. 90 (Amended Answer of L. Hoyal) at 7, ¶ 35; Dkt. 91 (Amended Answer of J. Hoyal and H&A) at 9, ¶ 35.)

31. L. Hoyal is 50% owner, Secretary, and Treasurer of H&A. (L. Hoyal Tr. 1086:2-12, 1089:22-1090:6, 1141:8-13; J. Hoyal Tr. 2019:9-13; Exh. 293; Dkt. 90 (Amended Answer of L. Hoyal) at 8, ¶ 36; Dkt. 91 (Amended Answer of J. Hoyal and H&A) at 10, ¶ 36.)

32. J. Hoyal, through H&A, provided oversight, direction, and management of the deceptive mailing operation.

32.1. J. Hoyal and Simpson, through H&A and Reality Kats, conceived of and ran the deceptive mailing operation. (J. Hoyal Tr. 2064:19-25, 2065:1-8, 2144:12-16, 2168:24-25; Exh. 3298 at 5, ¶ 18.)

32.2. J. Hoyal, through H&A, provided "business management consulting" to the deceptive mailing operation, which included "anything that has to do with managing companies and managing people's activities." (J. Hoyal Tr. 2022:9-15, 2055:24-2056:1.)

32.3. J. Hoyal, through H&A, provided day-to-day direction to each of the Defendants in this matter. (J. Hoyal Tr. 2055:24-2056:1; Pugsley Tr. 423:9-19; Parducci Tr. 660:15-18; Kaylor Tr. 1860:7-9; Lovrien Tr. 1051:9-14.)

32.4. J. Hoyal and Simpson, through H&A and Reality Kats, were responsible for the deceptive mailers the operation sent to consumers. (J. Hoyal Tr. 3522:23-24.)

32.5. H&A and Reality Kats co-owned the consumer database used to populate the mailers until 2015, when H&A relinquished its interest in the database. (J. Hoyal Tr. 2475:24-2477:13.)

32.6. J. Hoyal and Simpson, through H&A and Reality Kats, directed the formation of all of the companies that made up the deceptive mailing operation, including HCG LLC, the mailing entities, the submitting entities, and the call center. (J. Hoyal Tr. 2056:4-5, 2137:20-2139:7.)

### iii) Maximillian coordinated the flow of funds among the Corporate Defendants.

33. Maximillian Inc. ("Maximillian") was an Oregon corporation, formed on November 21, 2006, with its principal place of business at Parducci's residence. (Parducci Tr. 531:1-15; Exh. 218; Dkt. 131 (Amended Answer of Parducci) at 7, ¶ 23.)

34. Parducci was the President and Secretary of Maximillian. (Exh. 218; Dkt. 131 (Amended Answer of Parducci) at 12, ¶ 39.)

35. Parducci, through Maximillian, coordinated the transfer of consumer funds among the various Corporate Defendants, ultimately disbursing the vast majority of the profits equally to Reality Kats and H&A. (J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; Parducci Tr. 547:20-24, 548:15-25, 556:15-557:24, 558:14-21, 559:7-24, 565:11-15, 565:21-25, 567:18-570:13, 666:17-667:24, 678:6-13; Exh. 1072; Exh. 109; Exh. 327; Exh. 3298 at 6, ¶¶ 18-19.)

36. Parducci, through Maximillian, paid expenses related to the deceptive mailing operation, including lead lists (Parducci Tr. 550:9-18, 566:1-7, 645:3-15, 659:14-19; Exh. 3491), data maintenance services related to the consumer lead lists used to identify potential consumers to receive the deceptive mailers (Simpson Tr. 2639:1-7; Parducci Tr. 659:14-660:11; Exh. 236; Exh. 3407), computers, data management software, and supplies (Parducci Tr. 676:11-678:2; Exh. 238 at 1-12), as well as unrelated personal travel expenses of the Individual Defendants (Parducci 561:3-15).

### iv) Liberty sent deceptive mailers and received orders and payments.

37. Liberty Publishers Service, Inc. ("Liberty") was a New York corporation, formed on June 17, 2011. (Exh. 125 at 1-4; Dkt. 131 (Amended Answer of Lovrien) at 6-7, ¶ 20.) Liberty is

authorized to transact business in Oregon by the Oregon Secretary of State, with a registered address at 1750 Delta Waters Road 102-204, Medford, Oregon 97501. (Exh. 125 at 5.)

38. Lovrien was President, Secretary, and Registered Agent of Liberty. (Lovrien Tr. 854:4-17; Exh. 125 at 5; Dkt. 131 (Amended Answer of Lovrien) at 11, ¶ 38.)

39. Liberty sent subscription mailers to consumers, beginning in 2011. (Pugsley Tr. 164:2-5.)

40. Liberty mailers included a return address of P.O. Box 2489, White City, Oregon; subscription orders sent to this address were transported to property owned by Pugsley at 625 Brownsboro-Meridian Road, Eagle Point, Oregon ("Pugsley's Eagle Point Property"), where it operated (Dkt. 131 (Amended Answer of Lovrien) at 7, ¶ 20), for processing. (Pugsley Tr. 204:6-15; Babb Tr. 734:12-18, 735:1-8; Exh. 104.) Liberty mailers contained a website address for credit card orders of publisherspayment.com. (Pugsley Tr. 205:18-21, 208:23-209:1; Exh. 104; Exh. 500.)

41. Liberty used multiple business names or dbas, including Allied Publishing Services, American Consumer Publishers Association, Associated Publishers Services, Billing Services of America, Bradford Publishing Service, Circulation Billing Services, Global Publishers Center, Lake Shore Publishers Service, Magazine Billing Services, Magazine Distribution Service, Magazine Payment Services, Magazine Subscriber Services, Magazine Subscriptions Center, National Magazine Services, Periodical Billing Services, Platinum Subscription Service, Publication Service Networks, Publishers Access Services, Publishers Billing Exchange, Publishers Consolidated Subscription Services, Publishers Distribution Center, Publishers Education Services, Publishers Magazine Billing, Publishers Magazine Payment, Publishers Marketplace Services, Publishers Network Exchange, Publishers Payment Services, Publishers Periodical Service, Publishers Processing Service, Publishers Services Exchange, Readers Billing Services, Readers Payment Service, Seascape Publishers Network, Slo Call Center, Subscription Billing Service, Subscription Payment Exchange, Subscription Payment Services, United Publishers Services. (Exh. 125 at 8-10.)

42. Liberty replaced a prior mailing entity, Orbital. (J. Hoyal Tr. 2105:15-2106:10.) Orbital sent subscription mailers beginning in early 2010. (Pugsley Tr. 163:24-164:1; J. Hoyal Tr. 2105:11-14; Lovrien Tr. 833:3-13.)

43. In or about June 2011, Liberty took over all of Orbital's business. (Lovrien Tr. 855:25-856:2; Pugsley Tr. 147:7-11, 239:1-240:5.) At that time, everyone who worked for Orbital seamlessly transitioned to work for Liberty, at the same desks, doing the same work. (Lovrien Tr. 855:1-21.)

44. Many of the dbas used by Liberty were previously used by Orbital. (Pugsley Tr. 467:2-14; Exh. 15 (Orbital dbas).)

### v) Express sent deceptive mailers and received consumer orders and payments.

45. Express Publishers Service, Inc. ("Express") was an Oregon corporation, formed on August 1, 2014, with registered and/or mailing addresses of 3922 Bellinger Lane, Medford, Oregon

97501, 2728 West Main St. #102, Medford, Oregon and 2989 Thompson Creek Rd., Jacksonville, Oregon 97530. (Exhs. 1017-1018; Exh. 58 at 4-5.)

46. Strickler was President and Secretary of Express. (Strickler Tr. 1954:12-17, 1958:3-1959:9; Exh. 58 at 1-3; Exh. 61 at 5; Dkt. 131 (Amended Answer of Strickler) at 12, ¶ 42.)

47. Express used various business names, including: Associated Billing Service, United Billing Service, Associated Periodical Network, Associated Publishers Readership, Billing Services of Circulation, Circulation Billing Marketplace, Circulation Network Services, Global Billing Service, Lakeshore Publishers Billing, National Magazine Network, Magazine Billing Network, Magazine Distribution Marketplace, Magazine Payment Processing, National Magazine Marketplace, Publishers Distribution Network, Publishers Magazine Service, Publication Network Services, Publishers Billing Marketplace, Readers Magazine Services, Readers Payment Network, Subscription Billing Agency, Subscription Billing Network, United Publishers Agency. (Exh. 1018.)

48. Express began sending mailers in 2014, when it absorbed the operations of Liberty and Orbital. (Lovrien Tr. 871:22-872:5; Pugsley Tr. 148:2-3, 164:6-7, 240:6-20.) The transition from Liberty into Express was seamless. (Lovrien Tr. 872:10-13.) Express mailers contained the same website address and mailing address used by Liberty: P.O. Box 2489, White City, Oregon. (Pugsley Tr. 205:9-17.)

### vi) United sent deceptive mailers and received consumer orders and payments.

49. United Publishers Exchange, Inc. ("United") was a Nevada corporation, formed in December 2011, with a registered address of 3922 Bellinger Lane, Medford, Oregon 97501 and a mailing address of 850 S. Boulder Hwy #355, Henderson, Nevada 89015-7564. (Exh. 153; Exh. 154.)

50. Subscription orders sent to the Nevada address were shipped to Pugsley's Eagle Point Property for processing. (Pugsley Tr. 209:24-210:18, 211:17-24, 212:14-213:6, 216:4-13; Exh. 105; Exh. 108.) United mailers contained a website address for credit card orders of unitedpubex.com; this website redirected consumers to the publisherspayment.com website printed on the Liberty and Express mailers. (Pugsley Tr. 213:7-12, 214:13-215:7; Exh. 105; Exhs. 500-501.)

51. United used various business names, including: Associated Publishers Network, Premier Subscription Network, Publishers Magazine Exchange, Publishers Billing Network, Magazine Billing Associates, and Circulation Billing Network. (Exh. 1029 at 23-28; Exh. 154 at 7, 12, 17-22.) United mailers generally contained the dba name of "Associated Publishers Network (APN)." (Pugsley Tr. 370:10-14.)

52. United sent subscription mailers to consumers, beginning in 2012. (Pugsley Tr. 164:8-9; Exh. 216 at 3-5 ("UPE" mailers on tracking form).)

53. United operated from Pugsley's Eagle Point Property. (Dkt. 131 (Amended Answer of Pugsley and Lovrien) at 9, ¶ 31.)

54. The same people who worked for Orbital and Liberty also worked for United, performing the same duties, in the same office space. (Lovrien Tr. 862:21-23, 863:2-4, 865:24-866:5.)

55. In 2013 or 2014, Associated assumed the operations of United. (Lovrien Tr. 870:15-19; Pugsley Tr. 164:12-16, 238:2-5.) It was a seamless transition, with the same employees doing the same work in the same office. (Lovrien Tr. 870:22-871:21.)

### vii) Associated sent deceptive mailers and received consumer orders and payments.

56. Associated Publishers Network, Inc. ("Associated") was an Oregon corporation, incorporated on October 10, 2013, with registered addresses of 2080 Antelope Road #339, White City, Oregon 97503 and the White City Building. (Exh. 1015.)

57. Associated sent mailers to consumers, beginning in 2014. (Pugsley Tr. 164:10-11, 209:24-210:18, 211:17-24, 216:4-13; Exh. 108.)

58. Associated took over United's mailing operations, and the mailers were identical. (Lovrien Tr. 870:15-19; Pugsley Tr. 164:12-20, 210:15-18, 370:7-15.) It was a seamless transition, with the same employees doing the same work in the same office. (Lovrien Tr. 870:22-871:3.)

59. Express eventually took over Associated's operations. (Pugsley Tr. 256:3-257:16; Exh. 163.)

### viii) HCG LLC owned several Corporate Defendants and coordinated the transfer of funds among them.

60. Henry Cricket Group LLC ("HCG LLC") was a New York limited liability company, formed on November 24, 2009, with its principal place of business at Parducci's residence. (Parducci Tr. 582:5-20, 531:1-8; Exh. 219 at 2, 4; Dkt. 131 (Amended Answer of Parducci) at 6, ¶ 18.)

61. HCG LLC owned Anchor, Orbital, Liberty, Express, United, and Associated. (J. Hoyal Tr. 2104:13-2105:6, 2137:20-2139:7; Pugsley Tr. 430:9-13; Parducci Tr. 534:15-535:1, 669:21-670:4; Exh. 3298 at 7, ¶27.)

62. HCG LLC was owned by Revista Group Business Trust ("Revista Trust"). (J. Hoyal Tr. 2137:15-19; Parducci Tr. 586:5-9; Exh. 219.)

63. Parducci was the Manager and President of HCG LLC. (Exh. 219 at 17; Dkt. 131 (Amended Answer of Parducci) at 12, ¶ 39.)

64. Parducci, through HCG LLC, entered into contracts to obtain services related to maintaining consumer lead lists (Exh. 236; Exh. 3532; Exh. 3609), as well as data management software (Parducci Tr. 590:24-593:20; Exh. 238).

65. Parducci, through HCG LLC, coordinated the transfer of consumer funds among the Corporate Defendants. (Parducci Tr. 556:15-557:23, 595:5-596:24; Pugsley Tr. 148:19-150:5, 202:21-203:24; Exh. 124; Exh. 232; Pugsley Tr. 131:17-132:9; Exh. 1074 at 2, 4-5; Exh. 1074 at 2, 4-5; J. Hoyal Tr. 2135:5-25; Exh. 1071.)

### ix) HCG Inc. was the parent company of Express.

66. HCG Inc. was an Oregon entity, incorporated on August 1, 2014. (Exh. 230.)

67. HCG Inc. was the parent company of Express. (Exh. 58 at 3.)

### x) Adept managed mailing, receiving and processing operations for the Corporate Defendants.

68. Adept Management, Inc. ("Adept") was an Oregon corporation, formed on December 7, 2009, with a registered address of Pugsley's Eagle Point Property. (Exh. 187; Dkt. 131 (Amended Answer of Pugsley) at 3, ¶ 8.)

69. Pugsley was the President, Secretary, and Registered Agent of Adept. (Pugsley Tr. 127:25-128:16; Exh. 187; Dkt. 131 (Amended Answer of Pugsley) at 12, ¶ 40.)

70. Adept operated from Pugsley's Eagle Point Property between 2010 and 2014, then from the White City Building in 2015. (Pugsley Tr. 127:7-15, 302:12-17.)

71. Adept managed mailing, receiving, and processing operations for Orbital, Liberty, and Express, for which it received $30,000 a month from HCG LLC. (Pugsley Tr. 127:2-20, 132:17-25, 135:19-21, 182:15-20, 429:22-430:5; J. Hoyal Tr. 2062:2-23, 2064:15-18.) Adept received no funds from any source other than the deceptive mailing operation. (Pugsley Tr. 184:16-24.)

72. Adept and Crown performed the same function in the deceptive mailing operation. (Pugsley Tr. 132:10-15.)

### xi) Crown managed mailing, receiving, and processing operations for the Corporate Defendants.

73. Crown Resource Management, LLC ("Crown") was a Nevada limited liability company formed on January 6, 2009, with a registered address of 3064 Silver Sage Dr., Suite 150, Carson City, Nevada 89701 and an officer's address at Pugsley's Eagle Point Property. (Exh. 195; Dkt. 131 (Amended Answer of Pugsley) at 5, ¶ 14.)

74. Pugsley was manager of Crown. (Pugsley Tr. 129:20-22; Dkt. 131 (Amended Answer of Pugsley) at 12, ¶ 40.)

75. Crown was owned by Stevo Trust, an entity for which Pugsley and her husband are the settlors and J. Hoyal served as trustee from its inception until 2018. (Pugsley Tr. 130:17-131:15.)

76. Crown managed mailing, receiving, and processing operations for United and Associated, for which it received $10,000 a month from Maximillian. (Pugsley Tr. 132:3-9, 148:13-18, 183:5-7, 431:9-11; J. Hoyal Tr. 2065:9-13; Parducci Tr. 576:19-23.) Crown received no funds from any source other than the deceptive mailing operation. (Pugsley Tr. 184:16-24.)

### xii)  Atlas transferred consumer funds to Lovrien.

77.  Atlas Business Consulting LLC ("Atlas") was an Oregon limited liability company, formed on March 27, 2012, with its registered address at Lovrien's residence. (Exh. 110; Exh. 1031; Lovrien Tr. 906:17-18; Dkt. 131 (Amended Answer of Lovrien) at 4, ¶ 11.)

78.  Lovrien was the manager of Atlas. (Lovrien Tr. 867:14-16; Exh. 110; Dkt. 131 (Amended Answer of Lovrien) at 11, ¶ 38.)

79.  The sole purpose of Atlas was to be a conduit for payments to Lovrien from Maximillian for the work she did on behalf of United and Associated. (Lovrien Tr. 869:24-870:2, 904:19-24.)

### xiii)  North West Data performed customer service work for the operation.

80.  North West Data Services, LLC ("North West Data") was an Oregon limited liability corporation formed on January 25, 2013, with its principal place of business at 1750 Worthington Road, Eagle Point, Oregon 97524. (Exh. 1020.)

81.  North West Data performed customer service work for the deceptive mailing operation. (Lovrien Tr. 973:3-10.)

82.  Lovrien was the Registered Agent for North West Data. (Lovrien Tr. 972:21-973:2; Exh. 1020; Dkt. 131 (Amended Answer of Lovrien) at 11, ¶ 38.)

### xiv)  PPP NY performed call center operations, managed the website and responded to consumers.

83.  Publishers Payment Processing, Inc. ("PPP NY") was a New York corporation formed on December 2, 2009. (Exh. 488.)

84.  PPP NY operated a call center and website, received subscription orders in response to the mailers by telephone and internet, and performed customer service for the deceptive mailing operation. (Pugsley Tr. 434:18-19; Kaylor Tr. 1227:2-3, 1236:17-1237:2, 1623:7-9, 1624:5-12, 1626:8-10; Bacon Tr. 1227:2-3, 1236:16-24, 1238:21-1239:3.) Calls placed to the number printed on the mailers, 707-266-6673, were answered by a call center located in the White City Building, which was managed by Bacon and Kaylor. (Kaylor Tr. 1626:8-10; Bacon Tr. 1236:17-22; Exh. 11; Dkt. 34 (Answer of Bacon) at 10, ¶ 34; Dkt. 34 (Answer of Kaylor) at 11, ¶ 37.)

85.  PPP NY's call center handled consumer calls in response to switch notices sent by the deceptive mailing operation. (Pugsley Tr. 291:8-292:13; Exh. 518; Kaylor Tr. 1686:11-13.)

86.  PPP NY's call center handled consumer questions, inquiries, and complaints about the mailers, such as:

86.1.  The mailer looked like it came directly from the publisher. (Kaylor Tr. 1641:6-12; Exh. 1003 at 15 (#61), 17 (#67), 39 (#206), 58 (#332), 63 (#358).)

86.2.  The mailer looked like a bill. (Kaylor Tr. 1641:16-20, 1650:3-6, 1652:1-6.)

86.3. The consumer just renewed, so did not understand why he or she was receiving a renewal notice. (Kaylor Tr. 1641:24-1642:4.)

86.4. The consumer had not received the subscription he or she ordered. (Kaylor Tr. 1642:8-10, 1653:16-18; Exh. 1003 at 3 (#8), 56 (#310), 78 (#417), 78 (#418).)

86.5. The consumer had a hard time reaching the call center. (Kaylor Tr. 1642:11-13; Exh. 1003 at 6 (#23), 12 (#49), 19 (#83), 23 (#105), 25 (#111, #112), 37 (#197, #198), 38 (#199), 42 (#220), 45 (#236), 48 (#255), 50 (#272), 55 (#309), 66 (#366), 71 (#391), 73 (#399), 76 (#412), 81 (#433), 85 (#444), 87 (#450), 89 (#461), 115 (#609), 123 (#656), 130 (#693), 134 (#704).)

86.6. The mailers were fraudulent. (Kaylor Tr. 1642:14-15; Exh. 1003 at 2 (#4), 43 (#221), 47 (#250), 58 (#332), 128 (#686).)

86.7. Consumers felt that the Defendants had taken advantage of them, and that the consumer would report the Defendants to law enforcement. (Exh. 1003 at 5 (#15), 10 (#38).)

86.8. The consumer wanted a refund. (Kaylor Tr. 1655:20-24; Exh. 1003 at 2 (#4), 3 (#10), 4 (#11, #12), 9 (#37), 10 (#38), 11 (#42), 13 (#52), 15 (#61), 16 (#66), 17 (#67), 23 (#104), 23 (#106), 39 (#209), 40 (#213), 41 (#215), 44 (#224), 55 (#309), 58 (#332), 61 (#347), 62 (#354, #355), 67 (#374), 72 (#393), 73 (#396), 77 (#415), 78 (#418), 79 (#420), 81 (#432), 82 (#435), 83 (#428), 86 (#447), 87 (#452), 88 (#453), 91 (#471), 94 (#484), 126 (#674), 128 (#686), 134 (#708), 137 (#717), 138 (#719), 139 (#715).)

86.9. The consumer wanted to be removed from Defendants' mailing lists. (Exh. 1003 at 24 (#107), 32 (#171), 62 (#355), 67 (#373), 70 (#388), 88 (#454), 97 (#498, #499), 104 (#540), 112 (#589), 12 (#638).)

87. Customer service representatives were instructed to log consumer complaints in the "pubgroups" computer system, a consolidated subscription order database managed by Pugsley, on behalf of the mailing entities. (Kaylor Tr. 1636:9-22 (look up orders); Kaylor Tr. 1642:22-1643:6 (record complaints); Pugsley Tr. 155:22-156:10, 372:3-25.)

88. Kaylor and Bacon, through PPP NY, developed and revised scripts to address the inquiries and complaints received at the call center. (Kaylor Tr. 1643:24-1644:10, 1651:1-12; Exh. 398; Exh. 399.) These scripts were used with respect to all publications. (Kaylor Tr. 1649:6-10.)

89. Between 2011 and 2015, the PPP NY call center was located at the White City Building. (Simpson Tr. 2519:13-14.)

90. PPP NY's website allowed consumers to make credit card payments in response to the mailers. (Bacon Tr. 1275:17-19, 1278:18-1279:8; Exh. 501 at 2.) PPP NY's website, "publisherspayment.com," was printed on the subscription mailers. (Kaylor Tr. 1626:11-12.)

91. When a consumer made a credit card payment, whether by calling the call center or using the website, the consumer's credit card statement would reference "PPP" (Bacon Tr. 1278:19-1279:4, 1279:11-22) or "PPP Magazines" (Bacon Tr. 1275:20-1279:7).

92. Bacon and Kaylor, through PPP NY, received a daily report from the merchant account provider regarding the amount of credit card sales transactions that occurred over the telephone and via the website. (Bacon Tr. 1281:2-23; Exh. 411.)

93. Bacon and Kaylor, through PPP NY, sent daily reports of credit card transactions to the mailing entities that sent the mailers to consumers and to Maximillian. (Bacon Tr. 1281:2-15; Exh. 411.)

94. Although PPP NY's website included an email address (customerservice@publisherspayment.com) for customer service (Exh. 500 at 7), consumers could not contact the PPP NY call center using this address. (Kaylor Tr. 1627:12-17.) Emails sent to this address were not received by PPP NY employees (Bacon Tr. 1274:20-1275:4), but instead handled by Leanna Gillentine (Lovrien Tr. 888:3-8), who worked for North West Data (Lovrien Tr. 973:3-6) at Pugsley's Eagle Point Property (Pugsley Tr. 192:2014).

95. The call center handled refund requests by consolidating those requests into a refund log and forwarding those requests to Pugsley and Lovrien for review and approval. (Kaylor Tr. 1669:18-1670:4, 1672:5-19, 1675:15-1676:5.)

> **xv)   PPP OR was formed in August 2015, with a registered address at the White City Building.**

96. Publishers Payment Processing, Inc. ("PPP OR") was an Oregon corporation, formed on August 24, 2015, with a registered address at the White City Building. (Exh. 221.)

97. Parducci was listed as the Registered Agent of PPP OR. (Exh. 221.)

> **xvi)   PPP Magazines appeared on the internet website printed on Defendants' mailers.**

98. PPP Magazines, Inc. ("PPP Magazines") was an Oregon entity, incorporated on Aug. 20, 2013, with a registered address at Bacon's residence. (Exh. 1021; Bacon Tr. 1289:10-16.)

99. Bacon was the Registered Agent of PPP Magazines. (Exh. 1021.)

100. The name "PPP Magazines" appears, along with "Buyer's Choice" and "Publishers Payment Processing," on the website "publisherspayment.com." (Exh. 500.) "PPP Magazines" was also the business name that appeared on consumer credit card statements and may have held the merchant accounts for the call center. (Bacon Tr. 1275:20-1279:7.)

> **xvii)   CPE submitted orders and sent switch notices to consumers.**

101. Consolidated Publishers Exchange, Inc. ("CPE") was an Oregon corporation, incorporated on August 16, 2011, with a registered address at Bacon's residence. (Exh. 506; Bacon Tr. 1289:10-16.)

102. CPE was an "affiliated" or "in-house" clearing entity within the subscription operation. (J. Hoyal Tr. 2478:4-15; Kaylor Tr. 1677:15-21.)

103. CPE operated from the White City Building. (Kaylor Tr. 1678:3-5; Bacon Tr. 1288:16-17.)

104. Bacon, who also used the last name "Balero" (Bacon Tr. 1226:14-17), was manager, President, Secretary, and Registered Agent of CPE. (Bacon Tr. 1287:14-22; Exh. 506 at 2-4.)

105. CPE used two business names: Processing Express Solutions, added on August 24, 2011, and Premier Subscription Services, added on December 13, 2011. (Bacon Tr. 1294:9-14; Exh. 506 at 6-7.)

106. CPE made payments to Maximillian, at Parducci's direction. (Bacon Tr. 1333:3-10; Exh. 1072.)

### xviii) CAS submitted orders to publishers.

107. Customer Access Services, Inc. ("CAS") was an Oregon corporation, formed on August 12, 2012, with a registered address at Kaylor's residence. (Kaylor Tr. 1701:13-14; Exh. 419 at 1-2; *see also* Exh. 428; Exh. 1044 at 12.)

108. Kaylor was the President, Secretary, and Registered Agent of CAS. (Kaylor Tr. 1699:10-17, 1701:21-25, 1705:7-15; Exh. 419 at 1-3; Exh. 425; Exh. 1044 at 11.)

109. CAS was formed to take over submitting operations from CPE. (Kaylor Tr. 1696:1-1697:3.)

110. CAS submitted orders using subscription insert cards, which was the "same exact thing that CPE did." (Kaylor Tr. 1696:25-1697:7, 1733:18-22.) CAS recruited and managed contract workers to fill out subscription insert cards by hand, did data entry of orders, and arranged for mail drops to forward orders to publishers. (Kaylor Tr. 1678:16-25, 1679:7-12, 1698: 23-1699:9.)

111. CAS operated from the White City Building. (Kaylor Tr. 1700:14-15; Dkt. 34 (Answer of Bacon and Kaylor) at 5, ¶ 15.)

112. CAS paid Maximillian for "consulting" provided by Simpson and J. Hoyal. (Kaylor Tr. 1699:20-1700:13.)

### xix) MCE submitted orders to publishers.

113. Magazine Clearing Exchange, Inc. ("MCE") was an Oregon corporation, formed on September 23, 2013, with a registered address at Kaylor's residence. (Kaylor Tr. 1701:13-14; Exh. 468.)

114. Kaylor was President, Secretary, and Registered Agent of MCE. (Kaylor Tr. 1721:3-5; Exh. 468.)

115. MCE was formed to take over third-party clearinghouse relationships maintained by Bacon's companies. (Kaylor Tr. 1710:22-1711:12, 1720:20-1721:2; *see also* Pugsley Tr. 297:1-20;

Exh. 197.) MCE submitted consumer orders to publishers, using third-party clearinghouse relationships. (Kaylor Tr. 1714:11-16, 1723:18-23.)

116. MCE operated from the White City Building. (Kaylor Tr. 1716:15-17; Dkt. 34 (Answer of Bacon and Kaylor) at 7, ¶ 21.)

117. The same employees who worked for CAS and CPE also worked for MCE. (Kaylor Tr. 1719:3-6.)

118. MCE paid Maximillian at Parducci's direction. (Kaylor Tr. 1722:20-1723:2.)

### xx) Magazine Link sent switch notices to consumers.

119. Magazine Link, Inc. ("Magazine Link") was an Oregon corporation, formed on September 23, 2013, with a registered address at Kaylor's residence. (Kaylor Tr. 1725:23-1726:5; Exh. 472.)

120. Magazine Link operated from the White City Building. (Kaylor Tr. 1716:15-17; Dkt. 34 (Answer of Bacon and Kaylor) at 7, ¶ 22.)

121. Kaylor was President, Secretary, and Registered Agent of Magazine Link. (Kaylor Tr. 1726:22-24; Exh. 472; Exh. 475.)

122. The same employees who worked for CAS and CPE also worked for Magazine Link. (Kaylor Tr. 1719:3-6.)

### xxi) SHA submitted orders to publishers and sent switch notices to consumers.

123. Subscription House Agency, Inc. ("SHA") was an Oregon corporation, formed on August 15, 2012, with a registered address at Bacon's residential address. (Bacon Tr. 1289:10-16, 1308:19-1309:11; Exh. 1023.)

124. SHA operated from the White City Building, in the same room as CPE and Clarity Group. (Bacon Tr. 1308:19-1309:11.)

125. Bacon was manager, President, and Registered Agent of SHA. (Bacon Tr. 1306:7-12; Exh. 1023.)

126. SHA used third parties to submit consumers' subscription orders to publishers. (Bacon Tr. 1309:12-1310:7.)

127. SHA submitted subscription orders for Anchor but had no written contract with Anchor. (Bacon Tr. 1313:19-23.)

128. SHA also sent switch notices and refunded consumers' subscription orders for Anchor. (Bacon Tr. 1405:20-22.)

129. SHA made payments to Maximillian, at Parducci's direction. (Bacon Tr. 1336:4-11; Exh. 430.)

### xxii)    Wineoceros submitted orders to publishers.

130.   Wineoceros Wine Club, Inc. ("Wineoceros") was an Oregon corporation, formed on October 11, 2011. (Exh. 76; Dkt. 131 (Amended Answer of Strickler) at 9-10, ¶ 32.)

131.   Strickler was the President, Secretary, and Registered Agent of Wineoceros, and the company's registered address was Strickler's residence. (Strickler Tr. 1972:3-10; Exh. 76; Dkt. 131 (Amended Answer of Strickler) at 12, ¶ 42.)

132.   Strickler, through Wineoceros, submitted subscription orders to publishers, including *The New York Times*. (Strickler Tr. 1974:12-21, 1976:4-23, 1984:23-1985:2, 1988:4-15; Exh. 3229; Exh. 83). Those orders came from Kaylor and Bacon, through MCE. (Strickler Tr. 1974:17-1975:10.)

### xxiii)   Anchor sent orders to Bacon's and Kaylor's companies and paid them to submit the orders to publishers.

133.   Anchor Publishing Group, Inc. ("Anchor") was a New York corporation, formed on March 20, 2012, with a registered address of 711 Medford Center, Medford, Oregon 97504. (Exh. 28.)

134.   Babb was President and Secretary of Anchor. (Exh. 28.) Pugsley participated in Anchor operations, and through Anchor, sent orders to other Corporate Defendants to send to publishers. (Pugsley Tr. 282:24-283:14, 299:9-10; Babb Tr. 729:5-9, 729:21-23; Bacon Tr. 1300:6-7, 1300:17-21; Exh. 1060 (email with Pugsley regarding Anchor invoices to SHA).)

135.   Anchor paid for the submission of consumer orders to newspapers. (Pugsley Tr. 282:24-283:14, 283:17-284:1; Exh. 1060 at 1060-03.)

136.   The phone number listed on Anchor's bank accounts was associated with a line located at Pugsley's Eagle Point Property. (Babb Tr. 726:19-728:1; Exh. 30.)

### xxiv)   Clarity Group hired employees who performed worked for CAS, MCE, and Magazine Link.

137.   Clarity Group, Inc. ("Clarity Group") was an Oregon corporation, formed on January 31, 2014, with a registered address at Bacon's residential address. (Exh. 1016 at 2; Bacon Tr. 1289:10-16.)

138.   Clarity Group operated from the White City Building. (Bacon Tr. 1308:21-1309:6.)

139.   Bacon was manager, President, Secretary, and Registered Agent of Clarity Group. (Bacon Tr. 1322:5-12; Exh. 1016.)

140.   Clarity Group was an administrative company that performed work for CAS, MCE, Magazine Link, and CPC Solutions. (Kaylor Tr. 1719:9-23; Bacon Tr. 1324:25-1325:11, 1327:2-14.)

141.   The Clarity Group employees previously worked for CPE and SHA and performed the same functions at Clarity Group. (Bacon Tr. 1328:16-1329:3.)

142. CPE and SHA employees who became Clarity Group employees essentially performed the same duties at Clarity Group as they had at CPE and SHA. (Bacon Tr. 1328:16-20.) Bacon recruited and supervised the Clarity Group employees. (Bacon Tr. 1327:21, 1328:24-1329:3.)

### xxv) Specialties was a conduit for payments to Bacon.

143. Specialties, Inc. ("Specialties") was an Oregon corporation, formed on August 15, 2012, with a registered address at Bacon's residential address. (Exh. 1022 at 4; Bacon Tr. 1289:10-16.)

144. Bacon was the President, Secretary, and Registered Agent of Specialties. (Bacon Tr. 1329:25-1330:7; Exh. 1022 at 4; Exh. 1048 at 20.)

145. Bacon formed Specialties, on the advice of J. Hoyal, solely to receive payment for work she performed on behalf of CPE and the other entities that submitted orders to publishers. (Bacon Tr. 1304:1-8, 1330:12-23.)

## E. THE INDIVIDUAL DEFENDANTS

### i) Simpson, through Reality Kats, managed, controlled, and received the profits of the deceptive mailing operation.

146. In July 2005, Simpson formed Reality Kats. (Simpson Tr. 2512:21-22, 3017:20-23.)

147. Through Reality Kats, Simpson managed the database of consumer information, the data analysis, and the execution of the mailings for the deceptive mailing operation. (Simpson Tr. 2557:24-2558:13, 2560:12-2563:1, 3372:2-13, 3097:6-3098:11, 3056:1-8; Exh. 1282.)

148. Simpson was Reality Kats' manager and sole employee, opened bank accounts for Reality Kats and held signatory authority over those accounts, signed contracts on behalf of Reality Kats, and had the authority to approve invoices that made it possible for Reality Kats to be paid. (Simpson Tr. 2514:11-18, 2515:3-5, 2558:2-3, 3057:22-3058:3, 3306:3-20; Exh. 537 at 4-6; Exh. 1038 at 30; Exh. 2009; Exh. 2166.)

#### (1) Simpson was an integral part of the formation and continuation of the deceptive mailing operation.

149. Simpson and J. Hoyal directed the formation of new corporate entities that made up the subscription operation, including Revista Trust and HCG LLC. (J. Hoyal Tr. 2137:20-2139:7.) Simpson was intimately involved in discussions about the structure of the subscription operation. (J. Hoyal Tr. 3563:7-9.)

150. Simpson described himself as the "quarterback" of the operation. (Simpson Tr. 3041:12-25.) J. Hoyal and Simpson communicated daily about all aspects of the subscription business. (J. Hoyal Tr. 2081:11-24, 2142:12-17; Simpson Tr. 2524:2-2525:19.)

151. Many of the Individual Defendants considered Simpson to be their boss. (Pugsley Tr. 246:8-11, 424:25-425:7, 443:7-444:3, 3595:5-6; Exh. 3528 at 1; Parducci Tr. 529:8-10, 670:21-671:5; Bacon Tr. 1246:12-20; *see also* J. Hoyal Tr. 2461:3-4.)

### (2) Simpson designed the mailers, identified consumers to solicit, and provided direction to the Defendants.

152. Through Reality Kats, Simpson designed mailers and provided direction, review, and approval regarding the form of, and changes to, the mailers and accompanying envelopes. (Simpson Tr. 2576:17-2578:16, 2581:24-2584:11, 3189:11-21, 3190:8-3193:25, 3197:11-3198:10, 3225:24-3226:19, 3323:7-21, 3325:25-3326:6; Exh. 12; Exh. 211 at 23; Exh. 582; Exh. 1057; Exh. 3053 at 6; Exh. 3298 at 6-7, ¶ 25.)

153. Between 2010 and 2015, the Defendants used the form of the mailers Simpson had developed. (Simpson Tr. 2508:1-4, 2510:16-2511:19, 3030:6-17, 3189:11-3191:5, 3301:3-9; J. Hoyal Tr. 3543:8-12; Exh. 3298 at 6-7, ¶ 25; *see also* Exh. 521 (mailer from 2003); Exh. 553 at 20 (mailer from 1998).) The mailers used between 2010 and 2015 were substantially similar to Simpson's earlier mailers. (*See* J. Hoyal Tr. 2032:18-2034:16; Pugsley Tr. 407:25-408:1-6, 418:21-420:9; Lovrien Tr. 898:25-899:1; Exh. 521; Exh. 553 at 20.)

   153.1. Simpson directed the language, form, format and content of the mailers. (Parducci Tr. 615:14-25; *see also* Pugsley Tr. 361:5-6; J. Hoyal Tr. 3521:25-3522:24; Simpson Tr. 2576:17-2578:16, 3325:24-3326:6.)

   153.2. Simpson gave Pugsley directions on the mailer (Simpson Tr. 3323:7-24; Exh. 3053.6), including instructing her about the placement of text on the mailers (Simpson Tr. 3221:2-19; Exh. 211 at11), to add website information to the mailers (Pugsley Tr. 427:4-14), to change the phrase "account number" to "control number" (Simpson Tr. 3323:7-3324:14; Exh. 3053 at 6), and when to have them mailed to consumers (Simpson Tr. 2575:14-17; Pugsley Tr. 171:8-13). The first five digits of the control number that appeared on the mailer indicated when the mailer was prepared. (Simpson Tr. 2575:4-13.)

   153.3. Simpson made changes to the return envelope sent to consumers. (Simpson Tr. 2583:8-2584:11; Exh. 1057; Pugsley Tr. 3582:7-15; Exh. 211 at 56.)

   153.4. Simpson directed revisions to the mailers. (Pugsley Tr. 3582:16-3583:25, 3586:17-3587:14; Exh. 211 at 64, 98-100.) Pugsley routinely forwarded changes to the mailers to Simpson for approval (Pugsley Tr. 3587:15-3589:1, 3589:11-3590:14; Exh. 12), and he reviewed and approved these changes (Simpson Tr. 2582:14-2583:7; Exh. 12; *see also* Lovrien Tr. 899:7-17).

   153.5. Pugsley forwarded mailer "proofs" to Simpson for review and approval. (Pugsley Tr. 217:24-223:1, 235:13-236:7, 579:5-3580:4, 3580:16-3582:6, 3584:3-15; Exh. 211 at 1-4, 11-14, 41, 52, 73, 79, 96; J. Hoyal Tr. 2146:2-5, 2148:15-2149:2.) Simpson reviewed, made revisions to, and approved these mailers. (Simpson Tr. 2581:24-2582:13, 3191:13-3193:25, 3197:11-3198:10; Exh. 211 at 2, 6, 11, 12, 20, 24, 30, 52, 56, 73, 79, 89, 96; J. Hoyal Tr. 2146:2-8, 2146:19-2147:1.)

154. Through Reality Kats, Simpson managed and controlled the database of consumer information and analyzed the data to target consumers. (Simpson Tr. 2557:24-2558:16, 2560:12-2563:1, 3056:1-8, 3098:3-11, 3372:2-13; Exh. 1282; J. Hoyal Tr. 3561:4-9; Lovrien Tr. 1050:19-24.) Simpson's control over the consumer data and database provided him power

within the subscription operation. (J. Hoyal Tr. 3561:14-23.)

154.1. Simpson provided the data used for the mailers to Pugsley, including the form of the mailer, dba names, consumers' names and addresses, the name of the publication, the price, the number of issues or years, and a control number. (Simpson Tr. 2573:16-2575:3, 3325:25-3326:6; Pugsley Tr. 167:7-171:7; Exh. 1056; *see also* Simpson Tr. 3384:14-3385:12; Exh. 561; Exh. 562.)

154.2. Simpson performed data analysis for and provided data to the deceptive mailing operation. (Simpson Tr. 3056:1-8, 3372:2-13, 3098:6-11.) Simpson's data analysis included predicting consumer behavior. (Simpson Tr. 2559:16-2660:7.)

154.3. Simpson performed analyses of consumer data in his database that he described as "a masterpiece in integrations and particular kinds of data and how to . . . present the offers to people." (Simpson Tr. 3566:19-3567:2.)

154.4. The data Simpson provided to the Oregon subscription operation were "critical" to the mailing operation and prevented a "precipitous" downward slide in the business. (Simpson Tr. 3027:16-22, 3302:24-3303:25; J. Hoyal Tr. 3561:14-18; *see also* Parducci Tr. 669:11-16.)

154.5. Simpson set the subscription prices that were printed on the mailers. (Pugsley Tr. 223:7-15; Lovrien Tr. 1051:4-5; Kaylor Tr. 1859:21-1860:2.)

154.6. Simpson decided which publications would be printed on the mailers. (Lovrien Tr. 899:2-4, 1051:2-4; Kaylor Tr. 1859:18-1860:2.) This included directing Bacon and Kaylor regarding what publishers to call for permission to submit orders. (Kaylor Tr. 1734:17-1735:6; Exh. 435 at 1; Exh. 437; Exh. 440 at 1-2.) Simpson determined which consumers to solicit, when to send the mailers, in the name of which dba, which subscription to offer, at what price and for how long. (Lovrien Tr. 1050:25-1051:1; Simpson Tr. 2573:16-2575:3; *see also* Simpson Tr. 3384:14-3385:12; Exhs. 561, 562; Parducci Tr. 616:1-8; Pugsley Tr. 223:7-15; Lovrien Tr. 1051:4-5.)

154.7. Simpson instructed Bacon about which newspapers to call to seek permission to send orders and provided her with a file to use for that purpose. (Simpson Tr. 2608:12-2609:1, 2610:10-17, 3379:24-3380:25, 3437:25-3438:20; Exh. 440: Exh. 1098.) Simpson provided Bacon with a list of priority publications. (Simpson Tr. 3070:16-3071:23; Exh. 440.) Simpson followed up with Bacon when certain publications were not on her price list. (Simpson Tr. 2610:18-20.)

154.8. Simpson told Pugsley when each mailer had to be sent to consumers. (Pugsley Tr. 169:12-20, 171:4-23; Exh. 1056.) Simpson directed Pugsley to hold World Marketing, the vendor that printed and mailed the subscription mailers to consumers, to the timing directives that he set. (Pugsley Tr. 171:11-173:14; Exh. 209; Exh. 1056; Simpson Tr. 2580:17-2581:13.)

155. Simpson developed and provided the dba names used by the mailing entities and printed on the mailers. (Pugsley Tr. 198:13-23; Exh. 15; Exh. 366; Simpson Tr. 3325:1-3326:6; *see also* Simpson Tr. 2566:17-2570:5.) Simpson used identical or similar dba names on the mailers,

regardless of which mailing entity was associated with the mailer, because the dbas made consumers think they were dealing with a company with which they had a prior relationship. (Pugsley Tr. 378:18-379:11; *see also* Simpson Tr. 3168:24-3169:8, 3171:14-3172:4.) Simpson provided a list of dba names to Pugsley to open bank accounts. (Simpson Tr. 2566:2-16.) Simpson integrated the dba names Pugsley used to open bank accounts into the mail file he would provide to Pugsley. (Simpson Tr. 2566:10-2568:1.)

156. On July 4, 2011, Simpson and J. Hoyal met with Bacon at the White City Building, where they discussed her advancement to clearing orders and her salary. (Simpson Tr. 3377:14-3378:5; *see also* Simpson Tr. 2523:24-2524:1, 3067:5-23.)

### (3) Simpson developed the insert card system used by the Defendants.

157. Simpson developed the insert card system that the Defendants used. (Simpson Tr. 2522:16-2523:14, 3433:4-3434:15.) Simpson's system involved sending direct mail pieces to consumers with prices that were higher than those printed on publishers' subscription insert cards, sending the orders via insert cards to publishers, and profiting from the difference between the insert card price and the price consumers paid. (Simpson Tr. 2599:11-2601:20, 2602:12-2603:15.)

   157.1. The insert card system also allowed Simpson to find consumers to which he could target mailers for other high value publications. (*See* Simpson Tr. 3071:24-3073:9, 3163:23-3164:25, 3432:22-3433:3, 3442:1-7, 3073:10-3074:16, 3075:14-3077:12.)

   157.2. Simpson's insert card system was not an industry standard. (Simpson Tr. 2602:11-16, 2604:4-9.)

   157.3. The publications Simpson selected for the insert card system were not on "agency sales" (Simpson Tr. 2601:8-11), which is the process by which publishers sell subscriptions through multiple clearing firms and their respective agents (Pugsley Tr. 392:14-21). Instead, Simpson tested the insert card system with approximately 20 publications by calling the publishers and submitting orders on the insert cards to see whether the publishers would reject the orders. (Simpson Tr. 3067:5-14, 3437:1-11, 3438:21-3439:24.)

   157.4. Simpson and J. Hoyal implemented the card system in Oregon. (Simpson Tr. 2522:16-2523:11, 2523:24-2524:1, 2598:7-8, 2598:15-2599:16, 3434:9-3436:2.) The Defendants obtained a high-quality printer to print the insert cards. (Simpson Tr. 3435:3-6.) Simpson met with Bacon personally to discuss her duties with respect to this process. (Simpson Tr. 2597:5-2598:6, 2606:11-16, 3379:17-23; Bacon Tr. 1286:2-1287:4, 1301:1-5.)

   157.5. Simpson selected publications according to the value the publication could provide to the deceptive mailing operation, either due to the publication's profit margin, renewal rate, or likelihood that subscribers would be interested in other publication. (Simpson Tr. 3440:21-3441:14.) Certain publications, such as *The Wall Street Journal*, were valuable and were "always" on price lists. (Simpson Tr. 3074:24-3075:13.)

158. In 2014, Simpson communicated with Bacon about expanding the business model to include

regional publications. (Simpson Tr. 2607:2-2609:1; Exh. 437; Exh. 440.) Simpson came up with the idea to start mailing on regional newspapers when he realized that there were regional publications that were not on third-party clearinghouse price lists and that Defendants could use in-house submitting companies to send these orders using the insert card system. (Simpson Tr. 2596:7-22, 3109:8-3110:2.)

### (4) Simpson oversaw the finances of the operation and profited handsomely from the deceptive mailers.

159. Simpson and J. Hoyal generally split the profits of the subscription operation equally, through payments made from Maximillian to Reality Kats and to H&A. (J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; Parducci Tr. 565:11-15.) Reality Kats and H&A split a profit margin of approximately 20% from the deceptive mailing operation. (J. Hoyal Tr. 2084:10-20.) Simpson and J. Hoyal directed Parducci to disburse funds equally to Reality Kats and H&A from Maximillian's accounts. (Parducci Tr. 666:22-667:24.) An average of about $20-25 million flowed through the Maximillian accounts every year. (J. Hoyal Tr. 2083:17-19, 2084:13-15.)

160. Simpson tracked the financial operations. (J. Hoyal Tr. 2462:20-23.) Parducci provided Simpson daily reports for PPP NY, and information about PPP NY's end of year expenses, which he used to analyze revenues. (Simpson Tr. 3341:13-3342:20; Exh. 3446.) The daily reports also included information about the mailing companies' payments to Maximillian and HCG LLC. (Simpson Tr. 3352:12-3353:9, 3343:6-3345:5; Exhs 1074; Exh. 1075.) Simpson was aware that J. Hoyal directed Parducci to pay Reality Kats and H&A from mailing company revenues. (Simpson Tr. 3353:10-3357:7; Exh. 3304; Exh. 3482.)

161. Simpson analyzed the revenue data he received as part of his analysis to see if the mailers were profitable. (Simpson Tr. 3172:7-13, 3364:8-3366:22; Exh. 1071.)

162. Parducci reported to Simpson and J. Hoyal the number of subscription orders received, the amount of mail received from consumers, and the operational expenses of the subscription business, both in daily reports and in additional email updates. (J. Hoyal Tr. 2091:20-2094:6, 2130:10-2134:13; Exh. 329; Exh. 1071; Exh. 3298 at 7-8, ¶ 29.)

163. Parducci created daily reports on the operations of the Corporate Defendants that included details such as the number of bank deposits, amount of mail received, expenses, balances, checks ready to enter, and mailer status. (Parducci Tr. 598:21-599:18, 600:14-601:24; Exh. 1071; Babb Tr. 720:15-25, 721:7-15.)

164. At their direction, Parducci prepared and sent Simpson and J. Hoyal daily reports concerning the finances of HCG LLC, including bank balances, outstanding invoices, and payments made, including payments to Adept and Maximillian. (Parducci Tr. 598:7-17, 601:25-602:12; J. Hoyal Tr. 2126:23-2129:15; Exh. 1074.) Simpson checked on the progress of entering consumer checks received and was apprised of the status of processing the data entry. (Babb Tr. 721:16-722:10.) Simpson wanted the mailing companies to enter at least $200,000 of consumer payments a day. (Babb Tr. 723:4-16.)

165. Simpson reconciled reports he received from Pugsley and Parducci to make sure totals matched. (Simpson Tr. 2590:17-2591:2.)

166. Simpson had the authority to approve invoices that would affect whether Reality Kats was paid. (*See* Simpson Tr. 3057:22-3058:3.) Simpson and J. Hoyal directed Parducci to pay invoices from Maximillian's accounts (Parducci Tr. 549:12-17), and she would seek their approval before paying any invoices addressed to Maximillian (Parducci Tr. 550:14-551:2). Simpson and J. Hoyal directed Parducci to invoice the mailing companies on behalf of HCG LLC. (Parducci Tr. 595:5-596:16, Exh. 232; Exh. 124.) Simpson and J. Hoyal directed Parducci to invoice Maximillian on behalf of Wineoceros. (Parducci Tr. 614:11-16.) Simpson approved payments to obtain consumer lead data. (Simpson Tr. 3347:1-3349:14, 3351:10-16, 3359:2-7; Exh. 3491; Exh. 1073 at 1.)

167. Simpson and J. Hoyal directed Parducci to open bank accounts for Maximillian. (Parducci Tr. 541:24-542:1.) Simpson knew that Maximillian's accounts were used to transfer money out of the mailing operation. (Parducci Tr. 603:6-11.) Simpson received regular reports on HCG LLC's accounts, and what was billed or invoiced, and "always knew" precisely how much money was in Maximillian's accounts. (Parducci Tr. 560:5-17.)

168. Simpson, along with J. Hoyal, received daily reports from Parducci that contained gross remit information, number of calls received in the call center, amount of mail, number of orders entered, bank deposits, Quickbook balances, how many consumer checks entered, total deposits, and business expenses. (Simpson Tr. 2588:1-20, 3352:12-3353:9, 3364:8-3366:22; Exh. 179; Exh. 182.) Simpson instructed Parducci to include specific details on the daily reports she created, such as the status of the mailers, and the amount of mail received. (Parducci 598:21-600:13.) Parducci's reports showed the amount of mail that went to the mail house, when the mail was paid for, and when the mailers dropped. (Simpson Tr. 2579:13-25, 2589:25-2590:16.)

169. Pugsley sent Simpson daily reports of consumer orders received and payments deposited (Pugsley Tr. 242:2-10; Exh. 179; Exh. 182), weekly remit reports that included information about consumer orders that were switched to different publications (Simpson Tr. 2589:11-21, 2617:25-2618:3; Pugsley Tr. 242:11-13; Exh. 161; Exh. 162; Exh. 163; Exh. 214; Exh. 356), and nightly uploads of all consumer response information from the "pubgroups" system (Pugsley Tr. 245:5-246:1; *see* Exh. 179 at 17).

170. At their direction, Parducci sent daily reports on PPP NY's business to Simpson and J. Hoyal, which was "like another snapshot of customer service" and included the number of calls received. (Parducci Tr. 614:20-615:7.) Parducci provided reports concerning call center operations to J. Hoyal and Simpson. (J. Hoyal Tr. 2095:17-2096:9; Exh. 336.)

171. Pugsley sent Simpson information about consumer refund requests. (Simpson Tr. 2591:3-19; J. Hoyal Tr. 2174:18-2177:13; Exh. 360; Exh. 361.) The amount of refunds was also included on the daily reports Parducci sent. (Parducci Tr. 617:8-20.)

172. Pugsley sent Simpson reports about order cancellations. (Simpson Tr. 2592:16-23; *see also* Exh. 357; Exh. 557.) Pugsley sent Simpson information about the number of consumers who stopped payments on their checks. (Simpson Tr. 2592:24-2593:2; J. Hoyal Tr. 2172:22-2174:8; Exh. 558.)

### (5) Simpson was aware the mailers were deceptive.

173. Simpson knew that he should not be involved in the mailer approval process because of the 2004 Oregon Consent Judgment he signed. (Simpson Tr. 3194:4-3195:12.) Simpson reviewed the mailers at Pugsley's request. (Simpson Tr. 3189:22-3193:25; Exh 211.) He did not ensure that the mailers used by the deceptive mailing operation contained the language required by the 2004 Oregon Consent Judgment. (Simpson Tr. 3196:19-3197:5.)

174. Simpson was aware that the deceptive mailing operation was receiving complaints and inquiries from the Better Business Bureau ("BBB") and from state attorneys general. (Simpson Tr. 2612:11-2614:5; Exh. 1006; *see also* J. Hoyal Tr. 2197:17-2198:11.)

175. Simpson was aware that the operation was receiving cease and desist letters and was involved when they were received. (Simpson Tr. 2614:8-20, 2619:5-7, 3125:12-23, 3132:10-24; Exh. 531.) Simpson was aware that the operation continued to send orders to *The New York Times* even after receiving cease and desist letters from the publisher. (Simpson Tr. 2619:15-2620:4; Exh. 531; Exh. 1004 at 194.) Simpson was aware that the operation continued to send orders to *The Wall Street Journal* even after receiving cease and desist letters. (*See* Simpson Tr. 3127:4-3128:11, 3413:1-3414:1; Exh. 1004 at 72, 194.) Defendants did not respond to cease and desist letters from publishers. (*See* Simpson Tr. 3128:14-3129:3.) Simpson was aware that newspapers were sending fraud alerts to the deceptive mailing operation. (Simpson Tr. 2611:14-2612:10; Exh. 113.)

176. Although Simpson testified that Exhibit 2162 reflected that no mailers went out for *The Wall Street Journal* during periods when cease and desist letters were in effect (Simpson Tr. 2647:19-2648:16, 3134:17-3136:6), mailers were sent during these periods (Simpson Tr. 3400:4-3431:25; Exh. 1004 at 24, 34, 72, 94, 351).

177. The deceptive mailing operation sent mailers for a subscription to *The Wall Street Journal* that offered 48 more issues than the publication printed in a year. (Simpson Tr. 3412:7-19, 3427:4-12; Exh. 1004 at 78, 290.)

178. Simpson was aware that the deceptive mailing operation was using the insert card system. (Simpson Tr. 2610:21-25.) He knew the Defendants' use of the card system for regional newspapers was creating "huge blowback" in the industry. (Simpson Tr. 3110:1-19.)

179. Simpson was aware of the number of orders being switched to other publications because he received reports containing this information. (Parducci Tr. 618: 24-619:3; Exh. 214.) Simpson knew that the operation was switching *The Wall Street Journal* to other publications as early as 2012. (Simpson Tr. 2617:9-2619:4; Exh. 355.)

180. Beginning in August 2015, Simpson, through his current company, Dennis Simpson Consulting, has provided the same kind of services to direct mail companies who solicit subscriptions as he provided to the deceptive mailing operation, including services that rely on data he obtained during the 2010-2015 deceptive mailing operation. (Simpson Tr. 2624:13-23, 2625:21-2626:19, 2627:2-11; 3569:3-3570:20.) Simpson provides consumer data to clients in the direct mail business, and he makes recommendations on their mailers. (Simpson Tr. 3258:12-3259:21, 3312:19-3313:17; Exhs. 564.) The data Simpson is providing to his current clients contains information about Oregon consumers. (Simpson Tr. 2631:14-

25.)

181. Simpson did not provide a copy of the OR AVC to his current business partner, John Ackerman. (Simpson Tr. 2632:1-10.) Simpson did not inform the Oregon Department of Justice that he was starting a new business with Mr. Ackerman (Simpson Tr. 2630:7-11), who was a partner of Simpson and J. Hoyal in prior iterations of the operation, including Raybor and Mail Industries (L. Hoyal Tr. 1130:9-18; J. Hoyal Tr. 2027:4-16, 2027:24-2028:3, 2037:7-14, 2238:9-12, 2243:17-20, 2249:22-24; Simpson Tr. 2627:2-6, 3004:14-23; *see also* Simpson Tr. 2624:10-2626:19).

182. Simpson does not consider himself to be engaged in the subscription business because he does not own a mailing business in Oregon. (Simpson Tr. 2632:23-2633:4.)

183. Since August or September of 2015, Simpson has made around $6.5 million working for companies that send direct mail solicitations for subscriptions to publications. (Simpson Tr. 3316:7-10.)

### ii) J. Hoyal, through H&A, managed, controlled, and received the profits of the deceptive mailing operation.

#### (1) J. Hoyal helped form and continue the deceptive mailing operation through the Corporate Defendants.

184. J. Hoyal started working in the subscription industry with Simpson in or around 1997. (J. Hoyal Tr. 2024:3-7; Exh. 3298 at 2-3, ¶ 5.)

185. Starting in 1997, J. Hoyal submitted orders to publishers, reviewed mailers, conducted customer service, and handled other financial and business operations for Simpson's companies, including IC Marketing, ACPA, and Raybor. (J. Hoyal Tr. 2024:14-15, 2025:5-24, 2028:14-2029:1, 2032:15-20.) J. Hoyal was an owner and President of RJS Group ("RJS"). (J. Hoyal Tr. 2024:8-17, 2025:3-4.)

186. In or around 2005, J. Hoyal and Simpson formed a new arrangement to operate the subscription operation as partners. (J. Hoyal Tr. 2037:22-2038:4; Exh. 3298 at 5, ¶ 16.) J. Hoyal established the operational infrastructure for this operation. (J. Hoyal Tr. 2037:22-2038:7.)

187. As part of the 2005 structure, Mail Industries was formed to serve as the "financial reporting company" for the companies that sent mailers to consumers. (J. Hoyal Tr. 2037:22-2038:14.)

188. As part of the 2005 structure, GDS was formed to provide data processing infrastructure and logistical support (J. Hoyal Tr. 2037:22-2038:16, Exh. 3298 at 5, ¶ 17), including a call center at the White City Building (J. Hoyal Tr. 2041:9-14).

189. J. Hoyal and Simpson recruited individuals to form companies to send out mailers for the operation that started in 2005. (J. Hoyal Tr. 2037:22-2038:22; Exh. 3298 at 5, ¶ 17.) These individuals included Lydia Pugsley, who helped operate ABDI. (J. Hoyal Tr. 2049:14-24.)

190. J. Hoyal also recruited individuals to open companies, including APS, to submit the subscription orders that were received in response to the mailers. (J. Hoyal Tr. 2047:23-2048:4, 2050:23-2051:7.)

191. J. Hoyal and Simpson provided financing to the companies that sent the mailers for the 2005 operation, sometimes through Mail Industries. (J. Hoyal Tr. 2040:19-2041:3; Exh. 3298 at 5, ¶ 17.)

192. J. Hoyal was aware that, during the GDS days, consumers thought the mailers were from publishers, not from third parties, and that consumers made their checks payable to the publications. (J. Hoyal Tr. 2046:11-2047:22; Exh. 364.) He took no steps to correct the mailers' false impression. (J. Hoyal Tr. 2049:8-12.) Simpson and Bacon received the same notice. (Exh. 364.)

193. In or around 2010, J. Hoyal and Simpson restructured the enterprise as a successor to the 2005-2009 enterprise that involved GDS and Mail Industries. (J. Hoyal Tr. 2052:17-20; Exh. 3298 at 5-6, ¶ 18.)

194. J. Hoyal and Simpson set up numerous companies, which operated together to send mailers to consumers, submit orders to publishers, and provide customer service. (Exh. 3298 at 6, ¶¶ 22-23.) They structured the 2010 operation this way to facilitate their management and oversight of the operations and to control payments to "crossover employees" that "might slop over to different companies." (J. Hoyal Tr. 2102:6-2103:21.) While the 2010 operation involved various companies, J. Hoyal and Simpson operated it substantively as one company. (J. Hoyal Tr. 2103:22-2104:12.)

195. Consistent with their prior practice, Simpson and J. Hoyal worked together to operate the 2010 structure, with Simpson taking responsibility for the form and content of the mailers and J. Hoyal establishing the support infrastructure, including the companies necessary to supply the logistics for the mailing enterprise. (Exh. 3298 at 6-7, ¶¶ 25-26.)

196. J. Hoyal was responsible for developing the network of companies necessary to supply the logistics for the 2010 structure, consistent with his role since 2000. (J. Hoyal Tr. 2055:20-23.)

197. J. Hoyal, along with Simpson, directed the formation of all of the individual companies that made up the 2010 enterprise structure, including HCG LLC, its parent company, Revista Trust, the mailing entities, the submitting entities, the call center, and companies formed to replace those with which banks refused to do business. (J. Hoyal Tr. 2056:4-5, 2106:25-2107:16, 2137:15-2139:7.) These included:

197.1. HCG LLC, established as a holding company to own the entities that sent the mailers to consumers at the direction of J. Hoyal and Simpson. (J. Hoyal Tr. 2104:13-2015:6; Exh. 3298 at 7, ¶27.) J. Hoyal received the business names ("dbas") to be used by the mailing entities from Simpson. (J. Hoyal Tr. 2053:19-21, 2055:1-4.) These dba names flowed from one mailing company to the next. (J. Hoyal Tr. 2108:3-8.)

197.2. Revista Trust, HCG LLC's parent company. (J. Hoyal Tr. 2137:15-19, 2138:4-5.) J. Hoyal's mother, Dawna Hoyal, is the beneficiary of Revista Trust. (J. Hoyal Tr. 2139:16-25.)

197.3. Strickler is trustee of Revista Trust. (J. Hoyal Tr. 2140:7-9.)

197.4. Wineoceros, which J. Hoyal helped Strickler establish. (J. Hoyal Tr. 2168:6-10.)

197.5. Anchor, which sent orders to submitted entities and paid for that work. (J. Hoyal Tr. 2171:6-12.)

197.6. Atlas, through which Lovrien was paid for her work on behalf of United. (Lovrien Tr. 867:8-868:1.)

198. J. Hoyal recruited people to be officers of the Corporate Defendants. (J. Hoyal Tr. 2056:6-8.) These individuals included Lovrien, Strickler, Parducci, Bacon, Kaylor, and Pugsley. (J. Hoyal Tr. 2056:9-20, 2062:2-23, 2075:22-2076:5; *see also* Lovrien Tr. 850:7-16, 862:18-20; Parducci Tr. 521:2-11; Bacon Tr. 1226:24-1227:14; Strickler Tr. 1935:21-1936:5.)

199. J. Hoyal and Simpson hired Pugsley to manage the process of sending the mailers to consumers and handling orders and payments from consumers in response to those mailers. (J. Hoyal Tr. 2062:2-8, 2062:18-23.)

200. J. Hoyal arranged for HCG LLC to pay Pugsley $30,000 a month, through Adept, for her management of the mailing and processing operations. (J. Hoyal Tr. 2062:2-8, 2062:18-23, 2064:15-18.)

201. J. Hoyal arranged for Maximillian to pay Pugsley an additional $10,000 a month, through Crown, for her management of the mailing and processing operations. (J. Hoyal Tr. 2065:9-13.)

202. J. Hoyal and Simpson hired Parducci to provide, through Maximillian, the same services to the restructured operation that she provided to the prior GDS operation. (J. Hoyal Tr. 2075:22-2076:8; Exh. 3298 at 5-6, ¶¶ 18-19.) Parducci's duties included being the primary bookkeeper and financial coordinator for the 2010 enterprise structure; managing the enterprise's cash flow, including the payments between and among the various companies that constituted the enterprise; and "watching everything." (J. Hoyal Tr. 2076:9-16, 2090:13-23; Exh. 3298 at 6, ¶ 19 ("main bookkeeper for this business and managed the business' cash flow, including the payments between and among the various companies which constituted the business.").)

203. J. Hoyal set compensation for individuals involved in the restructured operation. (J. Hoyal Tr. 2057:4-6). These individuals included Lovrien, Strickler, Parducci, Bacon, Kaylor, and Pugsley. (J. Hoyal Tr. 2057:7-18; *see also* Lovrien Tr. 869:13-19; Parducci Tr. 528:22-529:7; Bacon Tr. 1247:3-5.)

204. J. Hoyal also approved bonuses for individuals who were involved in the operation, including Lovrien, Strickler, Parducci, Bacon, Kaylor, Pugsley, and Babb. (J. Hoyal Tr. 2057:25-2058:5.)

### (2) J. Hoyal supervised and oversaw the deceptive mailing operation.

205.  J. Hoyal and Simpson ran the deceptive mailing enterprise. (J. Hoyal Tr. 2064:19-2065:1-8, 2144:12-16.) J. Hoyal testified, "It was our baby, in a sense. We had business purposes for the structure, but it's our baby. It is our operation." (J. Hoyal Tr. 2064:23-25.) "The whole thing is my idea and Dennis'. This is our idea." (J. Hoyal Tr. 2168:24-25.)

206.  J. Hoyal and Simpson were the ultimate owners of the enterprise. (Lovrien Tr. 873:11-19.)

207.  J. Hoyal and Simpson operated the 2010-2015 operation "the same [way] we've done for 20 years for the most part." (J. Hoyal Tr. 2145:24-2146:1.)

208.  J. Hoyal and Simpson made high-level decisions concerning the subscription operation. (J. Hoyal Tr. 2144:12-2145:4, 2235:1-2236:12.) They relied on the other Individual Defendants to manage day-to-day activities, including registering web domains, opening mail box locations, opening bank accounts, processing consumer orders, depositing consumer checks, and issuing refunds. (J. Hoyal Tr. 2144:12-2146:1, 3522:25-3523:20.)

209.  J. Hoyal oversaw the day-to-day operations of the enterprise. (Pugsley Tr. 423:9-19; Parducci Tr. 660:15-18; Kaylor Tr. 1860:7-9; Lovrien Tr. 1051:9-14.)

210.  J. Hoyal provided oversight and direction to other Individual Defendants involved in the enterprise, including Bacon, Kaylor, Lovrien, Parducci, and Pugsley. (Bacon Tr. 1246:12-1247:2; J. Hoyal Tr. 2157:5-19, 2158:7-12, 2159:21-23, 2461:3-4; Kaylor Tr. 1625:20-23, 1707:19-1708:5; Parducci Tr. 529:8-10, 536:1-539:19; Babb Tr. 738:17-23; Pugsley Tr. 436:11-13, 443:7-17; Strickler Tr. 1936:23-24; Exh. 3528 at 1.)

211.  J. Hoyal resolved disputes among the Defendants. (J. Hoyal Tr. 2061:17-18.)

212.  J. Hoyal was involved in decisions about whether to pay refunds to consumers. (J. Hoyal Tr. 2061:24-2062:1.)

213.  J. Hoyal was regularly present at Pugsley's Eagle Point Property, on a daily or weekly basis. (J. Hoyal Tr. 2058:25-2059:5, 2141:18-20; Babb Tr. 738:24-739:1.)

214.  J. Hoyal was regularly present at the White City Building between 2011 and 2015. (J. Hoyal 2141:21-2142:1; Babb Tr. 739:4-4; Kaylor Tr. 1630:9-15, 1708:6-8.)

### (3) J. Hoyal received regular reports about all aspects of the operation.

215.  J. Hoyal received daily reports from Parducci about the operations of the enterprise, including the entities that sent the mailers, operated the call center, submitted orders to publishers, and the holding companies that owned them. (J. Hoyal Tr. 2078:13-2079:22, 2090:13-23, 2093:25-2094:3; Exh. 3298 at 7-8, ¶ 29.) Parducci's reports included:

215.1.  HCG LLC and Revista Trust reports, including profit and loss statements, tax information, bank account balances and expenses. (J. Hoyal Tr. 2041:21-2043:22, 2098:4-15, 2126:23-2129:8, 2136:25-2137:14; Exh. 316; Exh. 317; Exh. 337; Exh. 1074; Parducci Tr. 598:7-20, 601:25-602:12.) Among the expenses listed in the HCG

LLC reports were payments to Adept and Maximillian. (J. Hoyal Tr. 2127:17-2128:15; Exh. 1074 at 2.)

215.2. Mailing entity reports and updates involving financial status, subscription orders and payments received, refunds paid, and operational expenses. (J. Hoyal Tr. 2091:20-2093:9, 2130:10-2134:9, 2091:20-2092:15, 2093:11-2094:6, 2096:24-2097:8; Parducci Tr. 598:21-601:24, 617:8-20; Exh. 329; Exh. 335; Exh. 1071; Exh. 3414.)

215.3. Orders "switched" to other publications. (Parducci Tr. 618:24-619:3.)

215.4. Call center reports, which were "like another snapshot of customer service," showing the number of calls received by the call center and overhead costs. (Parducci Tr. 614:20-615:7; J. Hoyal Tr. 2095:17-2096:9; Exh 336; Exh. 3446.)

216.  J. Hoyal also received regular reports and information from Pugsley about all aspects of the operation. (Pugsley Tr. 241:14 – 255:16). These included:

216.1. Financial statements, profit and loss statements, and cash flow reports for the mailing entities. (Pugsley Tr. 423:20-424:6.)

216.2. Reports and information about consumers who stopped payment on their checks. (Pugsley Tr. 270:9-271:5; J. Hoyal Tr. 2172:22-2173:19, 2196:24-2198:11; Exh. 558; Exh. 1006.)

216.3. Cancellation reports. (Pugsley Tr. 268:23-270:8, 465:2-14; Exh. 357; Exh. 557.)

216.4. Refund reports. (J. Hoyal Tr. 2174:18-2177:24; Pugsley Tr. 271:10-273:9; Exh. 360; Exh. 361.) J. Hoyal knew that the enterprise issued refunds of between $50,000 and $75,000 a month. (J. Hoyal Tr. 2133:13-19, 2382:7-13.)

216.5. Daily reports about the volume of consumer orders and payments in response to the mailers. (Pugsley Tr. 242:2-243:1, 246:15-247:1; J. Hoyal Tr. 2161:23-2162:21; Exh. 179; Exh. 182.)

216.6. Orders submitted to publishers and "switched" to other publications, including by companies operated by Bacon and Kaylor. (J. Hoyal Tr. 2162:23-2165:22; Pugsley Tr. 252:9-11, 249:15-251:8, 252:9-11, 256:3-14; Exh. 214; Exh. 161; Exh. 162; Exh. 163.)

216.7. "Switch" detail reports and information. (Pugsley Tr. 257:17-261:12, 263:2-265:25; Exh. 279; Exh. 356.)

216.8. Consumer complaints. (J. Hoyal Tr. 2196:24-2198:11; Pugsley Tr. 471:12-472:7; Exh. 1006.)

216.9. Bank account closures. (Pugsley Tr. 249:12-14; Exh. 182 at 14.)

### (4) J. Hoyal directed the financial operations of the enterprise and profited handsomely from the deceptive mailers.

217. J. Hoyal and Simpson made decisions together about how to manage the funds within the Corporate Defendants. (J. Hoyal Tr. 2080:24-2081:2.) J. Hoyal had input into all financial aspects of the operation, which he referred to as "the company." (J. Hoyal Tr. 2057:23-24.)

218. J. Hoyal directed the opening of bank accounts (J. Hoyal Tr. 2056:2-3), including directing Parducci to open bank accounts for Maximillian, HCG LLC, and Revista Trust. (Parducci Tr. 541:24-542:1 (Maximillian); J. Hoyal Tr. 2471:8-11 (HCG LLC), 2461:19-24 (Revista Trust).)

219. J. Hoyal directed invoicing and payments among the Corporate Defendants, through Parducci and L. Hoyal. (J. Hoyal Tr. 2058:6-9, 2058:10-11 (Parducci), 2058:12-13 (L. Hoyal), 2100:17-2101:9 (both).)

220. J. Hoyal provided direction to Parducci, based on reports she provided to him concerning the financial operations of the deceptive mailing operation, regarding moving funds among the Corporate Defendants. (J. Hoyal Tr. 2079:23-2080:22.) This direction included:

    220.1. which company to invoice, when, and how much (J. Hoyal Tr. 2464:25-2465:3), including instructing Parducci to send invoices from HCG LLC to the mailing entities (Parducci Tr. 595:5-596:24; Exh. 232; Exh. 124);

    220.2. to make transfers from the HCG LLC accounts (Parducci Tr. 602:17-603:5; Exh. 1074);

    220.3. to deposit only one or two checks from the Corporate Defendants a day, to avoid potential banking issues (Parducci Tr. 570:22-571:14);

    220.4. to prepare invoices from Wineoceros to Maximillian (Parducci Tr. 614:11-16);

    220.5. to provide funds to Wineoceros through Maximillian, to keep it operating (J. Hoyal Tr. 2168:11-16; Strickler Tr. 1973:17-1974:4);

    220.6. to send invoices from Maximillian to HCG LLC to pay her salary (Parducci Tr. 612:9-11);

    220.7. to "pull" money from mailing entities and have H&A and Reality Kats invoice in the same amounts to transfer those funds from the operation to H&A and Reality Kats (J. Hoyal Tr. 2094:7-2095:4, 2096:10-17, 2097:13-19, 2098:20-2100:16; Exh. 124; Exh. 232; Exh. 329; Exh. 335; Exh. 336; Exh. 337; Exh. 3304; Parducci Tr. 595:5-596:24); and

    220.8. to disburse funds equally to Reality Kats and H&A from Maximillian's accounts (Parducci Tr. 666:22-667:24).

221. J. Hoyal and Simpson decided when they would withdraw the profits from the operation. (J. Hoyal Tr. 2085:9-12.) They conveyed the amount and timing to Parducci to "start working up a draw. . . ." (J. Hoyal Tr. 2085:13-2086:1.) Parducci would provide feedback to

J. Hoyal and Simpson if her analysis of the financial accounts indicated that "[their] decision was off in some way." (J. Hoyal Tr. 2086:6-23.)

222.    J. Hoyal and Simpson approved the payment of all invoices to Maximillian. (Parducci Tr. 550:14-551:2.)

223.    J. Hoyal authorized the construction of a building on Pugsley's property to house the work conducted there on behalf of the operation. (J. Hoyal Tr. 2142:2-9; Pugsley Tr. 152:13-17.)

224.    J. Hoyal authorized equipment purchases, including the purchase of a high-speed remote check scanner to be used on Pugsley's property for the work of the operation. (Pugsley Tr. 152:18-153:11, 153:22-24; J. Hoyal Tr. 2142:18-20; Exh. 349.)

225.    J. Hoyal approved requests for call center expenditures, either through Parducci or directly with Bacon and Kaylor. (J. Hoyal Tr. 2378:14-20; Parducci Tr. 676:11-677:2.)

226.    J. Hoyal performed his work on behalf of the deceptive mailing operation through H&A. (J. Hoyal Tr. 2022:9-15, 2055:24-2056:1.) On behalf of H&A, J. Hoyal:

    226.1.  opened bank accounts and held signatory authority over those accounts (L. Hoyal Tr. 1093:13-15; J. Hoyal Tr. 2022:19-2023:10; Exh. 306; Exh. 1042);

    226.2.  signed corporate documents (L. Hoyal Tr. 1088:12-25; Exh. 293); and

    226.3.  managed, directed, participated in, and made business decisions for H&A (J. Hoyal Tr. 2231:13-17; Dkt. 91 (Amended Answer of Defendants Jeffrey Hoyal & H&A) at ¶ 35).

227.    As an owner of H&A, J. Hoyal was the beneficiary of H&A's 50% profit from the subscription operation. (L. Hoyal Tr. 1086:8-12, 1141:8-13 (J. Hoyal owns 50% of H&A); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; Parducci Tr. 565:11-15; L. Hoyal Tr. 1202:23-1204:13 (H&A and Reality Kats split operation's profits equally).)

228.    H&A received approximately $15 million from the subscription operation between 2011 and 2015. (Simpson Tr. 2542:11-2543:2; Exh. 559 (Reality Kats received $14.99 million between 2011 and 2015); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9 (H&A and Reality Kats split the profits equally); Parducci Tr. 565:11-15 (proceeds of subscription operation went to J. Hoyal and Simpson).)

229.    The 2010-2015 operation received about $25 million a year in gross revenue. (J. Hoyal Tr. 2084:13-15.) "Of that, about 20 percent of that would work its way to Dennis and I, on average. . . ." (J. Hoyal Tr. 2084:13-20.)

    **(5)  J. Hoyal reviewed and approved the deceptive mailers sent by the operation.**

230.    J. Hoyal and Simpson were responsible for the mailers. (J. Hoyal Tr. 3522:23-24.)

231.  J. Hoyal reviewed mailer proofs that he received from Pugsley. (J. Hoyal Tr. 2058:14-24, 2146:2-14, 2148:15-2149:2, 2151:17-2152:23, 3522:20-24; *see e.g.*, Exh. 211 at 93.)

232.  J. Hoyal reviewed and approved changes to the mailers. (J. Hoyal Tr. 2151:17-2153:15.)

233.  J. Hoyal understood that Pugsley included him in every change to a mailer because of his role in the operation. (J. Hoyal Tr. 2148:11-14.)

234.  J. Hoyal had the authority to stop sending mailers for specific publications. (Exh. 3642 at 1; J. Hoyal Tr. 2436:23-2437:6, 2437:19-25.)

### (6) J. Hoyal oversaw call center operations, the submission of orders to publishers, and switching consumers to unordered subscriptions.

235.  J. Hoyal had ultimate management responsibility over the call center. (J. Hoyal Tr. 2376:17-2378:20.)

235.1.  J. Hoyal hired Bacon to move the call center to the White City Building, then hired her to manage it and set her compensation for doing so. (J. Hoyal Tr. 2156:12-14 (move), 2158:7-12 (manage), 2159:21-23 (set compensation); *see also* Bacon Tr. 1227:9-14, 1247:3-5.)

235.2.  J. Hoyal frequently visited the PPP NY call center to check in on things. (Bacon Tr. 1246:21-1247:2; Kaylor Tr. 1630:9-15.)

235.3.  J. Hoyal provided direction to Bacon on how to operate the call center, including the use of scripts and an employee handbook used at the prior call centers. (J. Hoyal 2157:1-19.)

235.4.  J. Hoyal reviewed changes to the call center handbook. (Kaylor Tr. 1650:21-25.)

235.5.  J. Hoyal oversaw Bacon's management of the call center. (Bacon Tr. 1246:12-20.)

236.  J. Hoyal and Simpson hired Bacon to set up companies to submit orders to publishers and third-party firms. (J. Hoyal Tr. 2159:24-2160:3; Bacon Tr. 1287:1-1288:7.)

237.  J. Hoyal advised Bacon to form Specialties to receive her compensation for operating the submitting companies. (Bacon Tr. 1304:1-8, 1330:12-23.)

238.  J. Hoyal met with Bacon at the White City Building to discuss the operation of her submitting companies. (J. Hoyal Tr. 2161:2-7.)

239.  J. Hoyal met with Kaylor to discuss the operations of her submitting companies. (J. Hoyal Tr. 2161:8-10.)

240.  J. Hoyal asked Strickler to submit orders to publishers through Wineoceros. (J. Hoyal Tr. 2168:17-25.) J. Hoyal and Simpson set Strickler's compensation for submitting orders through Wineoceros. (J. Hoyal Tr. 2171:3-5.)

241.    J. Hoyal provided advice to Bacon and Kaylor about calling publishers to ask if they could submit orders using subscription insert cards, a process he referred to as "white mail," including advising Bacon that if a publisher said no, she should continue calling to try to get a different answer. (J. Hoyal Tr. 2484:15-18, 2488:9-23, 2495:14-2496:13.)

242.    J. Hoyal knew that switches happened "all the time" (J. Hoyal Tr. 2409:1-10), and participated in discussions about switching consumers to magazine subscriptions or providing refunds when the operation could not provide the newspaper subscriptions those consumers ordered (J. Hoyal Tr. 2061:19-2062:1).

### (7)  J. Hoyal was aware the mailers were deceptive and provided direction on how to respond to consumer complaints.

243.    J. Hoyal knew that consumers did not understand that the mailers were from third parties, thought the mailers were from the publishers, and made their checks payable to the publications. (J. Hoyal Tr. 2046:8-2047:22; Exh. 364.) Simpson and Bacon received the same notice in 2009. (*See* Exh. 364.)

244.    J. Hoyal spoke with consumers who were confused by the operation's mailers and needed him to identify specific text on the mailer to understand that it was not a bill for their subscription. (J. Hoyal Tr. 2328:21-2329:5.)

245.    J. Hoyal was not surprised that consumers thought the mailer looked like a bill (J. Hoyal Tr. 2380:8-10), or thought the mailer was from the publisher (J. Hoyal Tr. 2380:11-13).

246.    J. Hoyal was aware that the operation received "a fair amount" of consumer complaints forwarded through state attorneys general. (J. Hoyal Tr. 2331:20-2332:11, 2333:5-6.)

247.    J. Hoyal was aware that Lovrien received and responded to consumer complaints, some of which were forwarded to Defendants through state attorneys general and the BBB. (J. Hoyal Tr. 2064:8-14.)

248.    J. Hoyal saw and was familiar with the complaints that Lovrien received from state attorneys general and the BBB. (J. Hoyal Tr. 2061:5-16, 2196:24-2198:11, 2331:20-2332:9; Exh. 118; Exh. 1004.)

249.    Pugsley informed J. Hoyal and Simpson about complaints received through the BBB and attorneys general. (J. Hoyal Tr. 2196:24-2198:8; *see* Exh. 1006.)

250.    J. Hoyal and Simpson talked about complaints received by the operation through state attorneys general and the BBB "all the time." (J. Hoyal Tr. 2197:17-2198:11.)

251.    J. Hoyal provided guidance to the operation concerning how to provide customer service, including how to draft written responses to consumer complaints. (J. Hoyal Tr. 2060:7-2061:4.)

252.    J. Hoyal discussed complaints involving the mailers for regional newspapers with Pugsley and Lovrien. (J. Hoyal Tr. 2436:8-20.)

253. J. Hoyal was aware that publishers, including *The New York Times*, rejected orders submitted by the operation. (J. Hoyal Tr. 2170:15-20, 2187:22-25.)

254. J. Hoyal was aware that *The New York Times* returned checks submitted by Wineoceros. (J. Hoyal Tr. 2170:21-23.)

255. J. Hoyal was aware that *The New York Times* wrote a check from its bank account to refund money that it deposited from Wineoceros. (J. Hoyal Tr. 2170:24-2171:2.)

256. J. Hoyal was aware the deceptive mailing operation received cease and desist letters from regional newspapers, as well as from *The Wall Street Journal* and *The New York Times*. (J. Hoyal Tr. 2179:1-11, 2179:17-2180:3, 2180:10-2182:19, 2184:1-2185:22, 2190:23-2196:17, 2434:25-2435:7, 2435:19-2436:1; Exh. 113; Exh. 150; Exh. 529 at 13-14.)

257. J. Hoyal was informed of cease and desist letters by other members of the operation, including Pugsley, Bacon, and Kaylor. (J. Hoyal Tr. 2178:12-2180:23, 2198:12-2200:22; Pugsley Tr. 306:18-22, 435:12-16; Exh. 407; Exh. 1006; Exh. 1007.)

    257.1. Pugsley informed J. Hoyal when she received or became aware of cease and desist letters from publishers. (Pugsley Tr. 306:18-22, 435:12-16; J. Hoyal Tr. 2178:12-15, 2179:1-11, 2198:12-2200:22.)

    257.2. Bacon informed J. Hoyal when she became aware of cease and desist letters from publishers. (J. Hoyal Tr. 2178:16-19, 2179:17-2180:3.) J. Hoyal instructed Bacon to inform him of cease and desist letters. (J. Hoyal Tr. 2189:16-22.)

    257.3. Kaylor informed J. Hoyal when she became aware of cease and desist letters from publishers. (J. Hoyal Tr. 2180:10-14, 2180:15-19.)

    257.4. J. Hoyal received cease and desist letters by email and was informed of them by telephone calls; he testified that "[t]here are a lot of normal ways it would come." (J. Hoyal Tr. 2199:21-2200:2.)

258. J. Hoyal received the July 19, 2010 cease and desist letter from Dow Jones from Pugsley. (Pugsley Tr. 308:17-20; Exh. 150.) J. Hoyal was aware that the deceptive mailing operation was "in a lot of tussle with *The Wall Street Journal* all the time." (J. Hoyal Tr. 2179:8-11.)

259. J. Hoyal was aware that the operation continued sending mailers for *The Wall Street Journal* after Dow Jones began sending cease and desist letters to the subscription operation in 2010. These mailings included mailings in or about March 2011, 2012, March 2013, and January 2014. (J. Hoyal Tr. 2427:9-2432:9; *see also* Exh. 2162.)

260. On December 15, 2011, J. Hoyal received a copy of a Dow Jones fraud alert alleging that Orbital "sends out deceptive notices styled as a 'renewal notice/new order' that misleadingly suggests it has a relationship to *The Wall Street Journal*. . . ." (J. Hoyal Tr. 2180:24-2183:6; Exh. 113 at 2.)

261. J. Hoyal was aware that the operation sent mailers for *The Wall Street Journal* after receiving the December 15, 2011 fraud alert. (J. Hoyal Tr. 2183:13-15.)

262. J. Hoyal has received hundreds, if not thousands, of cease and desist letters over the years and considers them to be "like holiday cards." (J. Hoyal Tr. 2418:6-23.) J. Hoyal was also aware of cease and desist letters sent to prior iterations of the subscription operation. (J. Hoyal Tr. 2037:4-15.)

263. J. Hoyal believed that he would have received a copy of the July 5, 2014 cease and desist letter from *The New York Times* to CAS. (J. Hoyal Tr. 2190:25-2196:17; Exh. 529 at 13-14.)

264. J. Hoyal was aware that *The New York Times*' cease and desist letters included language such as, "Please note: We will not process any sort of subscription orders submitted by Customer Access Services, Inc., or any affiliated companies, and any representation to a customer that such service is being provided by Customer Access Services, Inc. or its affiliates is fraudulent." (J. Hoyal Tr. 2190:25-2191:12; *see* Exh. 529 at 13.)

265. J. Hoyal received from Pugsley a copy of a cease and desist letter sent by counsel for *The Washington Post* on October 8, 2014. (J. Hoyal Tr. 2198:12-2220:2; Exh. 407.)

266. J. Hoyal received from Pugsley a copy of a cease and desist letter sent by *The Honolulu Star Advertiser*. (J. Hoyal Tr. 220:3-22; Exh. 1007.)

267. J. Hoyal was aware that the operation received "a lot of pushback" from regional newspaper publishers, including cease and desist letters, and an "exceptionally high amount of complaints" when it began sending mailers for regional newspapers. (J. Hoyal Tr. 2434:25-2435:7, 2435:19-2436:1.) He received "a lot of calls from Lydia [Pugsley] and Laura [Lovrien]" about the problems that resulted from sending mailers for regional newspapers. (J. Hoyal Tr. 2436:8-20.)

268. J. Hoyal knew about litigation involving allegations that the mailers sent by the operation were misleading and has been involved in litigation about these deceptive mailers for more than 20 years. (J. Hoyal Tr. 2330:22-2331:4.)

    268.1. J. Hoyal was aware that, between 1998 and 2004, publishers, including McGraw-Hill, Amos Press, Taunton Press, and Outdoor Empire, alleged that IC Marketing sent mailers, similar to the ones used between 2010 and 2015, which were deceptive and that IC Marketing continued to send mailers for those publications, even after injunctions were entered prohibiting this conduct. (J. Hoyal Tr. 2201:22-2202:14, 2205:18-2210:21, 2212:18-24, 2421:16-22; Exh. 552; Exh. 553.) He was also aware that reviewing courts rejected IC Marketing's contention that it could send mailers for publications despite receiving cease and desist letters from publishers under a theory of "agency sales." (J. Hoyal Tr. 2210: 24-2211:10, 2213:14-2215:8.)

    268.2. J. Hoyal was aware that the state of Oregon brought action against IC Marketing in 2001, alleging that the mailers it sent to consumers were deceptive, and that this litigation was resolved by a Consent General Judgment in 2004. (J. Hoyal Tr. 2219:19-2220:1; Exh. 555.)

    268.3. J. Hoyal was aware that Crain Communications brought suit in December 2006 against GDS, Mail Industries, Simpson, J. Hoyal, L. Hoyal, Parducci, and the companies they owned or operated, alleging that they sent subscription mailers,

similar to the ones sent between 2010 and 2015, that misrepresented that they were sent by or authorized by Crain Communications. (J. Hoyal Tr. 2216:3-2219:8; Exh. 556.)

268.4. J. Hoyal was aware that the state of Oregon brought an action against the deceptive mailing operation, including most of these Corporate and Individual Defendants, in March 2015, which was resolved in June 2015 with an AVC. (J. Hoyal Tr. 2443:4-8, 2448:13-2449:11; Exh. 2013 (Complaint); Exh. 2020 (AVC).) J. Hoyal signed the AVC on June 19, 2015, both personally and on behalf of H&A. (Exh. 2020 at 15-16.)

### iii) L. Hoyal managed consumer money from the deceptive mailing operation through H&A.

269.   Lori Hoyal ("L. Hoyal") has also been known as Lori Hutchings. (L. Hoyal Tr. 1084:20-24, 1138:7-8.)

270.   L. Hoyal has been Secretary and Treasurer of H&A since at least 2010. (L. Hoyal Tr. 1086:2-5, 1089:22-1090:6; J. Hoyal Tr. 2019:9-12; Exh. 293.) L. Hoyal owns a 50% interest in H&A. (L. Hoyal Tr. 1086:8-12, 1141:8-13.)

271.   On behalf of H&A, L. Hoyal prepared and signed corporate documents (L. Hoyal Tr. 1088:12-21, 1090:7-10; Exh. 293), and filed documents with the state of Oregon (L. Hoyal Tr. 1090:17-21; Exh. 293.)

272.   L. Hoyal handled the financial operations of H&A (L. Hoyal Tr. 1090:22-24), including:

272.1.   opening bank accounts and holding signatory authority over them (L. Hoyal Tr. 1092:14-1094:22; Exh. 1042 at 77-81; Exh. 1043 at 29-31; Exh. 1044 at 5);

272.2.   keeping the books, including maintaining QuickBooks and preparing balance sheets and profit and loss reports (L. Hoyal Tr. 1090:22-1091:13);

272.3.   paying H&A bills (L. Hoyal Tr. 1090:22-1091:3);

272.4.   receiving funds on behalf of H&A (L. Hoyal Tr. 1091:4-5);

272.5.   depositing funds to H&A accounts (L. Hoyal Tr. 1091:6-7);

272.6.   reviewing and reconciling H&A bank statements (L. Hoyal Tr. 1091:17-18, 1219:7-12);

272.7.   signing checks and wiring funds from H&A accounts (L. Hoyal Tr. 1091:22-25); and

272.8.   preparing documents to assist the accountant who prepared H&A's tax returns. (L. Hoyal Tr. 1092:1-3.)

273.   L. Hoyal prepared invoices on behalf of H&A, including invoices from H&A to Maximillian to receive funds from the deceptive mailing operation. (L. Hoyal Tr. 1091:19-21, 1095:19-25, 1096:6-16, 1146:12-14.)

274. L. Hoyal trained Parducci to track the subscription operation's finances and to distribute funds from the operation. (L. Hoyal Tr. 1129:19-1131:7; Parducci Tr. 599:19-23; Exh. 379.) L. Hoyal received Parducci's reports. (Exh. 3333.)

275. L. Hoyal communicated with J. Hoyal and Parducci regarding invoices and payments related to H&A's share of the profits from the deceptive mailing operation. (L. Hoyal Tr. 1099:1-1100:15, 1101:17-1102:2, 1102:10-1103:12, 1104:6-1106:11, 1106:17-1108:7, 1146:18-1147:16, 1202:14-16; Exh. 327-328; Exh. 339; Exhs. 380-381; Exh. 3301; Exh. 3464; Exh. 3482.)

276. L. Hoyal knew the funds H&A received from Maximillian were from the mailing operation. (L. Hoyal Tr. 1136:21-1137:3; *see also* Exh. 339 at 1.)

277. L. Hoyal knew that H&A and Reality Kats split the profits of the deceptive mailing operation equally. (L. Hoyal Tr. 1202:23-1204:13.)

278. L. Hoyal was not aware of a written agreement between H&A and Maximillian at any time. (L. Hoyal Tr. 1202:11-13.)

279. L. Hoyal was aware that banks closed H&A accounts; the banks did not tell her why they closed the accounts. (L. Hoyal Tr. 1093:16-1094:2.)

### (1) L. Hoyal transferred funds from H&A to related Hoyal entities and to Reality Kats.

280. Between March and April 2011 alone, L. Hoyal transferred $500,000 of consumer money through H&A to related entities and to Reality Kats. (L. Hoyal Tr. 1108:8-25, 1115:12-1121:4; Exh. 339; Exh. 341-346; Exh. 1042 at 77-89 (H&A financial records, reflecting payments from Maximillian to H&A and from H&A, through Breeze and Crater Lake Trust, to Reality Kats); Exh. 1042 at 5-75 (Breeze and Crater Lake corporate and financial account opening records).)

280.1. On or about March 29, 2011, L. Hoyal prepared an invoice from H&A to Maximillian for $500,000 after receiving an email message from Parducci requesting the invoice. (Exh. 339.) Parducci made three payments from Maximillian to H&A, totaling $500,000, in response to the March 29, 2011 invoice; the final payment was made on April 11, 2011. (Exh. 339.)

280.2. On April 12, 2011, L. Hoyal wrote a check in the amount of $500,000 from H&A to Breeze Enterprises LLC ("Breeze"), a Hoyal entity, on April 12, 2011 and prepared an accompanying invoice from Breeze to H&A. (L. Hoyal Tr. 1108:8-25, 1115:8-1116:12; Exh. 1042 at 82 (April 12, 2011 check from H&A to Breeze, $500,000).)

280.3. On April 12, 2011, L. Hoyal drafted a check in the amount of $500,000 from the Breeze bank account, payable to Crater Lake Trust—another Hoyal entity—and deposited that check into the Crater Lake Trust account. (L. Hoyal Tr. 1118:6-1119:10; Exh. 1042 at 16-85.)

280.4. On April 13, 2011, L. Hoyal wired $500,000 from a Crater Lake Trust bank account to a bank account held in the name of Reality Kats. (L. Hoyal Tr. 1120:11-22; Exh. 1042 at 86.)

### (2) L. Hoyal was a primary financial beneficiary of the operation.

281. As an owner of H&A, L. Hoyal was a beneficiary of H&A's 50% profit from the subscription operation. (L. Hoyal Tr. 1086:8-12, 1141:8-13 (L. Hoyal owns 50% of H&A); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9; L. Hoyal Tr. 1201:23-1204:13 (H&A and Reality Kats split subscription operation profits equally).)

282. H&A received approximately $15 million from the subscription operation between 2011 and 2015. (Simpson Tr. 2542:11-2543:2; Exh. 559 (Reality Kats received $14.99 million between 2011 and 2015); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-2101:9, L. Hoyal Tr. 1201:23-1204:13 (H&A and Reality Kats split subscription operation profits equally).)

### (3) L. Hoyal participated in prior iterations of the deceptive mailing operation.

283. L. Hoyal formed Certified List Management, LLC, for which she served as manager, in June 2005 to help Simpson purchase consumer lists. (L. Hoyal Tr. 1121:21-1122:21; Exh. 375.)

284. L. Hoyal was the owner of Mail Industries. (L. Hoyal Tr. 1122:22-23.)

285. L. Hoyal was President, Secretary, and Registered Agent of Mail Industries, Inc. (L. Hoyal Tr. 1122:24-1123:1, 1123:21-23; Exh. 376.)

286. L. Hoyal opened bank accounts on behalf of Mail Industries and was the sole signatory over those accounts. (L. Hoyal Tr. 1129:8-12.)

287. Mail Industries was located at 3976 Bellinger Lane, the Hoyals' residence. (L. Hoyal Tr. 1085:16-24, 1123:16-20; Exh. 376.)

288. Through Mail Industries, L. Hoyal performed financial reporting and bookkeeping for mailing entities that sent out subscription mailers to consumers and paid equal distributions of profits from the subscription operation to J. Hoyal, Simpson, and Ackerman. (L. Hoyal Tr. 1157:8-17, 1123:24-1126:15, 1130:9-1131:7, 1155:1-1157:2, 1213:17-1214:11, 1221:7-22; Exh. 379.)

289. L. Hoyal requested invoices from Reality Kats to Mail Industries to distribute profits to Simpson. (L. Hoyal Tr. 1129:13-1130:13, 1157:8-14; Exh. 379.) L. Hoyal requested Reality Kats invoices by contacting Parducci. (L. Hoyal Tr. 1129:13-1130:4; Exh. 379.) L. Hoyal's point of contact for Reality Kats was Parducci. (L. Hoyal Tr. 1224:17-18.)

290. L. Hoyal used the same computer, email address, and telephone number for the work she did through H&A and through Mail Industries. (L. Hoyal Tr. 1128:21-1129:7.)

291. L. Hoyal has described the financial reporting she performed through Mail Industries as similar to the financial reporting work Parducci performed through Maximillian. (L. Hoyal Tr. 1123:24-1124:3, 1143:4-7.)

292. Crain Communications brought suit against Mail Industries and L. Hoyal, along with GDS, Simpson, J. Hoyal, and Parducci, alleging that they sent subscription mailers that misrepresented that they were sent by or authorized by Crain Communications. (J. Hoyal Tr. 2216:3-2218:11; L. Hoyal Tr. 1126:16-20,1215:5-9; Exh. 556.)

#### iv) Parducci used the Corporate Defendants to transfer consumer funds among the Defendants.

293. Parducci was the bookkeeper and financial coordinator of the deceptive mailing operation. (J. Hoyal Tr. 2076:9-12, 2090:13-23.)

294. Through her numerous roles within the common enterprise, including her legal control over Maximillian and HCG LLC, Parducci arranged for the transfer of consumer funds among multiple Defendants. (J. Hoyal Tr. 2077:5-2078:12, 2082:16-2083:1, 2084:10-2086:5, 2090:1-23, 2100:17-2101:9; Parducci Tr. 547:20-548:4, 548:15-25, 556:15-557:24, 558:14-21, 559:7-24, 560:18-561:2, 563:4-564:11, 565:21-25, 567:18-568:21, 574:7-576:2, 666:17-667:24; Exh. 109; Exh. 248; Exh. 327; Exh. 430; Exh. 1072; Exh. 3298 at 6, ¶¶ 18-19.)

295. Parducci gathered reports from each of the Corporate Defendants and consolidated the information into reports that she circulated among the Defendants. (J. Hoyal Tr. 2078:13-2079:22, 2090:13-23.)

296. Parducci also used the name "Littlefield." (Parducci Tr. 518:2-5; Lovrien Tr. 905:3-5.)

#### (1) Parducci used Maximillian to funnel consumer funds between the Defendants, including to herself.

297. Parducci was President and Secretary of Maximillian. (Parducci Tr. 518:6-10, 519:23-25, 520:8-10; 530:10-531:15; Exh. 218). On its behalf, Parducci:

297.1. opened and managed bank accounts (Parducci Tr. 541:24-542:14; Exh. 226);

297.2. created and sent invoices to other Corporate Defendants (Parducci Tr. 556:15-557:24, 558:14-21, 559:22-24; *see also* Exh. 327);

297.3. paid invoices from other Corporate Defendants (Parducci Tr. 545:24-546:1, 546:2-13, 563:4-564:11; Exh. 248; Exh. 109), and expenses related to the operation of the deceptive mailing operation, including lead lists (Parducci Tr. 550:9-18, 566:1-7, 645:3-15, 659:14-19; Exh. 3491), data management services related to the lead lists used to identify potential consumers to receive the deceptive mailers (Simpson Tr. 2639:1-7; Exh. 3407; Parducci Tr. 659:16-660:11), computers, data management software, and supplies (Parducci Tr. 676:11-678:2; Exh. 238 at 1-12);

297.4. transferred funds directly to certain Corporate Defendants, such as Crown, United, Atlas or Associated (Parducci 576:19-577:1; Exh. 109);

297.5. signed checks (Parducci 562:25-563:3);

297.6. directed other Defendants to send funds to Maximillian (Parducci Tr. 567:18-568:21; Kaylor Tr. 1722:20-1723:2; Exh. 1072);

297.7. executed corporate documents (Parducci Tr. 518:6-10, 519:23-25, 520:8-10, 530:10-16; Exh. 218), including a backdated contract that provided Maximillian access to "Reality Kats' databases for the purpose of mail campaigns for Maximillian's clients" (Parducci 536:1-539:19; Exh. 2009);

297.8. signed tax returns (Parducci Tr. 580:20-22); and

298. Parducci was integral to the flow of consumer funds among the Corporate Defendants described above, as she had sole signatory authority over Maximillian's accounts. (Parducci Tr. 551:6-7.) Maximillian was the financial hub at the center of the subscription operation, where "the money came in and went right back out…" (Parducci Tr. 603:6-11.)

299. On J. Hoyal's instructions, Parducci directed other Individual Defendants to cut checks for specific amounts to other Corporate Defendants. (Parducci Tr. 574:7-576:2; Exh. 430.)

300. Parducci drew $14,000 a month from Maximillian for her work on behalf of the Corporate Defendants, and later an additional $2,000 a month when she began working on behalf of PPP NY. (Parducci Tr. 528:22-529:7; 612:12-613:2.)

301. She also authorized transfers of funds from Maximillian's bank accounts for personal expenses, such as car and cell phone payments (Parducci Tr. 545:24-546:13), a loan payment in the name of Kenneth Parducci, and payments to various merchants including SiriusXM radio, TJ Maxx, Target, Claire's Boutique, Gap, Kohl's, and Starbucks, among others. (Exh. 1038 at 39-43.)

302. J. Hoyal estimated that Parducci received between $150,000 - $250,000 a year from the subscription operation. (J. Hoyal Tr. 2083:7-16.)

### (2) Parducci performed bookkeeping functions for Reality Kats.

303. Parducci performed administrative functions for Reality Kats. On its behalf she:

303.1. performed bookkeeping (Simpson Tr. 2546:9-13, 2547:8-10);

303.2. opened bank accounts and held signatory over those accounts (Simpson Tr. 2551:11-2553:14, 2553:25-2554:1, 3306:3-20; Exh. 1038 at 30; Parducci Tr. 552:10-14; Exh. 227);

303.3. created and sent invoices (Parducci Tr. 547:25-548:14; *see generally* Exh. 327; Simpson Tr. 2554:1-2555:21);

303.4. filed corporate documents with the state of Oregon (Simpson Tr. 2548:18-20);

303.5. collected Simpson and Reality Kats mail delivered to the Hoyal's residential addresses from L. Hoyal (Simpson Tr. 3254:14-3255:14);

303.6.  paid bills (Simpson Tr. 2548:1-6); and

303.7.  collected tax information for Reality Kats and communicated it to the accountant who prepared the tax returns. (Simpson Tr. 2547:11-15.)

304.  Parducci also opened a bank account for Reality Kats' parent entity, Scenic Trust (Parducci Tr. 553:3-554:10; Exh. 223), and made transfers out of the account (Parducci Tr. 555:-17-25.) Parducci provided Simpson with the user name and password for the account. (Simpson Tr. 3308:12-23.)

305.  Parducci performed her work on behalf of Reality Kats at her personal residence, creating and sending invoices to herself from Reality Kats to Maximillian by hitting "print." (Parducci Tr. 547:25-548:14.)

306.  Parducci paid herself through Maximillian for the work she performed on behalf of Reality Kats. (Parducci Tr. 679:10-20; Simpson Tr. 2548:9-17.)

### (3)  Parducci acted as manager of HCG LLC, signing documents and performing tasks integral to the continued success of the deceptive mailing operation.

307.  Parducci was manager and President for HCG LLC. (Strickler Tr. 1994:8-13; Parducci Tr. 593:9-20, 609:1-7; Exh. 236; Exh. 238; Exh. 74.) On its behalf, Parducci:

307.1.  opened bank accounts using her personal residence as the street address and held signatory authority (Parducci Tr. 583:6-584:12; Exh. 225);

307.2.  signed corporate documents and contracts for the company as "manager" (Parducci Tr. 588:20-590:8; 593:9-20; 609:1-7; Exh. 236; Exh. 74 at 24; Exh. 238 at 12, 21, 31), "president" (Parducci Tr. 605:12-606:11; Exh. 147; Exh. 124; Exh. 126; Exh. 147 at 3-4; Exh. 148 at 2), "accounting mgr" (Exh. 219; Exh. 225; Exh. 232; Exh. 236 at 1, 3, 5-6, 9, 11, 13, 25, 27, 29), and "operations & finance mngr" (Exh. 236 at 14, 20-21);

307.3.  sent invoices (Parducci 595:5-596:24; Exh. 232; Exh. 124); and

307.4.  appointed officers for its subsidiary entities Orbital and Liberty, signing as the President and "holder of 100% of all outstanding shares of the corporation." (Parducci Tr. 603:24-604:12, 697:2-700:1; Exh. 147; Exh. 148 at 2; Exh. 126.)

308.  Parducci opened bank accounts for HCG LLC's parent company, Revista Trust, providing her residential address as the mailing address, and signed the application that listed her as the trustee. (Parducci Tr. 586:10-24, 587:4-15; Exh. 224.)

309.  Parducci created financial reports for Revista Trust and sent them for J. Hoyal's review. (Parducci Tr. 588:10-16.)

310.  Parducci paid herself through Maximillian for the work she performed on behalf of HCG LLC. (Parducci Tr. 612:5-8.)

311. Parducci signed contracts on behalf of HCG LLC to obtain services related to maintaining consumer lead lists used to identify potential consumers to receive the deceptive mailers (Parducci Tr. 588:17-590:8, 659:14-660:11; Exh. 236; Simpson Tr. 2639:1-7; *see also* Exh. 3532), and data management software. (Parducci Tr. 590:24-593:20; Exh. 238 at 1-12).

312. Parducci performed tasks on behalf of HCG LLC at her personal residence, the same location as Maximillian's principal place of business. (Parducci Tr. 530:25-531:8, 533:13-19, 585:14-19; Exh. 218.)

313. Following entry of the 2015 Assurance of Voluntary Compliance, Parducci signed an asset purchase agreement on behalf of HCG LLC, selling its assets to Ryan Azares. Parducci previously sent payments to Mr. Azares, J. Hoyal and L. Hoyal's nephew, from Maximillian's accounts for his mail subscription business. (Parducci 606:25-610:6; Exh. 74 at 14-26.) Parducci signed this agreement as the "manager" of HCG LLC, and as "president" of Liberty, Orbital, Express, and Associated. (Exh. 74 at 23-24.)

   (4) **Parducci held signatory authority over numerous other Corporate Defendants and performed various tasks on their behalf.**

314. Parducci held signatory authority over Wineoceros' financial accounts (Parducci Tr. 613:5-614:6; Exh. 77; Strickler Tr. 1991:20-1992:7), was listed as its Secretary in documents submitted to financial institutions (Exh. 77; Exh. 1044 at 14-22), and performed bookkeeping tasks on its behalf. (Strickler Tr. 1992:17-21.)

315. Parducci was the Registered Agent of PPP OR, and "Noel Noelle" listed as the Incorporator. (Exh. 221.)

316. Parducci held signatory authority over PPP NY's financial accounts. (Parducci Tr. 614:17-19; Exh. 1039 at 5.)

317. Parducci purchased supplies on behalf of the PPP call center through Maximillian's accounts. (Parducci Tr. 676:11-677:2.)

   (5) **Parducci was integral in the operation of the interrelated entities as a common enterprise.**

318. Prior to acting as a corporate officer of several Corporate Defendants, Parducci provided bookkeeping services to other companies without acting as a corporate officer of these companies. (Parducci Tr. 521:12-526:6.) This included many of the same functions she later performed as part of the deceptive mailing operation, including signing checks on that company's behalf. (Parducci Tr. 521:12-526:6.)

319. Parducci was aware of, or had access to, information concerning the deceptive nature of the operation:

   319.1. Parducci provided regular reports about the financial aspects of the subscription operation to Simpson, J. Hoyal, and Pugsley, including HCG LLC and other Corporate Defendants' bank account balances, pending expenses, the date mailers were scheduled to be posted, the cost of each mailer, consumer orders received, any refunds paid, and call center operations. (Pugsley Tr. 426:19-21; J. Hoyal Tr.

2078:13-14, 2079:22, 2090:13-23, 2091:20-2094:6, 2095:17-2096:9, 2126:23-2129:15, 2130:10-2134:13, 2136:25-2137:19; Parducci Tr. 598:7-599:18, 600:14-602:12, 614:20-615:7; Exh. 317; Exh. 329; Exh. 336; Exh. 1071; Exh. 1074; Exh. 3298 at 7-8, ¶ 29.)

319.2. Parducci reported to J. Hoyal and Simpson the number of subscription orders received, the amount of mail received from consumers, and the operational expenses of the subscription business, both in daily reports and in additional email updates. (J. Hoyal Tr. 2091:20-2094:6, 2130:10-2134:13; Exh. 329; Exh. 1071; Exh. 3298 at 7-8, ¶ 29.)

319.3. Parducci included refunds on daily reports she circulated among the Defendants. (Parducci Tr. 617:8-20.)

319.4. Parducci received reports on the amount of refunds. (Pugsley Tr. 271:10-273:8; J. Hoyal Tr. 2174:18-2177:13; Exhs. 360-361.)

319.5. Parducci was aware of the insert card process used by the Defendants to submit consumer orders. (Parducci Tr. 618:7-11.)

319.6. Parducci was aware that the Defendants would switch consumers' newspaper orders with a magazine subscription, and she included the number of switches on her daily reports. (Parducci Tr. 618:24-619:3; *see also* Exh. 214.)

319.7. Parducci was aware that the Defendants' bank accounts were being closed by financial institutions. (Parducci Tr. 658:20-659:8.)

319.8. Parducci testified that she "probably received a mailer in the mail." (Parducci Tr. 616:9-19.)

319.9. Parducci was aware of cease and desist letters sent to the Defendants (Pugsley Tr. 490:17-492:6, Exh. 1008) and continued sending invoices to the Corporate Defendants sending the mailers and making disbursements from Maximillian's accounts, if instructed to do so. (Parducci Tr. 626:17-627:4.)

319.10.Parducci agreed to and signed a post-dated contract between Maximillian and Reality Kats that provided Maximillian access to Reality Kats' databases for the explicitly defined purpose of "mail campaigns for Maximillian's clients." (Parducci 536:1-539:19; Exh. 2009.)

319.11.Parducci was also involved in discussions about the logistics and operation of the scheme; she discussed price file and authorization issues with Bacon and reported these communications to Pugsley, Simpson, and J. Hoyal. (Exh. 214 at 14; *see also* 214B at 6 ("Hi Shannon, I'll give you a call tomorrow mid-morning'ish and go over the authorization process.")

320. Parducci testified that she paid invoices despite the fact that Maximillian did not owe the amounts specified on invoices and that it did not enter into any contracts with these companies. (Parducci 549:22-550:18.)

321.  Parducci performed the same bookkeeping and administrative functions for J. Hoyal and Simpson prior to becoming an officer of Corporate Defendants. (Parducci Tr. 681:24-682:3.) Parducci was personally named in a lawsuit brought by Crain Communications that alleged the subscription operation in existence at that time sent deceptive mail solicitations. (Parducci Tr. 680:14-682:14; J. Hoyal Tr. 2216:3-2219:8; Exh. 556.) Parducci was deposed in the matter, and yet testified that she does not recall whether she read the complaint personally naming her as a defendant. (Parducci Tr. 681:6-7, 682:13-14.)

> **v) Pugsley managed the mailing and receiving operation through multiple Corporate Defendants.**

322.  Pugsley and Lovrien are sisters; Babb is their mother. (Lovrien Tr. 832:2.)

323.  Pugsley dealt with Simpson regarding the mailers and with J. Hoyal regarding the financial aspects of the business. (Pugsley 425:24-426:3.)

324.  Pugsley worked closely with J. Hoyal and discussed all aspects of the subscription operation with him. (Pugsley Tr. 145:20-21 ("Any – anything and everything. I mean, if it had to do with operations, we would have a discussion.") Pugsley copied J. Hoyal on most email messages that she sent to Simpson, so he would be aware of those matters and could deal with them. (Pugsley Tr. 374:6-15.)

> **(1) Pugsley reviewed mailer proofs and was part of the process that sent them to consumers.**

325.  Pugsley was the liaison with World Marketing, the vendor that printed and sent the mailers to consumers; she coordinated revisions to mailers, review and approval of mail "proofs," and the timing of mailings. (Pugsley Tr. 167:7-171:23; 185:4-21; Exh. 100; Exh. 214; Exh. 1056.) Simpson provided direction to Pugsley regarding her communications with World Marketing. (Pugsley Tr. 3580:5-7.)

326.  Pugsley received some of the mailer forms directly from Simpson. (Pugsley Tr. 165:12-166:8, 196:24-197:20.) Exhibit 11 reflects the same form of mail piece that Pugsley recalls seeing prior to 1998, when she worked for one of Simpson's partners, taking calls from consumers in response to the mailers. (Pugsley Tr. 186:10-25; Exh. 11.)

327.  Pugsley provided the form of the mailers used by the enterprise to World Marketing, on behalf of Orbital, Liberty, Express, United, and Associated, to be printed and mailed to consumers. (Pugsley Tr. 165:5-166:8, 166:11-167:6, 196:24-197:20; Pugsley Tr. 166:16-23 (Orbital), 166:24-25 (Liberty), 167:1-2 (Express), 167:3-4 (United); 167:5-6 (Associated).)

328.  Pugsley received data files for the information to be printed on the mailers from Simpson, by email or online file transfer. (Pugsley Tr. 167:7-168:12; Exh. 1056.) These data files contained the consumer's address, publication, term, and price information to be printed on the mail pieces, the form of the mail piece to be used, the dba business name of the mailing entity, and the control numbers assigned to each mailer. (Pugsley Tr. 169:12-170:9, 197:18-20, 362:1-363:14.)

329.  Pugsley provided the data files she received from Simpson to World Marketing, to be printed on the mailer forms. (Pugsley Tr. 170:15-171:7; Exh. 1056 at 3.)

330. World Marketing sent Pugsley mailer proofs for review before they printed them and sent them to consumers. (Pugsley Tr. 185:5-13.) Pugsley reviewed mailer proofs on behalf of all of the mailing entities. (Pugsley Tr. 185:4-18.) *See* Exh. 100 (Orbital mailer proofs); Exh. 104 (Liberty mailer proofs); Exh. 105 (United mailer proofs); Exh. 109 (Associated mailers proofs); Exh. 1056.)

331. Pugsley forwarded mail proofs to Simpson and J. Hoyal, and suggested changes to Simpson and J. Hoyal about the mailer's form and substance. (Pugsley Tr. 217:24-223:1, 235:12-236:7; Exh. 100; Exh. 104; Exh. 211 at 1-4, 11-14, 96.)

332. Pugsley reviewed the mailer proofs for accuracy and also forwarded them to Lovrien and Babb for review and feedback. (Pugsley Tr. 185:19-186:4, 188:7-14, 195:5-14, 196:2-9, 206:17-208:21; Exh. 12; Exh. 100; Exh. 104; Exh. 105; Exh. 108.)

333. Pugsley received suggestions from Kaylor and Lovrien concerning changes to the form of the mail piece, based on consumer communications, and brought those suggestions to Simpson and J. Hoyal. (Pugsley Tr. 216:17-217:14, 364:11-365:24; Exh. 100.)

334. Pugsley, on behalf of the mailing entities, received price files from clearing firms every week and reviewed them personally. (Pugsley Tr. 384:25-385:19.)

335. After 2011, Pugsley only received price files that contained *The New York Times* and/or *The Wall Street Journal* from Bacon and Kaylor. (Pugsley Tr. 325:25-326:11.)

336. Pugsley was aware that Bacon's price files included publications for which she only submitted orders using subscription insert cards. (Pugsley Tr. 282:11-20, 314:24-315:5.)

337. Pugsley testified that if a title appeared on a price file, the operation sent mailers for that title; she took no other action to determine whether to send mailers. (Pugsley Tr. 267:10-22, 322:10-325:22, 351:1-352:3.)

   337.1. This was the case even if the operation received a cease and desist letter from the publisher of the title. (Pugsley Tr. 267:10-22, 308:17-309:6, 310:3-13, 311:8-312:16, 481:21-482:12.)

   337.2. This was the case even if the publication was rejecting orders and returning checks sent by the operation. (Pugsley Tr. 481:21 – 482:12.)

   337.3. Simpson and J. Hoyal informed Pugsley that if a title appeared on a price list, the operation could send mailers for that title. (Pugsley Tr. 417:6-19.)

338. Pugsley understood that "clearance" to submit orders to publishers and permission to send mailers are different matters. (Pugsley Tr. 262:11-24.)

   (2) **Pugsley managed the operations of the mailing entities.**

339. Pugsley provided bookkeeping and data management services and managed orders for the printing and mailing of mailers to consumers for Orbital, Liberty, Express, United, and Associated, through her companies Adept and Crown. (Pugsley Tr. 127:2-24; 132:17-133:1;

135:19-23; 148:13-18; ; J. Hoyal Tr. 2062:2-23; Dkt. 131 at 12, ¶ 40.) Pugsley did the same work through Adept and Crown. (Pugsley Tr. 132:10-12.)

340. Pugsley performed and supervised the processing and receiving work of the mailing entity Defendants and Orbital at her Eagle Point Property between 2010 and 2014 and, in 2015, from White City Building. (Pugsley Tr. 127:7-15, 302:12-17; Lovrien Tr. 833:21-834:1, 880:25-881:3.)

341. Pugsley entered customer orders into the database, assisted with sorting and preparing consumer checks for deposit, and supervised the other individuals who performed this work, including Lovrien, Babb, and Strickler. (Pugsley Tr. 198:24-200:7, 200:20-24, 436:18-437:1; Strickler Tr. 1936:20-22, 1941:3-9; Lovrien Tr. 847:17-20.)

342. Pugsley hired individuals to sort and process subscription orders and payments received from consumers, trained, supervised, and managed those individuals, and provided them with a place to work. (Pugsley Tr. 150:15-23, 151:7-22, 152:4-12, 156:5-8, 436:18-437:1, 439:15-18; Lovrien Tr. 832:15-21, 836:12-837:8; Strickler Tr. 1936:8-22; Babb Tr. 720:8-10.)

343. Pugsley received reports from Lovrien, Babb, and Strickler about consumer orders entered, payments deposited, and customer service issues. (Pugsley Tr. 154:14-19, 156:18-157:3; Babb Tr. 720:21-25.)

344. Pugsley gave Lovrien templates for language to use in responding to complaints from state attorneys general. (Lovrien Tr. 1058:2-5.) Pugsley instructed Lovrien to invoice Maximillian for the work she did on behalf of United. (Lovrien Tr. 869:6-10.)

345. Pugsley registered web domains used by Corporate Defendants, including "pubgroups.com," "publisherspayment.com," "premiersubscriptionnetwork.com," and "unitedpubex.com," and used her personal credit card to pay for them. (Pugsley Tr. 158:24-162:12; Exh. 1024.)

346. Pubgroups.com hosted the subscription order tracking system, as well as email accounts used by Babb, Lovrien, Strickler, and others. (Pugsley Tr. 159:18-160:2; Strickler Tr. 1969:18-21.)

347. Pugsley worked with a programmer to develop a "pubgroups" computer system that was used by data entry and call center personnel to track subscription orders (Pugsley Tr. 155:22-156:10.) The "pubgroups" computer system contained information about every mailer, including the control number, the consumer's information, whether the consumer made payments, the check number on any payments, the date of any payments, the company that submitted the order, and customer service notes, including complaints. (Pugsley Tr. 372:3-25; Bacon Tr. 1496:5-1497:7; Kaylor Tr. 1636:9-1637:3, 1642:22-1643:15.)

348. Pugsley had the highest level of access (5 of 5) to the "pubgroups" computer program used to manage customer orders, refunds, and data. (Lovrien Tr. 891:25-892:5.)

349. Pugsley also provided training for the "pubgroups" computer system. (Pugsley Tr. 156:3-8, 372:3-373:2).

350. Publisherspayment.com and unitedpubex.com were domain names used on the mailers sent to consumers, for website, credit card payment, and customer service purposes. (Pugsley Tr. 162:4-163:14; *see also* Exhs. 11, 118 at 34-35(mailers reflecting publisherspayment.com); Exhs. 105 at 6, 118 at 28 (mailers reflecting unitedpubex.com).)

351. Pugsley worked with Bacon and a programmer to set up the website publisherspayment.com. (Pugsley Tr. 163:15-20, 448:2-14.)

352. Pugsley transferred the domain name "publisherspayment.com" to Bacon. (Pugsley Tr. 161:11-21.)

353. Pugsley provided direction to call center management, including Kaylor and Bacon, about refund processing, including expediting refunds for consumers who complained to law enforcement agencies or the BBB. (Pugsley Tr. 273:9-275:9; Exh. 403.)

### (3) Pugsley sent subscription orders to Bacon to submit to publishers and coordinated the submitting and switching of consumer orders.

354. Pugsley sent orders received in response to the mailers to submitting entities to be forwarded to publishers, a process she referred to as "remit." (Pugsley Tr. 275:23-276:13.)

355. Pugsley sent subscription orders received in response to Liberty, Express, United, and Associated mailers to Bacon for submission to publishers. (Pugsley Tr. 276:8-13, 435:7-11.) Pugsley also sent subscription orders received in response to Orbital mailers to Bacon. (Exh. 214B at 9.)

356. Pugsley understood that Bacon operated "in house" clearing entities. (Pugsley Tr. 284:5-285:2; J. Hoyal Tr. 2478:7-15.)

357. Pugsley paid the submitting companies on behalf of the mailing companies. (Pugsley Tr. 282:21-283:14, 283:17-284:1.)

358. Pugsley was told by Bacon when she set up new companies to submit orders to publishers. (Pugsley Tr. 282:24-283:4, 288:2-5, 289:11-290: 9, 294:11-296:8, 297:1-20; Exh. 517; Exh. 1060; *see also* Exh. 197; 513.)

359. Pugsley also used Anchor to send orders to the companies that submitted them to publishers and to pay them for that work. (Pugsley Tr. 282:24-283:14, 299:9-10; Babb Tr. 729:5-9, 729:21-23.)

360. Pugsley, Lovrien, and Bacon communicated about clearing and switch operations. (Pugsley Tr. 276:14-277:13.)

361. The term "switch" refers to the process of sending consumers notice that they would receive "replacement publications" instead of the publications they ordered, either because the ordered publication was no longer in print or because the publishers rejected orders submitted by the defendants, unless the consumer affirmatively requested a refund by a specified date. (Pugsley Tr. 266:4-268:22, 290:15-292:9, 479:9-481:15; Exh. 518.)

362. Pugsley coordinated the submitting and switch operations through Adept and Crown, including directing Lovrien to send subscription orders that had been rejected to Bacon to be "resubmitted as a switch file" and advising Bacon to submit a different mailer in response to an audit request because the operation's mailers would not get approval. (Pugsley Tr. 277:14-278:19, Exh. 132; Pugsley Tr. 474:24-475:16, 478:8-18.)

363. Pugsley provided Bacon with examples of switch notices that Pugsley sent on behalf of Orbital in 2010, regarding *The Wall Street Journal* subscriptions, to facilitate Bacon's switch operations. (Pugsley Tr. 282:1-6).

364. Pugsley was aware that Bacon's price lists included publications for which Bacon only submitted orders using subscription insert cards. (Pugsley Tr. 282:11-20, 314:24-315:5; *see also* Exh. 214A at 2; Exh. 214B at 1, 4.)

### (4) **Pugsley provided reports to Simpson, J. Hoyal, and Parducci on "absolutely everything."**

365. Pugsley reported on all aspects of the subscription operation —"absolutely everything" – to Simpson, J. Hoyal, and Parducci, including the QuickBooks, balances in corporate bank accounts, accounts payable, amount of mail that was received, amount of mail that was entered, pounds of mail that was received, number of orders that were entered into the computer system, remits, switches, refunds, and bills paid. (Pugsley Tr. 241:14-255:16, 271:10-273:8; Exhs. 161-163, 179, 182, 214, 360-61.)

366. Pugsley reported switches on the weekly remit reports that she sent to Simpson, J. Hoyal, Parducci, and Lovrien (Exh. 161-163) and provided additional detailed information on the switch operations by email (Pugsley Tr. 252:9-11, 257:17-261:12; Exh. 214 at 1-2, 14; Exh. 279; Exh. 356).

367. Pugsley provided a list of "titles on switch" each week to Simpson, J. Hoyal, Lovrien, and Bacon. (Pugsley Tr. 261:13-262:10; Exh. 355.)

368. Pugsley informed Simpson, J. Hoyal, and Parducci when banks closed subscription operation accounts or refused to accept deposits. (Pugsley Tr. 248:7-16, 249:12-14; Exh. 182 at 14.)

369. Pugsley sent nightly reports to Simpson containing all information regarding consumer responses to the mailers that had been received that day, including consumer name, publication ordered, price, and whether the payment was partial or in full. (Pugsley Tr. 244:20-247:11, 442:13-21; Exh. 179 at 17; Exh. 182 at 1, 7.)

370. Pugsley reported all financial information regarding the subscription operation to Parducci, including all funds received from consumers for subscription orders. (Pugsley Tr. 153:25-154:2, 157:18-22, 426:17-19.)

### (5) **Pugsley managed the financial operations of the mailing entities and profited from the deceptive mailers.**

371. Pugsley opened bank accounts for Orbital, held signatory authority over these accounts (Pugsley Tr. 126:23-127:1; Exh. 1046 at 1-2, 4-5), and held signatory authority over

Liberty's accounts. (Pugsley Tr. 133:2-135:18; Exh. 127; Exh. 1036 at 62-89; Exh. 1040 at 3-28; Exh. 1041 at 7-62; Exh. 1042 at 91-118.)

372. Pugsley directed Bacon and Strickler to open bank accounts for Express (Pugsley Tr. 136:8-138:17, 142:22-144:6, 146:3-11; Exhs. 62-63), received updates from Strickler about his attempts to open accounts and make deposits (Pugsley Tr. 146:15-147:3; Strickler Tr. 1966:18- 1968:17; Exhs. 65-67), and had online access to Express accounts (Pugsley Tr. 135:22-136:1). Pugsley also did the bookkeeping for Express. (Pugsley Tr. 385:13-15.)

373. Pugsley wrote checks on behalf of corporate defendants that others would sign. (Lovrien Tr. 865:15-20; Exh. 156; Babb Tr. 728:16-729:4.)

374. Pugsley transferred consumer funds from Orbital, Liberty, Express, United, and Associated to HCG LLC, in response to invoices for "consulting" from Parducci, on behalf of HCG LLC and Maximillian, and paid those invoices from the mailing entity bank accounts. (Pugsley Tr. 148:19-150:12; Exh. 124.)

375. Pugsley transferred funds from the mailing entity dba accounts to the mailing entity main accounts before transferring funds to HCG LLC and Maximillian. (Pugsley Tr. 202:16-20, 203:6-22.)

376. Pugsley performed bookkeeping for Orbital, Liberty, Express, Associated, and United (Dkt. 131 (Amended Answer of Pugsley) at 12, ¶ 40; Pugsley Tr. 126:21-22, 132:17-20) and provided the financial statements, profit and loss statements, and cash flow reports for these companies to J. Hoyal and Parducci. (Pugsley Tr. 423:20-424:6.)

377. Pugsley received credit card settlement reports from the call center and incorporated the information from these reports into the daily financial reports she provided to Parducci. (Pugsley Tr. 157:4-22; Exh. 411.)

378. Pugsley negotiated with J. Hoyal for Adept to receive payment of $30,000 per month, paid from HCG LLC, and for Crown to receive $10,000 a month, paid from Maximillian, for her work managing these functions. (Pugsley Tr. 127:16-20, 182:15-20, 183:5-7, 429:22-430:5, 431:6-11; J. Hoyal 2064:15-18, 2065:9-13.) Pugsley submitted invoices on behalf of Adept and Crown to HCG LLC and Maximillian, respectively, by sending those invoices to Parducci. (Pugsley Tr. 131:17-132:9.)

379. Pugsley received $5,000 a month from each Adept and Crown as payroll; any remaining funds from Adept and Crown, after expenses, were transferred to Pugsley's farm or to her trust (Stevo Trust). (Pugsley Tr. 182:21-184:15, 431:12-25, 433:11-434:4.)

### (6) Pugsley was the corporate officer of Adept and Crown.

380. Pugsley was the President, Secretary, and Registered Agent of Adept (Pugsley Tr. 128:2-16; Exh. 187). On its behalf, Pugsley

380.1. opened bank accounts and held signatory authority over those accounts (Pugsley Tr. 129:1-13; Exh. 1030);

380.2. signed corporate documents (Pugsley Tr. 128:2-18; Exh. 187);

380.3. negotiated the terms of Adept's responsibilities and compensation as part of the subscription operation with J. Hoyal (Pugsley Tr. 127:16-20, 182:15-20, 183:5-7, 429:22-430:5, 431:6-11); and

380.4. determined her own compensation. (Pugsley Tr. 431:3-5.)

381. Pugsley was the manager of Crown. (Pugsley Tr. 129:20-22.) On its behalf, Pugsley

381.1. opened bank accounts and held signatory authority over those accounts (Pugsley Tr. 130:3-14; Exh. 196);

381.2. filed documents with the state of Nevada (Pugsley Tr. 129:25-130:2);

381.3. negotiated the terms of Crown's responsibilities and compensation as part of the subscription operation with J. Hoyal (Pugsley Tr. 127:16-20, 182:15-20, 183:5-7, 429:22-430:5, 431:6-11); and

381.4. submitted invoices to Maximillian. (Pugsley Tr. 131:17-132:9.)

382. Crown is owned by Stevo Trust, an entity for which Pugsley and her husband are the settlors and J. Hoyal served as Trustee from its inception until 2018. (Pugsley Tr. 130:17-131:15.)

### (7) Pugsley was aware of consumer complaints.

383. Pugsley was aware of consumer complaints made to the operation.

383.1. Pugsley was aware that the operation received complaints from consumers and filed those complaints in their records. (Pugsley Tr. 408:18-21.)

383.2. Pugsley was aware of some of the consumer complaints from state attorneys general and the BBB. (Pugsley Tr. 470:22-471:2.)

383.3. Pugsley handled some of the complaints from state attorneys general before Lovrien started handling them. (Pugsley Tr. 155:2-15.)

383.4. Pugsley provided Lovrien with templates for responding to complaints forwarded through state attorneys general. (Lovrien Tr. 1058:2-5.)

383.5. Pugsley was aware that consumers complained about the mailers. (Pugsley Tr. 469:25-470:21.)

383.6. Pugsley supervised individuals who handled customer service work, including Strickler, Lovrien, and Babb. (Pugsley Tr. 154:10-16.)

383.7. Pugsley received customer service logs from Lovrien and Babb, which contained information about their telephone calls with consumers. (Pugsley Tr. 154:17-19, 193:6-18.)

383.8. Pugsley handled customer service issues. (Strickler Tr. 1937:11-22; 1944:23-1945:20.)

383.9. Pugsley was aware that the operation received a higher than usual rate of consumer complaints after they started sending mailers for regional newspapers. (Pugsley Tr. 339:3-9.)

383.10. Pugsley was aware that switches led to customer complaints. (Pugsley Tr. 388:19-24, 468:7-8.)

383.11. Pugsley worked as a customer service representative in 1997 and 1998, answering consumer calls placed in response to mailers that looked like the ones Defendants sent to consumers between 2010 and 2015. (Pugsley Tr. 114:18-116:25, 407:25-408:1-6.)

384. Pugsley provided reports to Simpson and J. Hoyal about complaints forwarded from state attorneys general and the BBB. (Pugsley Tr. 471:12-472:7; Exh. 1006.)

385. Pugsley was aware that consumers were stopping payments on the checks they sent to the operation. (Pugsley Tr. 471:6-8, 484:15 ("There were tons of stop payments."))

386. Pugsley provided reports to Simpson and J. Hoyal about consumers who stopped payment on their checks. (Pugsley Tr. 270:9-271:5, 471:12-25; J. Hoyal Tr. 2172:22-2174:14; Exh. 558; Exh. 1006.)

387. Pugsley provided reports to Simpson and J. Hoyal about "cancelled" orders and/or offers. (Pugsley Tr. 268:23-270:8, 465:2-14; Exhs. 357, 557.)

388. Pugsley was aware that publishers were making complaints about the subscription mailers. (Pugsley Tr. 471:9-11.)

389. Pugsley was usually told by Lovrien when the subscription operation received "cease and desist" letters from publishers and received copies of those letters. (Pugsley Tr. 306:2-9).

390. When Pugsley learned of cease and desist letters, she informed the other members of the subscription operation, including Simpson, J. Hoyal, and Lovrien. (Pugsley Tr. 306:18-307:1, 435:12-16, 472:1-7; Exh. 1006.)

391. Pugsley was aware of "fraud alerts" and cease and desist letters from publishers, including the following:

391.1. July 19, 2010 cease and desist letter on behalf of *The Wall Street Journal*. (Pugsley Tr. 307:8-23; Exh. 150, p. 1-2.) Pugsley forwarded this cease and desist letter to Simpson, J. Hoyal, and David Lennon. (Pugsley Tr. 308:17-20.)

391.2. June 15, 2011 cease and desist letter concerning *The Wall Street Journal* sent to Lovrien. (Pugsley Tr. 309:11-20; Exh. 150, p. 3-4.)

391.3. December 15, 2011 fraud alert by Dow Jones, which she forwarded to Simpson and J. Hoyal. (Pugsley Tr. 318:20-321:10; Exh. 113.)

391.4. July 2014 cease and desist letter Bacon received from *The New York Times*. (Pugsley Tr. 321:13-23; Exh. 531; Exh. 529 at 13-14.)

391.5. September 30, 2014 letter from Scripps Media. (Exh. 1010.) Pugsley forwarded this letter to Simpson, Bacon, and Lovrien on October 9, 2014. (Exh. 452.)

391.6. October 2, 2014 letter from *The Honolulu Star-Advertiser*. (Exh. 405; Exh. 1007.) Pugsley forwarded this letter to J. Hoyal, Simpson, Bacon, and David Lennon on October 20, 2014. (Exh. 1007.)

391.7. October 3, 2014 letter from *The Tulsa World*. (Pugsley Tr. 327:21-328:3; Exh. 1009.) Pugsley informed Simpson, Lovrien, and Bacon of this letter on October 8, 2014 (Exh. 1009) and forwarded a copy to them on October 10, 2014. (Exh. 158.)

391.8. October 3, 2014 letter from *The Omaha World Herald*. (Pugsley Tr. 327:21-328:3; Exh. 1009.) Pugsley informed Simpson, Lovrien, and Bacon of this letter on October 8, 2014 (Exh. 1009) and forwarded a copy to them on October 10, 2014. (Exh. 158.)

391.9. October 3, 2014 letter from *The Chicago Sun Times*. (Pugsley Tr. 327:21-328:3; Exh. 133; Exh. 1009.) Pugsley informed Simpson, Lovrien, and Bacon of this letter on October 8, 2014. (Exh. 1009.)

391.10. October 6, 2014 letter from Gannett Co., on behalf of its publications, including the *Cincinnati Enquirer*, the *Kentucky Enquirer*, the *Arizona Republic*, and the *Indianapolis Star*. (Exh. 452.) Pugsley forwarded this letter to Simpson, Bacon, and Lovrien on October 9, 2014. (Exh. 452.)

391.11. Letter from Dispatch Printing Co. (Exh. 452) Pugsley forwarded this letter to Simpson, Bacon, and Lovrien on October 9, 2014. (Exh. 452.)

391.12. October 7, 2014 letter from *The Washington Post*. (Exh. 133.) Pugsley forwarded this letter to J. Hoyal, Simpson, Bacon, and David Lennon on October 13, 2014. (Exh. 407.)

391.13. October 10, 2014 letter from *The Dallas Morning News*. (Exh. 158). Pugsley forwarded a copy of this letter to Simpson, Lovrien, and Bacon on October 10, 2014. (Exh. 158.)

391.14. Numerous cease and desist letters from regional newspapers starting in September 2014, which she forwarded to Simpson, J. Hoyal, Lovrien, and Bacon. (Pugsley Tr. 327:7-14.)

392. Pugsley was aware of other indicia of fraud, including:

392.1. bank account closures (Pugsley Tr. 248:7-249:14; Exh. 182 at 14);

392.2. warnings from third-party clearinghouses that the mailers were deceptive and/or unauthorized (Exh. 38);

392.3. trouble clearing newspaper orders (Pugsley Tr. 386:22-387:4);

392.4. the use of mail drops in Colorado and Texas to submit orders to publishers from other locations (Pugsley Tr. 315:14-316:7);

392.5. newspaper publishers rejecting orders and not cashing or returning checks submitted by the subscription operation (Pugsley Tr. 305:4-23, 314:9-14, 489:9-10; Exh. 1068);

392.6. consumer checks written to the publications (Pugsley Tr. 302:12-22; Exh. 1051);

392.7. high volumes of switches (Pugsley Tr. 305:4-13; Exh. 1068); and

392.8. that the lack of "clearance" for newspapers was causing "a huge customer service nightmare." (Pugsley Tr. 304:8-23.)

393. Pugsley signed an Assurance of Voluntary Compliance ("AVC") with Oregon in June 2015. (Pugsley Tr. 329:20-23, 333:9-11). Pugsley testified that she understands the AVC she signed in June 2015 to only prevent her from working in the subscription business within the state of Oregon. (Pugsley Tr. 502:10-18)

394. In October 2015, J. Hoyal approached Pugsley about the potential of opening a new subscription operation. (Pugsley Tr. 329:24-331:1, 504:8-10) After J. Hoyal approached Pugsley, Pugsley talked with Lovrien and Babb about his proposal. (Pugsley Tr. 329:24-331:1, 510:11-513:12.) Pugsley also received copies of proposed mail pieces for a potential new subscription operation. (Pugsley Tr. 504:11-13.)

395. Pugsley included Lovrien on virtually all email messages that she sent concerning the subscription operation, including reports, so operations could continue if Pugsley were not available. (Pugsley Tr. 141:17-142:21, 242:11-15.)

396. Pugsley structured financial transactions to avoid scrutiny by financial institutions. (Pugsley Tr. 263:2-265:5; Exh. 279.)

397. Pugsley received daily reports from the call center, which included call volume, number of orders received by phone, and the dollar amount of those orders. (Kaylor Tr. 1637:24-1638:6, 1639:6-11.)

### vi) Lovrien oversaw the mailing and receiving operations and responded to consumer complaints.

#### (1) Lovrien managed the mailing and receiving operations.

398. Lovrien began working part-time for the operation in 2009 and became a full-time employee of Orbital in 2010. (Lovrien Tr. 832:3-833:8.) When she began working for Orbital, her duties included:

398.1. opening incoming mail (Lovrien Tr. 838:19-24, 844:25-845:3);

398.2. sorting the mail into payments, cancellations, removal requests, and complaints (Lovrien Tr. At 845:7-846:9);

398.3. entering consumer orders into a database (Lovrien Tr. 837:19-838:3; 888:24-890:11; J. Hoyal Tr. 2064:4-7; Strickler Tr. 1941:3-9);

398.4. canceling orders when checks were returned by the bank (Lovrien Tr. 838:13-14.)

398.5. sorting and preparing consumer checks for deposit (Lovrien Tr. 838:22-839:22, 846:19-847:9; Pugsley Tr. 198:24-200:24); and

398.6. researching customer accounts when there were customer service issues. (Lovrien Tr. 839:23-25.)

399. Lovrien processed checks from consumers that were made payable to the publications rather than the Corporate Defendant or dba identified on the mailer. (Lovrien Tr. 891:3-17.)

400. Lovrien had the highest level of access (5 of 5) to the computer program used to manage customer orders, refunds, and data. (Lovrien Tr. 891:18-892:3.)

401. When Lovrien began working full time for Orbital, she was paid a salary of $2,500 per month, paid directly to her from Orbital. (Lovrien Tr. 849:9-21.)

402. Starting in or about March 2011, following a conversation with J. Hoyal and Pugsley, Lovrien became President of Orbital. (Lovrien Tr. 849:22-850:16; Pugsley Tr. 278:20-24.) Lovrien's monthly salary increased to $5,000, before taxes, again paid directly to her from Orbital. (Lovrien Tr. 853:8-854:3.)

403. In June 2011, Lovrien became President and Secretary of Liberty. (Lovrien Tr. 854:4-19; Pugsley Tr. 278:20-24; Exh. 125 at 5.) Lovrien performed the same duties on behalf of Liberty that she performed for Orbital, for the same salary, $5,000 per month. (Lovrien Tr. 855:4-6; 862:1-10.)

404. Lovrien opened bank accounts for Liberty over which, as President, she had signatory authority. (Lovrien Tr. 856:3-10; Pugsley Tr. 133:2-135:18; Exh. 127). In August 2011, she opened an account at Premier West Bank. (Exh. 1036 at 62-89; Lovrien Tr. 856:13-857:22). That account was eventually closed by the bank. (Lovrien Tr. 858:11-14.)

405. In February 2012, Lovrien opened an account for Liberty at Key Bank. (Exh. 1041 at 7-8; Lovrien Tr. 858:15-859:21.) She opened the account at Key Bank because PremierWest closed Liberty's account there. (Lovrien Tr. 859:3-5.) That account was eventually closed by the bank. (Lovrien Tr. 860:6-7.)

406. In July 2013, Lovrien opened an account for Liberty at Bank of the Cascades. (Exh. 1040 at 3-29; Lovrien Tr. 860:18-861:5.) She opened the account at Bank of the Cascades because Key Bank had closed Liberty's account there. (Lovrien Tr. 860:9-10, 861:6-8).

407. Lovrien opened a post office box for Liberty in White City, P.O. Box 2489. (Lovrien Tr. 861:19-25.) That mailbox appeared on mailers sent out by Liberty and Express. (Exh. 11; Lovrien 886:3-7, 887:11-888:17.)

408. Lovrien began performing work on behalf of United shortly after the company was incorporated in December 2011. (Exh. 153 at 3; Exh. 154; Lovrien Tr. 862:14-16.). Lovrien's job duties on behalf of United were essentially the same as her duties for Liberty and Orbital. (Lovrien Tr. 862:21-863:4.)

409. Lovrien opened and was a signatory on United's bank accounts. (Lovrien Tr. 863:2-8; Exh. 154 at 1, 6, 11, and 16.)

410. Lovrien was the point of contact between United and a UPS Store in Henderson, Nevada, that received mail destined for United. (Exh. 130 at 1, 14-15; Exh. 1029 at 16, 19, 29-30; Lovrien Tr. 863:22-864:7.) Lovrien paid for United's mailbox at the UPS Store using a check drawn on a Liberty account. (Exh. 156; Exh. 1042 at 119.)

411. Lovrien wrote a check on a Liberty bank account to open financial accounts for United. (Exh. 155; Exh. 1042 at 120.)

412. Lovrien was paid $5,000 per month for her work on behalf of United, in addition to the $5,000 per month she was paid for her work on behalf of Liberty. (Lovrien Tr. 867:8-10, 868:8-19.) Her $5,000 per month salary for United was paid to her through Atlas, a company she incorporated in March 2012. (Lovrien Tr. 868:14-19; Exh. 110.)

413. To receive her salary, Lovrien would send an invoice each month from Atlas to Maximillian for $5,000 for "management of United." (Lovrien Tr. 869:3-5, 869:24-870:2; Exh. 109; Lovrien Tr. 904:15-906:16.) After Maximillian paid the invoice, Lovrien would pass the money through from Atlas to her personal bank account. (Lovrien Tr. 868:20-25.)

414. Associated took over United's mailing operations, and, working for Associated, Lovrien performed the same work she did for United. (Lovrien Tr. 870:15-19). It was a seamless transition, with the same employees doing the same work in the same office. (Lovrien Tr. 870:22-871:21.) Lovrien performed the same functions on behalf of United and Associated that she performed as President of Orbital and Liberty. (Pugsley Tr. 278:20-279:2; Exh. 132.)

415. Express took over Liberty's operation in August 2014, and working for Express, Lovrien performed the same work she did for Liberty. (Lovrien Tr. 871:22-872:13; Pugsley Tr. 278:20-279:7.)

416. Lovrien continued to be paid a total of $10,000 per month during the entire time she worked for Associated and Express. (Lovrien Tr. 873:2-10)

> (2) **Lovrien responded to numerous consumer complaints and received fraud alerts and cease and desist letters.**

417. Starting with Orbital and continuing with Liberty, United, Associated, and Express, Lovrien responded to consumer complaints forwarded to the subscription operation by state attorneys general and the BBB. (Lovrien Tr. 850:17-24; Pugsley Tr. 155:2-21; J. Hoyal Tr. 2064:8-14; Exh. 118; Exh. 1001 at 9-11; Exh. 1004.) The complaints that Lovrien reviewed and to which she responded included complaints:

417.1. that a consumer did not get the publication they had paid for (Lovrien Tr. 850:25-851:2; 852:6-853:3; Exh. 118 at 6; Exh. 118 at 15; Exh. 118 at 20; Exh. 118 at 27);

417.2. that a consumer's order was switched to a publication different than the one they had originally ordered (Lovrien Tr. 851:3-8; 852:6-853:3; Exh. 118 at 4, 6);

417.3. that consumers realized that they had to make all installment payments for a publication before receiving the publication (Lovrien Tr. 851:14-17; 852:6-853:3);

417.4. that consumers had difficulty reaching customer service (Lovrien Tr. 851:18-20; 852:6-853:3; Exh. 118 at 15);

417.5. that the Defendants were not authorized to offer the newspapers that they offered for sale (Exh. 118 at 6; Exh. 118 at 15; Exh. 118 at 23; Exh. 118 at 33; Exh. 1004 at 227-30);

417.6. that mail sent to the Defendants was returned as undeliverable (Exh. 118 at 4);

417.7. that consumers thought the mailer was from the publication when, in fact, it was from the defendants (Lovrien Tr. 851:21-24; 852:6-853:3);

417.8. that the consumer had difficulties obtaining refunds (Lovrien Tr. 851:25-852:2; 852:6-853:3; Exh. 118 at 11, 15, 22);

417.9. that consumers were sick of receiving the Defendants' junk mail and wanted the solicitations to stop (Lovrien Tr. 852:3-853:3);

417.10. that the defendants were engaged in "fraud," "deceptive marketing," and a "scam" (Lovrien Tr. 907:14-909:6; Exh.117; Exh. 118 at 11; Exh. 118 at 27; Exh. 1004 at 1 (response letter), 4 (complaint); Exh. 1004 at 139 (response letter), 141 (complaint); Exh. 1004 at 322 (response letter), 326 (complaint)); and

417.11. that Defendants' mailers were "bills" (Exh. 1004 at 141; Exh. 1004 at 130; Exh. 1004 at 31; Exh. 1004 at 43; Exh. 1004 at 309-312; Exh. 1004 at 47-48; Exh. 1004 at 93-94; Exh. 1004 at 97-98; Exh. 1004 at 37-38).

418. Lovrien drafted and sent detailed, tailored letters to the consumers who had complained to state attorneys general or the BBB. (Lovrien Tr. 918:9-21.) She retained a copy of each letter she sent, with a handwritten notation of how she handled the complaint. (Exh. 118 at 1; Lovrien Tr. 912:16-913:1; Exh. 118 at 8; Lovrien Tr. 920:12-24.) She provided customer service logs to Pugsley. (Pugsley Tr. 154:14-19.)

419. Lovrien would often use the pseudonym "Michelle Miller" when responding to consumer complaints to mask her identity. (Exh. 118 at 25; Lovrien Tr. 924:8-22.)

420. Lovrien received or reviewed multiple cease and desist letters and fraud alerts from publishers. (Lovrien Tr. 934:6-13, 939:23-940:13.) She forwarded all of them to Pugsley and counsel, David Lennon. (Lovrien Tr. 940:25-941:7; 960:23-961:4.) The fraud alerts and cease and desist letters that Lovrien received or reviewed included:

420.1. a June 2011 cease and desist letter from Dow Jones addressed directly to Lovrien demanding that the Defendants stop soliciting subscriptions to *The Wall Street Journal* (Lovrien Tr. 959:21-960-4; Exh. 150 at 3-4);

420.2. a December 2011 "Fraud Alert" from Dow Jones stating that the Defendants were not authorized to solicit subscriptions to *The Wall Street Journal* (Exh. 113 at 1-3; Lovrien Tr. 934:17-936:22);

420.3. a September 2013 cease and desist letter from Dow Jones addressed directly to Lovrien demanding that the Defendants stop soliciting subscriptions to *The Wall Street Journal* (Lovrien Tr. 960:5-12; Exh. 150 at 9-10);

420.4. an October 2014 cease and desist letter from *The Washington Post* (Exh. 133 at 2-4; Lovrien Tr. 931:13-14);

420.5. a November 2014 follow-up cease and desist letter from *The Washington Post* in which the newspaper returned a check from CAS (Lovrien Tr. 945:2-948:9; Exh. 461 at 31-33);

420.6. a January 2015 follow-up cease and desist letter from *The Washington Post*, addressed to Lovrien, in which the newspaper with the newspaper enclosed eight checks from CAS (Lovrien Tr. 948:10-950:23; Exh. 461 at 8-18);

420.7. an October 2014 cease and desist letter from *The Chicago Sun-Times* (Lovrien Tr. 951:8-952:14; Exh. 134; Lovrien Tr. 952:19-953:5; Exh. 1009);

420.8. an October 2014 cease and desist letter from *The Philadelphia Inquirer* (Lovrien Tr. 953:6-954:3; Exh. 136);

420.9. a November 2014 cease and desist letter, addressed to Lovrien, from counsel for the Newspaper Association of America of behalf of 363 different newspapers (Lovrien Tr. 954:4-956:8; Exh. 138 at 2-16); and

420.10. December 2014 and February 2015 cease and desist letters, addressed to Lovrien, from *The Seattle Times* with which the newspaper returned sixty-one checks for unauthorized orders (Lovrien Tr. 957:1-958:16; Exh. 139).

421. After receiving or reviewing cease and desist letters from publications (*see* FOF ¶ 420), Lovrien continued to allow orders for the publications to be processed. (Lovrien Tr. 943:6-15; 944:4-9.)

421.1. Lovrien's response letters alone indicate that Defendants processed orders for *The Wall Street Journal* on March 28, 2011 (Exh. 1004 at 139), April 18, 2011 (Exh. 1004 at 127), August 5, 2011 (Exh. 1004 at 381), October 4, 2011 (Exh. 1004 at 68), October 4, 2011 (Exh. 1004 at 68), October 13, 2011 (Exh. 1004 at 7), February 3, 2012 (Exh. 1004 at 377), April 2, 2013 (Exh. 1004 at 74), April 10, 2013 (Exh. 1004 at 355), April 19, 2013 (Exh. 1004 at 57), April 25, 2013 (Exh. 1004 at 40), April 26, 2013 (Exh. 1004 at 307), May 3, 2013 (Exh. 1004 at 339), May 31, 2013 (Exh. 1004 at 28), June 13, 2013 (Exh. 1004 at 300), June 20, 2013 (Exh. 1004 at 79), June 21,

2013 (Exh. 1004 at 362), July 16, 2013 (Exh. 118 at 8), August 8, 2013 (Exh. 1004 at 1), August 22, 2013 (Exh. 1004 at 45), October 16, 2013 (Exh. 1004 at 212; Exh. 118 at 12), and November 25, 2013 (Exh. 1004 at 189).

421.2. Lovrien's complaint response letters alone indicate that Defendants processed orders for *The New York Times* on April 7, 2014 (Exh. 118 at 31; Exh. 1004 at 267), April 18, 2014 (Exh. 1004 at 225), May 16, 2014 (Exh. 1004 at 279), and June 13, 2014 (Exh. 118 at 25).

422. Even though the Defendants used a custom-built computer program to process and track orders, they did not modify the program to prevent employees from entering orders for publications for which they had received cease and desist letters. (Lovrien Tr. 944:16-945:1.)

### (3) Lovrien's in-depth knowledge of the subscription operation.

423. In April 2013, Lovrien was notified that third-party clearing firms, including Publications Unlimited, issued warnings to the subscription operation about sending mailers that were unauthorized and/or deceptive. (Exh. 38.)

424. From 2010 to February 2015, Lovrien performed her work for Orbital, Liberty, United, Associated, and Express in a small office located in a one-bedroom apartment on Pugsley's Eagle Point Property. (Lovrien Tr. 833:16-834:1, 834:16-22, 880:25-881:3.) "It was very close quarters." (Lovrien Tr. 835:13.)

425. In February 2015, Lovrien's office moved to a commercial building in White City, where the call center was located. (Lovrien Tr. 880:25-881:3; 883:8-15.) She worked in the White City Building until the operation closed in March 2015. (Lovrien 1052:13-1053:19.)

426. Lovrien considered herself a supervisor in that she was "the most computer savvy" person in the office, and other employees would come to her whenever there was a problem. (Lovrien Tr. 836:18-23.) Babb submitted her employee timecard to Lovrien if Pugsley was not available. (Babb Tr. 738:7-9.) Babb also asked Lovrien for assistance when Pugsley was unavailable, if she had any questions on how to complete her daily report of checks processed. (Babb Tr. 721:1-6.)

427. Lovrien was familiar with the mailers that the operation sent out, going back to Orbital in 2010. (Lovrien Tr. 842:13-24; Exh. 11.)

428. By the time Lovrien became President of Liberty, she was reviewing all of the mailer proofs before they were sent to consumers, reading them closely to check for errors. (Lovrien Tr. 898:8-24, 899:18-901; Exh. 104 at 7; Exh. 105 at 26; Exh. 108 at 20.) The mailers that she reviewed included mailers for *The Wall Street Journal* and *The New York Times*. (Lovrien Tr. 1069:10-15.) She suggested changes to the mailers as a result of consumer calls to the customer service center. (Lovrien Tr. 899:7-14.) Dennis Simpson approved the changes. (Lovrien Tr. 899:15-17.)

429. Starting in 2012, Lovrien created and maintained a master list of every publication offered by the Defendants, including the UMC code and the number of issues offered. (Lovrien Tr. 903:1-13.) Lovrien considered it a "living document" that she could change at any time.

(Lovrien Tr. 1069:16-25.) Lovrien could have included a column showing which publications had sent the Defendants cease and desist letters, but she did not. (Lovrien Tr. 1070:4-9.)

430. Lovrien submitted to Bacon subscription orders rejected by publishers so that they could be switched to other publications. (Pugsley Tr. 277:14-279:7; Exh. 132.) After publishers rejected orders, Bacon tried to set up a new in-house clearing entity to re-submit the orders to publishers, and Bacon informed Lovrien. (Exh. 513 at 1.)

431. Lovrien received refund logs from the operation's call center. (Kaylor Tr. 1670:1-4.)

432. On March 16, 2012, Lovrien asked Parducci to execute a "Consent and Statement of Action of Shareholders" on behalf of HCG LLC, naming Lovrien the President, Secretary, and Treasurer of Orbital. (Exh. 148.) Lovrien asked Parducci to backdate it, to make it seem as if it was executed on March 1, 2011. (Exh. 148 at 1.)

433. Lovrien was the Registered Agent for Northwest Data LLC. (Lovrien Tr. 972:21-973:2.)

434. Lovrien received remit and switch reports from Pugsley. (Exhs. 161-163.) Pugsley also copied Lovrien on most email messages related to the operation. (Pugsley Tr. 141:17-142:21, 242:11-15.)

### vii) Strickler controlled and operated mailing and submitting defendants.

### (1) Strickler's work on behalf of Orbital.

435. Strickler began working for H&A in 1998 as a business consultant. (Strickler Tr. 1934:21-25.) He worked for H&A for approximately four and one-half years. (Strickler Tr. 1935:1-4.)

436. Strickler subsequently worked for another company, Freedom Financial, owned by J. Hoyal and Simpson. (Strickler Tr. 1935:5-20.)

437. Strickler then performed consulting work for RJS and ACPA, a prior subscription business operated by J. Hoyal and Simpson. (Strickler Tr. 1953:16-24.) Among his duties were "uncomfortable things for the management," like firing people. (Strickler Tr. 1954:2-11.)

438. Strickler started working for Orbital in 2010. (Strickler Tr. 1935:21-25; Lovrien Tr. 835:22-24, 836:15-16.) He worked in the one-room office on Pugsley's property with Lovrien and Babb. (Strickler 1936:13-19.) His duties included picking up the mail, opening it, and sorting it. (Strickler Tr. 1937:23-25, 1938:17-21; Pugsley Tr. 198:24-200:24.)

439. The mail that Strickler opened and sorted included mailers returned as undeliverable and mailers that had been returned with payments for subscription orders. (Strickler Tr. 1939:1-1940:17; Exh. 11.)

440. Strickler also sometimes input consumer order and payment information into the computer system. (Strickler Tr. 1941:10-21.)

441. Strickler also sometimes prepared consumer checks for deposit, either remotely or for in-person delivery at the bank. (Strickler Tr. 1942:15-1943:12; Lovrien Tr. 847:12-16; Pugsley Tr. 198:24-200:24; Exh. 47.)

442. Strickler also processed requests from consumers to be removed from the Defendants' mailing list. (Strickler Tr. 1944:13-1945:12.)

443. Strickler also sometimes responded to consumer complaints and provided customer service logs to Pugsley. (Strickler Tr. 1947:9-1949:7; Pugsley Tr. 154:14-19.)

444. Strickler received and responded to some of the email messages sent to the customer service address printed on the Orbital mailers. (Pugsley Tr. 191:20-192:7.)

445. Strickler was paid $2000/month for his work with Orbital. (Strickler Tr. 1953:11.)

446. In 2014, Strickler incorporated and became President and Secretary of Express. (Strickler Tr. 1954:12-17, 1958:3-1959:9; Exh. 58 at 1-3.) Strickler's salary as President of Express was $5000/month. (Strickler Tr. 1954:23-25.)

447. Express was in the same line of work as Orbital, sending out solicitations for subscriptions to publications. (Strickler Tr. 1955:1-8.)

### (2) Strickler's mailing and receiving work as President of Express.

448. As President of Express, Strickler was responsible for:

    448.1. setting up and managing multiple bank accounts for multiple dbas (Strickler Tr. 1955:12-14, 1959:10-25, 1960:12-23, 1963:13-1964:4; Exh. 58 at 5-49);

    448.2. signing checks (Strickler Tr. 1960:1-3);

    448.3. signing corporate documents (Strickler Tr. 1958:10-1959:9; Exh. 58);

    448.4. making sure deposits were made (Strickler Tr. 1955:15-17);

    448.5. making sure that orders were fulfilled (Strickler Tr. 1955:18-20); and

    448.6. making sure that customer service issues were being handled (Strickler Tr. 1955:21-23).

449. Strickler would "check on the different departments and be sure that everything was running smoothly." (Strickler Tr. 1956:2-3.) This included customer service, data processing, and clearing. (Strickler Tr. 1956:16-21.)

450. Strickler completed the form necessary to register Express with the State of Oregon as an employer. (Strickler Tr. 1971:21-1972:2; Exh. 59 at 2.)

451. Strickler was aware that banks had shut down several of the subscription operation's accounts in the past, so he opened accounts for Express at different banks as backups. (Strickler Tr. 1964:23-1965:4; Exh. 63.)

452.    After the banks kept shutting down Express's accounts, Strickler had the idea to open an account at a credit union instead of a bank. When approached by Strickler, the credit union declined. (Strickler Tr. 1968:7-14; Exh. 65.)

453.    Strickler gave Pugsley authorization to handle Express's online banking transactions. (Strickler Tr. 1966:18-25).

### (3)  Strickler submitted orders through Wineoceros.

454.    In October 11, 2011, Strickler incorporated Wineoceros. (Exh. 76.) Strickler is the President, and Secretary of Wineoceros, and the company's registered address is Strickler's residence. (Exh. 76; Strickler Tr. 1972:3-10.)

455.    Strickler is the owner and sole shareholder of Wineoceros. (Strickler Tr. 1972:19-22.)

456.    Strickler originally intended Wineoceros to be an internet-based lifestyle, marketing, and content provider for Southern Oregon wine and wine-related products. (Strickler Tr. 1973:5-9, 2014:12-22.)

457.    J. Hoyal, though Maximillian, provided Strickler with $88,000 in seed money to get Wineoceros up and running. (Strickler Tr. 1973:20-1974:4.)

458.    Strickler opened bank accounts on behalf of Wineoceros and was a signatory. (Strickler Tr. 1991:15-1992:23; Exh. 77; Strickler Tr. 1993:5-6; Exh. 1040 at 31-36; Strickler Tr. 1993:7-12; Exh. 79.)

459.    In August 2013, Strickler, though Wineoceros, began to clear subscription orders forwarded to him by Kaylor and Bacon, through MCE. (Strickler Tr. 1974:17-1975:10.) The orders included orders for *The New York Times*. (Strickler Tr. 1975:18-19.)

460.    Strickler was paid $2,000/month to clear orders forwarded to him. (Strickler Tr. 1987:23-1988:1.)

### (4)  Strickler's attempts to deceive publishers and clearinghouses.

461.    *The New York Times* rejected orders submitted by Strickler. (Strickler Tr. 1977:24-1978:1.)

462.    On September 30, 2014, *The New York Times* informed Strickler in writing that he was "working with solicitation companies that have been sent cease-and-desist letters by The Times because of their unauthorized practices." (Strickler Tr. 1978:5-24.) *The New York Times* returned two Wineoceros checks to Strickler uncashed, for $38,860.84 and $5,764.80, and sent Strickler a separate refund check for $34,861.50 to refund previous orders that were not authorized. (Strickler Tr. 1978:9-13, 1979:4-8; Exh. 3214.)

463.    On October 8, 2014, Strickler responded to *The New York Times* with a letter drafted by David Lennon, acknowledging receipt of both the September 30 letter and checks and returning to the newspaper the refund check for previous orders. (Strickler Tr. 1980:18-1982:1; Exh. 3214.)

464. On October 21, 2014, *The New York Times* responded by sending the refund check back to Strickler with a cover letter reiterating that the orders were made in response to misleading solicitations not from Wineoceros, but from entities that had previously been sent cease-and-desist letters. (Strickler Tr. 1982:9-1983:23.)

465. On December 18, 2014, Strickler once again returned the refund check to *The New York Times*, ripping it up before mailing it so that the newspaper would not return it to him. (Strickler Tr. 1984:6-20; Exh. 3229.) In his cover letter, Strickler admitted that the orders were solicited by Wineoceros's "agents," but insisted that Wineoceros was authorized to submit orders pursuant to an agreement with *The New York Times*. (Exh. 3229.)

466. When *The New York Times* demanded that Strickler produce a copy of any such agreement, he was unable to do so. (Strickler Tr. 1987:12-22.)

467. Strickler told *The New York Times* that Wineoceros had solicited subscriptions from Wineoceros "members." (Strickler 2017:20-22.) The individuals that Strickler claimed were "members" did not know they were members. (Strickler 2017:23-2018:5.)

468. Strickler repeatedly lied to independent third-party clearinghouses, telling them that Wineoceros solicited publications with its own mailers, when in fact it did not. (Strickler Tr. 1988:16-1991:14.)

469. On December 1, 2009, Strickler, as the Trustee of Revista Trust, executed a document appointing Parducci as manager and President of HCG LLC. (Exh. 73; Strickler Tr. 1994:6-24.) He executed documents on behalf of Revista Trust and attended quarterly board meetings with Parducci. (Strickler Tr. 1995:4-9.) When Strickler was the trustee of Revista Trust, J. Hoyal's mother was the beneficiary. (Strickler Tr. 1996:3-7.) Strickler is still the trustee of Revista Trust to this day. (Strickler 2007:13-19.)

### viii) Babb was a corporate officer and performed receiving and processing work for the deceptive mailing operation.

470. Babb is Lovrien's and Pugsley's mother. (Babb Tr. 711:1-2, Pugsley Tr. 195:15-16.)

471. In 2006, Babb started working for Pugsley, who was working at ABDI and Orbital, the predecessor company to Liberty. (Babb Tr. 710:23-711:8.)

472. Until early 2010, Babb handled customer service, answering consumer calls from her home from consumers who received mailers for publications such as *The Wall Street Journal*. (Babb Tr. 711:9-712:3; 712:12-17; 714:11-14; 717:9-25; 752:3-9.)

473. Babb's telephone number was listed on mailers sent to consumers. (Babb Tr. 711:23-25.)

474. The largest share of complaints were from consumers who, after receiving the mailer, wondered why they had received a bill. (Babb Tr. 712:4-11.) Other consumers complained that they had not yet received their subscriptions. (Babb Tr. 712:18-20.)

475. Babb was aware when mailers were sent because she would receive more calls from consumers soon afterwards. (Babb Tr. 713:4-7.) Babb would get slammed with calls; the phone would ring as soon as Babb ended a call with another consumer, and at one point she

had to obtain an extra battery for her cordless phone in order to handle the volume of calls. (Babb Tr. 713:8-17.)

476. Babb cataloged and sent Pugsley consumer complaints she received from consumers about the mailers, including complaints that consumers thought they had received a bill, or wanted to be removed from the mailing list. (Babb Tr. 712:4-713:3.)

477. Babb picked up, opened and sorted mail on behalf of the Corporate Defendants. (Babb Tr. 718:4-19; 719:10-18.) The mail for each company ultimately went to the same location, either Pugsley's Eagle Point Property or the White City Building. (Babb Tr. 734:12-18; 735:1-8.)

478. Babb processed subscription orders and payments, performed data entry work, and prepared customer checks for deposit on behalf of the Corporate Defendants. (Babb Tr. 719:25-720:7, 734:9-11, 733:5-734:8; Strickler Tr. 1941:3-9; Lovrien Tr. 835:15-21, 847:12-16; Pugsley Tr. 195:15-18, 198:24-200:24; J. Hoyal Tr. 2064:4-7.) She performed similar functions for each of the Corporate Defendants she worked for, including Liberty, Express, and United, as well as the 2010 mailing entity, Orbital. (Babb Tr. 733:5-734:8.)

479. Babb reviewed mailer proofs for typographical errors before they were sent to consumers. (Babb Tr. 736:7-13; Exh. 12; Exh. 100.)

480. Despite previously dealing with the types and volumes of complaints from consumers, described above, Babb agreed to become President of Anchor, one of the Corporate Defendants that paid remits to clearing entities. (Babb Tr. 724:1-14; Pugsley Tr. 298:9-10, 299:11-19.)

481. As President of Anchor, Babb signed corporate documents (Babb Tr. 725:12-726:13; 753:6-8; Exh. 28; Exh. 29), and opened bank accounts (Babb Tr. 726:19-728:7; Exh. 30). Babb also opened a post office box and signed and deposited checks on behalf of Anchor. (Babb Tr. 728:13-18; 730:10-14.)

482. Babb permitted Pugsley to use her electronic signature to sign documents on behalf of Anchor. (Babb Tr. 728:19-729:4.)

483. On April 19, 2013, while Babb was President of Anchor, she received notice from Publications Unlimited that consumers complained about "unsolicited 'renewal like' notices" from Anchor and that any company submitting orders based on those notices would be deauthorized. (Babb Tr. 730:22-733:1; Exh. 38.) Babb forwarded this notice to Pugsley and Lovrien. (Exh. 38.) After receiving the April 19, 2013 notice, Babb submitted additional corporate documents to the state of Oregon on behalf of Anchor in May 2013 (Exh. 29 at 1-3) and March 2014 (Exh. 29 at 4-9).

### ix) Bacon submitted orders and managed the call center through multiple Corporate Defendants.

484. Bacon first started working in the subscription business in approximately 2002, when she was a customer service call center representative at ACPA. (Bacon Tr. 1228:1-2, 1490:9-19.) After ACPA, Bacon worked at GDS, which performed the same services as ACPA (Bacon

Tr. 1229:12-1230:9) and operated out of the same location: the White City Building (Bacon Tr. 1229:9-11, 1230:19-21). After GDS, Bacon worked at, and was an officer of, Alliance Publishing Services (Alliance). (Bacon Tr. 1231:5-7, 1232:21-24.)

485. ACPA, GDS, and Alliance were all connected to J. Hoyal. (Bacon Tr. 1228:9-1229:2, 1229:12-17, 1232:15-17.) Other Defendants also worked there with Bacon. For example, Parducci worked at GDS at the same time as Bacon (Bacon Tr. 1230:16-18), and Bacon supervised Kaylor at ACPA (Kaylor Tr. 1620:23-1621:4) and hired her at GDS (Kaylor Tr. 1622:14-20).

### (1) Bacon oversaw all aspects of the call center.

486. In June 2011, J. Hoyal hired Bacon to work at PPP NY. (Bacon Tr. 1227:9-14.)

487. At the time Bacon was hired, PPP NY was a call center operating out of New York. (Bacon Tr. 1227:9-18.)

488. Bacon was hired to assist the New York call center and establish a call center in White City. (Bacon Tr. 1234:10-23.)

489. Although Bacon was the only PPP NY employee in White City when she was hired (Bacon Tr. 1236:5-15), the call center in White City later grew to approximately 15 employees (Bacon Tr. 1241:8-13).

490. Bacon became a senior manager who oversaw the call center in White City. (Bacon Tr. 1244:8-12; Kaylor Tr. 1629:3-5; J. Hoyal Tr. 2158:7-9.)

491. Bacon's senior management duties included:

491.1. recruiting and hiring (Bacon Tr. 1239:14-19);

491.2. training (Bacon Tr. 1241:18-21);

491.3. supervising, including supervising other managers (Bacon Tr. 1241:22-23, 1242:4-8);

491.4. firing (Kaylor Tr. 1629:3-5);

491.5. providing scripts to employees (Bacon Tr. 1242:23);

491.6. monitoring phone calls between employees and consumers (Bacon Tr. 1241:24-1242:3);

491.7. updating the PPP NY employee handbook, which was adapted from the materials used at ACPA (Kaylor Tr. 1650:11-20);

491.8. requesting necessary operational equipment (Parducci Tr. 676:11-18);

491.9. working with a computer programmer and Pugsley to set up PPP NY's website (Pugsley Tr. 163:15-23), which was registered to Bacon (Bacon Tr. 1248:23-1249:5); and

491. 10. "problem-solving" (Kaylor Tr. 1629:3-5).

492. Bacon had access to the pubgroups database, which stored consumer information. (Lovrien Tr. 891:18-892:10; Bacon Tr. 1247:24-25.)

### (2) **Bacon knew that some consumers thought the mailer looked like a bill.**

493. Bacon was aware of the types of complaints that consumers were making to the call center: they were "the exact same phone calls that I got from ACPA to GDS to where we are here today." (Bacon Tr. 1409:20-24.)

494. Consumers told employees at the call center that they thought the mailer looked like a bill. (Kaylor Tr. 1619:22-1620:4.)

495. The call center provided employees with a document, previously used at ACPA and GDS, that was intended to assist employees in answering "hard questions." (Kaylor Tr. 1644:3-14; Exh. 398.) The document included scripted answers to questions concerning the mailer's resemblance to a bill and publishers' alerts that Defendants were not authorized to sell their titles. (Exh. 398.)

496. The call center also provided employees with a "call flow" document that was intended to assist employees in structuring their conversations with consumers. (Kaylor Tr. 1651:1-12; Exh. 399.) The document included scripted answers to possible inquiries, including: "Why did I receive this bill?" (Exh. 399 at 1.)

497. Bacon received and read a letter written by a PPP NY employee in which the employee expressed her concerns about the mailers, including concerns that consumers "constantly call in thinking an offer is a bill," and that "some of the companies we work for have been sued for our solicitations. Because they appear as bills and misleadingly imply that we are associated with the publishers." (Bacon Tr. 1434:21-1435:1; Exh. 1058.)

498. Bacon did not speak with the employee about her concerns. (Bacon Tr. 1443:24-1444:3.)

### (3) **Bacon created and managed multiple Corporate Defendants that submitted orders to publishers and switched consumers to unordered subscriptions.**

499. In the summer of 2011, after working at the PPP NY call center for approximately a month, Bacon was hired by J. Hoyal and Simpson to open CPE. (Bacon Tr. 1285:11-15, 1287:5-7.)

500. Bacon, who also used the last name "Balero" (Bacon Tr. 1226:14-17), formed and was the manager, President, Secretary, and Registered Agent of CPE. (Bacon Tr. 1287:14-22; *see also* Exh. 506.) Bacon's home address was listed on CPE's corporate documents, which Bacon signed. (Bacon Tr. 1288:6-12, 1288:25-1289:2; Exh. 506.) On CPE's behalf, Bacon:

500.1. opened a bank account, and was a signatory to that account (Bacon Tr. 1302:25-1303:3);

500.2. recruited, hired, and trained CPE employees (Bacon Tr. 1303:4-7, 1303:13-14); and

500.3. had domain names registered to her (Bacon Tr. 1303:17-20; *see also* Exh. 1024 at 6 (GoDaddy.com domain registrations); Exh. 1025 at 7-8).

501. In August 2012, Bacon also formed SHA. (Exh. 1023.) Bacon was the manager, President, and Registered Agent of SHA. (Bacon Tr. 1306:7-12; Exh. 1023.) Bacon's home address was listed on SHA's corporate documents, which Bacon signed. (Bacon Tr. 1307:23-1308:10; Exh. 1023 at 2.) On behalf of SHA, Bacon:

501.1. recruited and trained SHA employees (Bacon Tr. 1321:8-11.); and

501.2. opened bank accounts for SHA and was a signatory to those accounts (Bacon Tr. 1321:23-1322:1; Exh. 1049).

502. In 2012, Bacon recommended Kaylor to J. Hoyal and Simpson as a good candidate for opening another clearing firm, CAS. (Kaylor Tr. 1696:1-15; Bacon Tr. 1393:12-18; Exh. 513.) Bacon acted as the conduit for communication between Kaylor and Simpson, J. Hoyal, and Pugsley. (Kaylor Tr. 1707:6-9, 1735:11-20; Exh. 435.) On behalf of CAS, Bacon:

502.1. trained CAS employees (Bacon Tr. 1329:8-11); and

502.2. held signatory authority over a CAS bank account (Kaylor Tr. 1704:2-6; Exh. 1044 at 10-13).

503. In January 2014, Bacon formed Clarity Group. (Exh. 1016.) Bacon was the manager, President, Secretary, and Registered Agent of Clarity Group. (Bacon Tr. 1322:5-12; Exh. 1016.) On Clarity Group's behalf, Bacon:

503.1. signed corporate documents (Bacon Tr. 1322:16-1323:5; Exh. 1016 at 2);

503.2. recruited the Clarity Group employees from her previous clearing firms, CPE and SHA (Bacon Tr. 1328:24-1329:3);

503.3. oversaw the Clarity Group employees and, in that capacity, was the "point person" for her and Kaylor's companies, including CAS, Magazine Lin6k, CPC Solutions, and MCE (Bacon Tr. 1324:25-1325:22, 1327:15-1328:13; Exh. 197);

503.4. trained the employees of CAS, Magazine Link, CPC Solutions, and MCE (Bacon Tr. 1329:8-11); and

503.5. opened a bank account and was a signatory to that account (Exh. 1033).

504. In August 2012, Bacon formed Specialties as a consulting company solely to receive payment, which she considered "bonuses," for the work she did at CPE and the other Corporate Defendants that submitted orders to publishers. (Bacon Tr. 1304:1-8, 1330:12-21; Exh. 1022.) Specialties received bonuses amounting to hundreds of thousands of dollars from CPE, Clarity Group, and SHA, on checks that Bacon signed. (Bacon Tr. 1335:5-14; Exh. 1072; Exh. 1043 at 37-60 ($680,333 in checks signed by Bacon from CPE, Clarity Group, and SHA).) Bacon testified that she had "complete control over Specialties." (Bacon Tr. 1330:7-9.) Bacon was the President, Secretary, and Registered Agent of Specialties

(Bacon Tr. 1329:25-1330:7; Exh. 1022 at 4; Exh. 1048 at 20), which she operated out of her home (Bacon Tr. 1330:10-11). On Specialties' behalf, Bacon:

504.1. opened a bank account for Specialties and was a signatory to that account (Bacon Tr. 1339:6-9).

### (4) Bacon was integrally involved in the process of submitting orders to publishers.

505. One of Bacon's responsibilities was to call publishers who had removed their titles from the price lists of third-party clearinghouses and ask if they would accept orders sent in on the publishers' subscription insert cards. (Bacon Tr. 1295:24-1296:20, 1340:8-21, 1341:9-16.) Those publishers included *The Wall Street Journal* and *The New York Times*. (Bacon Tr. 1344:12-18, 1345:18-22.)

506. When she called *The Wall Street Journal* or *The New York Times*, Bacon did not ask to speak with any particular person. (Bacon Tr. 1349:10-20.)

507. Bacon provided the person with whom she spoke with very little information about the context of the phone call. For example, unless asked, Bacon did not provide any information about herself, or on whose behalf she was calling. (Bacon Tr. 1348:23-1349:9.) Similarly, when she called *The Wall Street Journal* or *The New York Times*, Bacon did not provide any information about whether she was sending only a few orders or several thousand. (Bacon Tr. 1349:21-1350:9.)

508. If she received a "yes" from the person who answered the phone, Bacon would list the publication on a price file (Bacon Tr. 1360:25-1361:11) that she would share with Pugsley and the Defendants that sent mailers (Bacon Tr. 1364:11-18).

509. Bacon trained others, including Kaylor, on how to make these phone calls to publishers. (Bacon Tr. 1398:16-1399:16; Kaylor Tr. 1733:23-1734:10.)

510. During her time at CPE, SHA, and Clarity Group, Bacon never saw *The Wall Street Journal* on the price file of a third-party clearinghouse. (Bacon Tr. 1617:13-18.)

### (5) Bacon oversaw the filling out of insert cards and the use of mail drops.

511. If a consumer ordered a publication on Bacon's price list, Bacon would receive the consumer's name and address so that it could be filled out, by hand, onto a subscription insert card. (Bacon Tr. 1374:13-20, 1377:1-5.)

512. Bacon used a third-party printing shop to reproduce copies of the insert cards. (Bacon Tr. 1377:8-14.)

513. Filling out the insert cards was a laborious process (Bacon Tr. 1378:9-11) that involved both employees of the Corporate Defendants and contract labor from a nearby retirement home. (Bacon Tr. 1377:15-19, 1378:1-8.)

514. The employees and contract labor were provided pens with different colored ink (Bacon Tr. 1380:20-1381:3) and were instructed to alternate pens when filling out the insert cards (Exh.

418 at 2). Bacon testified that she took responsibility for these instructions but could not explain them. (Bacon Tr. 1380:20-1381:9.)

515.  Instead of sending the completed insert cards directly to the publisher, the clearing entities sent them to various UPS store locations, or "mail drops," that would send them to the publisher. (Bacon Tr. 1382:16-1383:6.) Bacon never understood the purpose of using the mail drops. (Bacon Tr. 1383:7-15.) Nonetheless, she trained Kaylor to follow the same process. (Kaylor Tr. 1683:23-1684:2.)

### (6) **Bacon oversaw the process of switching consumers to publications they did not order.**

516.  Not all of the insert card orders were accepted by the publishers. (Bacon Tr. 1384:17-19.) To determine whether the insert card orders were clearing, Bacon monitored whether the publisher was depositing the checks sent with the orders. (Bacon Tr. 1384:20-1385:1; *see also* Exh. 1068.)

517.  There were instances when Bacon knew that *The Wall Street Journal* and *The New York Times* were not depositing the checks sent with the orders, but Bacon nonetheless kept those publications on her price list. (Bacon Tr. 1388:8-10, 1388:24-1389:4.)

518.  If a consumer ordered a publication that did not appear on a price list, that order became a "switch" that Bacon was responsible for trying to clear, and if she could not clear it, the Defendants would send a notice to the consumer assigning them a different publication or, if they responded by a certain date, a refund. (Bacon Tr. 1404:14-1405:22, 1406:11-20; Exh. 518 at 3.)

519.  Bacon reviewed and approved the switch notices sent to consumers (Bacon Tr. 1406:4-10; Exh. 518 at 1) and trained employees on how to determine which titles consumers were assigned during the switch notice process, which involved considering how much the consumer had paid, the value of possible replacement subscriptions, and guessing what the consumer would want (Bacon Tr. 1407:22-1408:24).

### (7) **Bacon was aware of cease and desist letters from publishers.**

520.  Bacon was aware of the fraud alert issued by the publisher of *The Wall Street Journal*, which described Defendants' mail solicitations as "fraudulent," "deceptive," and "misleadingly" suggesting a relationship with *The Wall Street Journal*. (Bacon Tr. 1416:3-7, 1416:24-1417:5; Exh. 113 at 2.)

521.  Bacon also received and read a cease and desist letter from the publisher of *The Wall Street Journal*, dated August 14, 2012, demanding that she, "or any affiliated persons or entities immediately cease and desist the unlawful, unauthorized practice of soliciting subscriptions and payments for Dow Jones publications." (Bacon Tr. 1417:6-23; Exh. 150 at 5.) The letter notified Bacon that she was "selling a product – and taking consumer funds for a product – that [she was] not authorized to sell and simply cannot deliver." (Exh. 150 at 5.) The letter further demanded that Bacon stop making copies of their insert cards, and stop sending switch notices to consumers who had ordered *The Wall Street Journal*. (Exh. 150 at 5-6.)

522. Nonetheless, Bacon knew that Defendants continued to send out mailers for *The Wall Street Journal* (Bacon Tr. 1425:4-10; *see also* Exh 1068) and continued to send switch notices to consumers who had ordered but not received *The Wall Street Journal* (Bacon Tr. 1425:12-15).

523. Similarly, Bacon knew that Defendants were continuing to try to clear orders for *The New York Times*, despite receiving two cease and desist letters from *The New York Times*. (*See* Exh. 531.)

### x)   Kaylor submitted orders and managed the call center.

524. Kaylor first worked for Simpson and J. Hoyal "around 2003," when she worked in the ACPA call center. (Kaylor Tr. 1618:21-1619:1; J. Hoyal Tr. 2035:21-22.) She started as a customer service representative (Kaylor Tr. 1619:8-10) and was promoted to supervisor and closing lead customer service representative (Kaylor Tr. 1622:3-7; *see also* Simpson Tr. 3025:5-11, 3047:23-3048:2).

525. Kaylor was familiar with the mailers used to drive responses to the ACPA call center. (Kaylor Tr. 1619:5-7.) At ACPA, Kaylor received calls from consumers in response to the mailer (Kaylor Tr. 1619:8-21), including calls from consumers who said that the mailer they received looked like "a bill" (Kaylor Tr. 1619:22-1620:3) and was "misleading" (Kaylor Tr. 1620:5-8).

526. In 2004 or 2005, Kaylor was laid off from ACPA and, that same day, was hired by Bacon at GDS. (Kaylor Tr. 1620:15-20, 1622:8-18.) At GDS, Kaylor held the same position that she had held at ACPA, customer lead nighttime closing supervisor. (Kaylor Tr. 1622:8-13.) Kaylor worked at GDS for a short time before relocating to California. (Kaylor Tr. 1622:21-1623:1.)

### (1)   Kaylor managed the call center for the mailing operation, ran Corporate Defendants that submitted orders to publishers, and was aware of the deceptive nature of the mailer.

527. In 2011, Bacon hired Kaylor to work at the PPP NY call center in White City. (Kaylor Tr. 1623:5-9.)

528. At the PPP NY call center, Kaylor started out as a customer service representative, quickly assumed the responsibilities of a supervisor, and was later promoted to call center manager. (Kaylor Tr. 1624:19-23, 1627:21-22.)

529. Kaylor's responsibilities as the call center manager included taking and monitoring calls from consumers; assisting customer service representatives with consumer questions; training customer service representatives; problem-solving; entering daily orders; interviewing potential employees; hiring and firing employees; conducting performance reviews; and supervising the call center supervisor, Leigh Darrohn. (Kaylor Tr. 1634:3-20, 1635:6-10, 1787:13-15.)

530. Kaylor was familiar with the mailers used to drive calls to the PPP NY call center. (Kaylor Tr. 1625:24-1626:7, 1795:11-15; Exh. 11.) Kaylor testified that these mailers were "almost exactly similar" to the mail pieces that drove calls to the ACPA call center. (Kaylor Tr.

1619:5-7, 1795:16-19.) Kaylor was the registration contact for the customer service number printed on the Liberty and Express mailers. (Kaylor Tr. 1624:13-15; Exh. 394.)

531. Kaylor helped Bacon update the ACPA employee handbook to use at the PPP NY call center. (Kaylor Tr. 1650:11-18, 1802:17-22.)

532. The PPP NY call center received and responded to consumer complaints about the mailer, including complaints that:

532.1. the mailer looked like it was from the publisher (Kaylor Tr. 1665:14-1666:11);

532.2. the mailer looked like a bill, a top complaint received by the call center (Kaylor Tr. 1641:16-23; 1649:17-1650:10);

532.3. consumers had just renewed their subscriptions and could not understand why they were receiving another renewal notice (Kaylor Tr. 1641:24-1642:4);

532.4. the price of the subscription was too high (Kaylor Tr. 1642:5-7, 1650:3-10);

532.5. consumers had not received their subscriptions (Kaylor Tr. 1642:8-10);

532.6. the offer looked fraudulent (Kaylor Tr. 1642:14-15); and

532.7. consumers wanted refunds (Kaylor Tr. 1655:20-1656:4).

533. Scripts were provided to customer service representatives to help them answer questions commonly received in the call center (Kaylor Tr. 1643:24-1644:10, 1645:2-5, 1651:1-11; Exh. 398, Exh 399), including:

533.1. "Why did I receive this bill?" (Kaylor Tr. 1652:1-6; Exh. 399);

533.2. "I just called the publisher and they stated that I should not renew through you because you are a fraud" (Kaylor Tr. 1645:6-1646:17; Exh. 398);

533.3. "[H]ow come the publisher does not recognize you?" (Kaylor Tr. 1646:23-1647:6; Exh. 398);

533.4. "Why did you send me this, I just renewed?" (Kaylor Tr. 1647:7-11; Exh. 398);

533.5. "This looks like a bill, if an old person gets this they could be fooled into sending you money" (Kaylor Tr. 1647:17-20; Exh. 398);

533.6. "I recently ordered and still haven't received my magazine" (Kaylor Tr. 1653:16-18; Exhibit 399); and

533.7. "I recently ordered from you, and I want a refund" (Kaylor Tr. 1655:23-1656:4; Exhibit 399).

534. As part of Kaylor's training of customer service representatives, she listened in on customer service calls. (Kaylor Tr. 1635:9-24.)

535. The complaints received by the PPP NY call center were the same types of complaints received by the ACPA call center. (Kaylor Tr. 1639:17-23.)

536. The complaints and inquiries received in the call center were logged into a shared computer system that was accessible by Kaylor, Bacon, and the individuals who entered orders on behalf of the Defendants that sent mailers. (Kaylor Tr. 1642:22-1643:15.)

537. Lovrien forwarded written complaints and inquiries to the call center to handle. (Kaylor Tr. 1774:19-1775:6.)

538. Kaylor responded to consumer complaints and attorneys general inquiries received by the call center, including a complaint that CAS was acting as an unauthorized representative of *The New York Times*. (Kaylor Tr. 1775:9-1777:6; Exh. 431.)

539. Kaylor had the discretion to hire call center employees without Bacon's approval. (Bacon Tr. 1240:7-9, 1240:14-19.)

540. Kaylor or the call center supervisor sent daily reports to Pugsley, Lovrien, and Bacon. (Kaylor Tr. 1634:3-9, 1639:1-11.) These reports contained information about call volume, number of phone orders received, and the dollar amount of the phone orders. (Kaylor Tr. 1637:24-1638:7.)

541. At Pugsley's direction, Kaylor instituted a rush refund policy for the call center that limited rush, or "manual," refunds to requests arising from "attorney general/BBB problem" or that were approved by management. (Kaylor Tr. 1674:15-1675:13; Exh. 397 at 19.)

542. As the call center manager, Kaylor had the authority to place refund requests on a log to be refunded by the Defendants who sent mailers. (Kaylor Tr. 1669:20-25.)

543. Within a few months of working at the PPP NY call center, Kaylor began helping Bacon submit orders to publishers. (Kaylor Tr. 1676:13-1677:4.) Bacon trained Kaylor in the insert card process developed by Simpson. (Kaylor Tr. 1733:18-25, 1914:15-19.)

544. Neither Kaylor's nor Bacon's companies had contracts with newspapers to sell subscriptions or to submit orders. (Kaylor Tr. 1744:24-1745:6.) Instead, upon a request by Simpson or Pugsley for a specific publication, Kaylor called the publication's general customer service number. (Kaylor Tr. 1734:23-1735:6, 1739:18-1740:9; Exh. 435.) Kaylor did not identify the company for whom she was calling. (Kaylor Tr. 1740:10-20.) She did not ask to speak to a manager. (Kaylor Tr. 1740:25-1741:1) She did not tell the representatives she spoke with that she was associated with companies who sold subscriptions or used a mailer. (Kaylor Tr. 1742:17-1743:6.) She did not tell the representatives how many orders she planned to submit. (Kaylor Tr. 1741:11-17.) Whenever a representative told her no, Kaylor called back until she spoke with a representative who told her she could submit orders for other people. (Kaylor Tr. 1744:7-23.) Kaylor would then put these titles on a price file. (Kaylor Tr. 1745:15-21, 1749:10-14.)

545. Kaylor submitted orders to newspapers by recruiting independent contractors to fill out subscription insert cards by hand. (Kaylor Tr. 1677:7-13, 1679:7-10; 1681:1-3.) Kaylor would often photocopy the insert cards. (Kaylor Tr. 1680:22-25.) She then mixed the orders,

bundled them, and sent them to friends and family who would mail the orders to publishers. (Kaylor Tr. 1679:1-6, 1681:8-1682:8, 1699:7-9.)

546. Kaylor generated or supervised the creation of checks sent to *The Wall Street Journal*, *The New York Times*, and regional newspapers. (Kaylor Tr. 1835:23-1836:2.)

547. Kaylor first performed submitting work through Bacon's company, CPE. (Kaylor Tr. 1676:13-1677:4.). Kaylor was a signatory to a CPE merchant account, recruited people to work for CPE, and made decisions about whether CPE would send switch notices to consumers. (Kaylor Tr. 1679:1-6, 1685:11-19, 1686:14-1687:4; Exh. 416 at 3-4.) She also signed checks sent to publishers in Bacon's absence. (Kaylor Tr. 1684:25-1685:3.)

548. Beginning in mid-2012, Bacon recruited Kaylor to start CAS, a clearing company to replace CPE. (Kaylor Tr. 1696:1-21.) Kaylor formed CAS to submit orders to publishers through the subscription insert card process, the "exact same thing that CPE did." (Kaylor Tr. 1696:25-1697:7, 1698:23-25.)

549. Kaylor was the President, Secretary, and Registered Agent of CAS. (Kaylor Tr. 1699:10-17; Exh. 419 at 1-3; Exh. 1044 at 11.)

549.1. Kaylor opened CAS bank accounts and was a signatory on those accounts. (Kaylor Tr. 1704:2-3, 1704:16-25; Exh. 425; Exh. 1044 at 10-13.) Kaylor knew that a CAS bank account had been closed because of a publisher's complaint to the bank that CAS did not have authorization to submit orders or to solicit subscriptions on its behalf. (Kaylor Tr. 1914:1-19.)

549.2. Kaylor used her residence as the business address for CAS. (Kaylor Tr. 1701:13-14; Exh. 419 at 1-2.)

549.3. Kaylor recruited and managed contract workers, did data entry of orders, and put orders together in bundles to send to the mail drops to be mailed to publishers for CAS. (Kaylor Tr. 1699:1-9.)

550. *The New York Times*, *The Wall Street Journal*, and regional newspapers were not cleared through third party clearinghouses. (*See* Kaylor Tr. 1769:5-9, 1769:16-21, 1770:14-20 1746:10-1747:12.).

551. Kaylor sent switch notices to consumers and submitted the switched orders to unordered publications through third party clearing companies. (*See* Kaylor Tr. 1728:8-1729:5.)

551.1. Switch notices were post cards informing consumers that their orders could not be fulfilled and would be switched to an unordered publication if the consumer did not respond within the time indicated in the notices. (Kaylor Tr. 1686:2-13; Exh. 518.)

551.2. The call center received calls from consumers responding to switch notices. (*See* Kaylor Tr. 1686:11-13.) Kaylor created the "June 2012 Switch Letter Process" document to guide customer service representatives' answers to consumers' questions about switch notices they received, including orders for *The Wall Street Journal* that were switched to other publications because the original orders could not be obtained.

(Kaylor Tr. 1692:15-1693:7, 1695:15-18, 1839:1-1840:12, 1850:6-1852:6; Exhs. 400, 400A.)

551.3. Either the Defendants that sent mailers or Bacon and Kaylor determined whether switch notices would be sent to consumers. (Kaylor Tr. 1686:14-1687:4.)

551.4. Kaylor and Bacon determined what publications to offer in the switch notices. (Kaylor Tr. 1689:1-6, 1725:12-15.)

552. In 2013, Bacon recruited Kaylor to start Magazine Link and MCE, new companies to send switch notices to consumers and orders that had been switched to other publications to third party clearing companies. (Kaylor Tr. 1711:13-1712:14; Exh. 470 at 2.) These companies took over some of the functions of Bacon's companies. (*See* Kaylor Tr. 1710:16-1711:5, 1720:20-1721:2.)

552.1. Kaylor started Magazine Link to send switch notices to consumers. (Kaylor Tr. 1698:9-13, 1708:16-1709:4, 1714:11-20.) Kaylor was the President, Secretary, and Registered Agent of Magazine Link. (Kaylor Tr. 1726:22-24; Exhs. 472, 475.) Kaylor opened bank accounts for Magazine Link and was a signatory authority on those accounts. (Kaylor Tr. 1729:6-10; Exh. 475; Exh. 476; Exh. 1038 at 81-84; Exh. 1041 at 64-68.) Kaylor used her residence as Magazine Link's business address. (Kaylor Tr. 1725:23-1726:5; Exh. 472 at 1.) Magazine Link received complaints from the BBB and attorneys general. (Kaylor Tr. 1894:21-1895:2.)

552.2. Kaylor started MCE to submit orders through third party clearing companies, including fulfilling orders that were switched to other publications. (Kaylor Tr. 1708:22-1709:4, 1714:22-1715:14.) Kaylor was President, Secretary, and Registered Agent of MCE. (Kaylor Tr. 1721:3-5; Exh. 468.) Kaylor opened bank accounts for MCE, was a signatory on those accounts, and filed corporate documents on behalf of MCE. (Kaylor Tr. 1722:16-19; Exh. 471; Exh. 1045 at 21-24, 33-34.) Kaylor used her residence as MCE's business address. (Kaylor Tr. 1721:20-1722:1; Exh. 468.)

(2) **Kaylor continued to send orders to publishers or switch publications after the operation received cease and desist letters from newspapers and rejected orders.**

553. Kaylor received cease and desist letters from newspapers. (Kaylor Tr. 1754:1-8, 1765:14-1766:10, 1771:12-22; Exh. 150 at 5-6; Exh. 529 at 2-3; Exh. 461 at 6-7.) Newspapers also rejected orders and returned checks. (Kaylor Tr. 1750:25-1751:3.) A pattern of rejected orders sometimes preceded the receipt of a cease and desist letter. (Kaylor Tr. 1757:7-17.) Kaylor forwarded the cease and desist letters to the operation's attorney and kept them in her files. (Kaylor Tr. 1754:9-13.) Kaylor believes she also forwarded the cease and desist letters to Bacon. (Kaylor Tr. 1754:9-22.)

553.1. Kaylor started CAS shortly after Dow Jones sent a cease and desist letter to CPE in August of 2012. (Kaylor Tr. 1755:8-1757:20; Exh. 150.) Approximately two months after Kaylor started CAS, Simpson requested that Bacon prioritize "clearances" for *The Wall Street Journal*. (Kaylor Tr. 1757:21-1758:15; Exh. 440.) Despite the Dow

Jones cease and desist letter, Kaylor sent orders for *The Wall Street Journal* through CAS. (Kaylor Tr. 1757:18-20, 1759:1-3.)

553.2. Kaylor started Magazine Link and MCE shortly after Dow Jones sent Lovrien a cease and desist letter in September 2013. (*See* Kaylor Tr. 1760:15-20; Exh. 150.) Despite the letter, Kaylor switched orders for *The Wall Street Journal* through Magazine Link. (*See* Kaylor Tr. 1763:18-1764:24; Exh. 1065.)

553.3. CAS and Wineoceros sent orders to *The New York Times*. (Kaylor Tr. 1769:22-25, 1770:11-13.) *The New York Times* sent a cease and desist letter to CAS and its affiliates in August 2014. (Kaylor Tr. 1765:18-1766:10; Exh. 529 at 2-3.) After receiving the letter, Kaylor switched rejected orders for *The New York Times* through Magazine Link. (Kaylor Tr. 1767:6-16.)

554. Bacon and Kaylor's companies operated from the White City Building. (J. Hoyal Tr. 2161:11-13.)

555. Kaylor opened a mailbox in White City, Oregon, that was shared by CAS, Magazine Link, and Magazine Clearing Exchange. (Kaylor Tr. 1717:20-1718:17; Exh. 428.)

556. The same employees did work for Magazine Link, MCE, CAS and CPE. (Kaylor Tr. 1719:3-8, 1758:8-10.)

### (3) Kaylor profited from the deceptive mailers.

557. As a customer service representative at the PPP NY call center, Kaylor received sales commissions in addition to her regular wages. (Kaylor Tr. 1628:11-14.) After being promoted, Kaylor transitioned to a salary of $40,000 per year. (*See* Kaylor Tr. 1628:16-17, 1633:21-25.)

558. Kaylor received compensation from CAS starting at $2,000 per month plus occasional bonuses, in addition to her call center salary. (Kaylor Tr. 1702:4-18.) The bonuses ranged from $1,000 to $20,000. (Kaylor Tr. 1703:2-10.) In January or February of 2015, her compensation from CAS increased to $4,000 per month. (Kaylor Tr. 1702:12-15.)

### F. THE CORPORATE DEFENDANTS CONDUCTED THE DECEPTIVE MAILING OPERATION AS A COMMON ENTERPRISE

### i) The Corporate Defendants exhibited common control, including shared owners and officers.

559. Through various corporate entities, J. Hoyal and Simpson have been operating the subscription business essentially the same way between 2000 and 2015. (J. Hoyal Tr. 2102:6-2104:12.) They ran the business as a partnership and communicated about all of the important aspects of the business. (J. Hoyal Tr. 2159:12-20.)

560. H&A and Reality Kats developed the structure of the 2010-2015 operation as a "restructured" successor to the subscription operation they had been conducting together between 2005 and 2009 and consolidated it in Oregon to maintain stronger control over it. (J. Hoyal Tr. 2052:17-20, 2244:23-2245:18, 3542:4-12; Exh. 3298 at 5, ¶¶ 16-18.)

561. H&A and Reality Kats directed the formation of all of the companies that made up the operation, including Revista Trust, HCG LLC, the mailing entities, Bacon and Kaylor's companies, and the call center. (J. Hoyal Tr. 2137:20-2139:7; *see also* J. Hoyal Tr. 2056:4-5, FOF ¶ 197.)

562. H&A and Reality Kats provided overall direction and control over the entities that made up the subscription operation and the activities of the subscription operation. (J. Hoyal Tr. 2409:17-2410:15; Simpson Tr. 2560:12-2563:1; Exh. 1282 at 1-2 (describing Reality Kat's responsibilities); Simpson Tr. 3041:12-25 (describing himself as the "quarterback" of the operation); *see also* FOF ¶¶ 19-32.)

563. H&A and Reality Kats received reports on all aspects of the subscription business from Pugsley. (Pugsley Tr. 241:14-262:10; Exhs. 179, 182 (mail volume and payment reports); Exhs. 161-163, 214 (remit and switch reports)); Pugsley Tr. 271:10-273:8; J. Hoyal Tr. 2174:18-2177:13; Exhs. 360-361 (refund reports); Pugsley Tr. 471:12-472:7; Exh. 1006 (complaints); Pugsley Tr. 270:9-271:5, 471:12-25; J. Hoyal Tr. 2172:22-2174:14; Exh. 558; Exh. 1006 (stop payment orders); Pugsley Tr. 268:23-270:8, 465:2-14; Exhs. 357, 557 (cancelled orders); Pugsley Tr. 261:13-262:10; Exh. 355 (switch information); Pugsley Tr. 306:18-307:1, 308:17-20, 309:11-20, 327:7-14; 435:12-16, 472:1-7; Exh. 150; Exh. 158; Exh. 407; Exh. 452; Exh. 1006; Exh. 1007; Exh. 1009 (cease and desist letters); Exh. 113 (fraud alerts).) Parducci also provided them with regular reports about the financial aspects of the subscription operation, HCG LLC and other Corporate Defendants' bank account balances, pending expenses, the date mailers were scheduled to be posted, the cost of each mailer, consumer orders received, any refunds paid, and call center operations. (Pugsley Tr. 426:19-21; J. Hoyal Tr. 2078:13-14, 2079:22, 2090:13-23, 2091:20-2094:6, 2095:17-2096:9, 2126:23-2129:15, 2130:10-2134:13, 2136:25-2137:19; Parducci Tr. 598:7-599:18, 600:14-602:12, 614:20-615:7; Exh. 317; Exh. 329; Exh. 336; Exh. 1071; Exh. 1074; Exh. 3298 at 7-8, ¶ 29.)

564. HCG LLC owned Orbital, Liberty, Express, United, Associated, and Anchor. (J. Hoyal Tr. 2104:13-2105:6, 2137:20-2139:7, 2171:6-12, 2172:11-21; Pugsley Tr. 430:9-13; Parducci Tr. 534:15-535:1, 585:20-586:1, 669:21-670:4; Babb Tr. 2171:6-12, 2172:11-21; Exh. 74 at 1; Exh. 3298 at 7, ¶ 27.)

565. Adept and Crown managed the mailing, receiving, and order processing functions of Orbital, Liberty, Express, United, and Associated. (Pugsley Tr. 127:2-24; 132:17-133:1; 135:19-21; 148:13-18; 132:24-133:1; 135:19-21; 148:13-18; J. Hoyal Tr. 2062:2-23; Dkt. 131 (Amended Answer of Pugsley) at 12, ¶ 40.)

566. Reality Kats owned and controlled the consumer database it used to select the consumer and publication information that appeared on Orbital, Liberty, Express, United, and Associated mailers. (Simpson Tr. 2557:22-2558:16.) H&A held a partial ownership in the database until 2015. (J. Hoyal Tr. 2475:24-2477:13.)

567. Bacon was an officer of CPE, PPP Magazines, SHA, Clarity Group, and Specialties, as well as the senior manager of the call center. (Bacon Tr. 1287:17-20 (CPE); Bacon Tr. 1306:7-10 (SHA); Bacon Tr. 1322:5-10 (Clarity Group); Bacon Tr. 1330:2-5 (Specialties); Exh. 1021 (PPP Magazines); Bacon Tr. 1244:8-10 (call center).)

568. Kaylor was an officer of CAS, MCE, and Magazine Link, as well as a manager of the call center. (Exh. 419 at 1-2 (CAS); Exh. 468 (MCE); Kaylor Tr. 1726:22-24; Exh. 472 (Magazine Link); Kaylor Tr. 1624:19-23, 1634:3-13 (call center).)

569. Lovrien was an officer of Atlas, Liberty, and Liberty's predecessor, Orbital, and performed the same functions for Orbital, Liberty, Express, United, and Associated. (Lovrien Tr. 867:24-870:2; Exh. 110 (Atlas); Lovrien Tr. 854:4-17; Exh. 125 at 5 (Liberty); Pugsley Tr. 278:20-279:7; Lovrien Tr. 855:4-6, 862:1-863:4 (same functions for Orbital, Liberty, United); Lovrien Tr. 870:15-872:12, 873:2-10 (same functions for United, Associated, Liberty, Express).)

570. Parducci was an officer of HCG LLC and Maximillian. (Exh. 219 at 17 (HCG LLC); Exh. 218 (Maximillian).)

### ii) The Corporate Defendants operated as a "maze of interrelated companies."

571. Reality Kats and H&A structured the operation to consist of a number of companies that worked together to sell subscriptions, fulfill orders, and provide customer service. (Exh. 3298 at 6, ¶¶ 21-22.) They did so to facilitate their management and oversight of the operations and to control payments to "crossover employees" that "might slop over to different companies." (J. Hoyal Tr. 2102:6-2103:21.)

572. While the operation was set up as separate companies, J. Hoyal and Simpson operated it substantively as one company, with various departments underneath it. (J. Hoyal Tr. 2103:22-2104:12.)

573. Reality Kats, via Simpson, provided the mailers used by the operation. (J. Hoyal Tr. 2052:21-23; *see also* FOF ¶ 11.9.)

574. Reality Kats, via Simpson, provided the information that was printed on the mailers. (J. Hoyal Tr. 2052:24-2053:2; Exh. 3298 at 6-7, ¶ 25.) This information included the name of the consumer, the consumer's address, the name of the publication, the length of the subscription, the price, the business name used by the mailing entity, and when the mailers would be sent to consumers. (J. Hoyal Tr. 2053:3-4 (consumer name), 2053:5-6 (consumer address), 2053:12-13 (length of subscription), 2053:12-13 (price), 2053:16-18 (business name), 2053:14-15 (mailing date); *see also* Exh. 3298 at 6-7, ¶ 25.)

575. H&A was responsible for helping establish the companies necessary to supply the logistics for the 2010 enterprise structure, consistent with J. Hoyal's role since 2000. (J. Hoyal Tr. 2055:20-23, 2056:4-5, 2106:25-2107:16, 2137:15-2139:7.) H&A provided services to each of the Defendants named in the FTC's Complaint. (J. Hoyal Tr. 2055:24-2056:1; Dkt. 91 (Amended Answer of Defendants Jeffrey Hoyal an H&A) at 9, ¶ 35; *see also* FOF ¶ 11.8.)

576. Maximillian, via Parducci, handled the financial operations of the enterprise, tracking operations, invoicing and transferring funds among the Corporate Defendants, and disbursing the profits of the enterprise to Reality Kats and H&A. (J. Hoyal Tr. 2079:23-2083:1, 2084:10-2086:16, 2090:1-23, 2100:17-2101:9; Parducci Tr. 547:20-24, 548:15-25, 556:15-

557:23, 558:14-21, 559:7-24, 565:11-25, 567:18-570:13, 666:17-667:24, 678:6-13; Exh. 327; Exh. 1072; Exh. 109; Exh. 3298 at 6, ¶ 18-19.)

577. Liberty, Express, United, Associated, and the predecessor entity, Orbital, sent deceptive mailers to consumers and received subscription orders and payments from consumers by mail. (Pugsley Tr. 164:2-5 (Liberty sent mailers beginning in 2011); Pugsley Tr. 163:24-164:1, J. Hoyal Tr. 2105:11-14; Lovrien Tr. 833:3-13 (Orbital sent mailers beginning in 2010); Lovrien Tr. 871:22-872:4; Pugsley Tr. 164:6-7, 255:12-24 (Express sent mailers beginning in 2014); Pugsley Tr. 164:8-9 (United sent mailers, beginning in 2012); Pugsley Tr. 164:10-11, 209:24-210:18, 211:17-24, 216:4-13, 370:6-21 (Associated sent mailers beginning in 2014).) Dbas transferred from one mailing entity to another. (J. Hoyal Tr. 2108:1-8.)

578. Pugsley managed the mailing and receiving operations of Orbital, Liberty, Express, United, and Associated. (Pugsley Tr. 127:2-24 (Orbital), 132:17-133:1 (Orbital and Liberty), 135:19-21 (Express), 148:13-18 (United and Associated); J. Hoyal Tr. 2062:2-23 (Pugsley); Dkt. 131 (Amended Answer of Pugsley) at 12, ¶ 40.)

579. Adept, via Pugsley, submitted invoices to HCG LLC through Parducci (Pugsley Tr. 131:17-22) and Crown, via Pugsley, submitted invoices to Maximillian through Parducci (Pugsley Tr. 132:3-9.) Adept and Crown, via Pugsley, performed the same function in the deceptive mailing operation. (Pugsley Tr. 132:10-12.)

580. Atlas was a conduit for payments from Maximillian to Lovrien for work she performed on behalf of United and Associated. (Lovrien Tr. 869:24-870:2.)

581. North West Data, owned by Lovrien's sister, provided customer service for the subscription operation. (Lovrien Tr. 973:3-10.)

582. PPP NY operated a call center and internet portal to answer consumer calls and to receive subscription orders and payments from consumers by telephone and internet. (Pugsley Tr. 434:18-19; Kaylor Tr. 1623:7-9, 1624:5-12, 1626:8-10; Bacon Tr. 1227:2-3, 1236:16-1237:2, 1238:21-1239:3.) Both the names Publishers Payment Processing and PPP Magazines appear on the publisherspayment.com website. (Exh. 500.)

583. The call center also handled consumer calls in response to "switch notices." (Pugsley Tr. 291:8-292:13; Exh. 518; Kaylor Tr. 1686:11-13.)

584. CPE, CAS, MCE, SHA, and Wineoceros submitted orders to publishers and clearinghouses that were placed in response to Orbital, Liberty, Express, United, and Associated mailers. (Kaylor Tr. 1677:15-21, 1697:15-24, 1698:5-8, 1714:11-16, 1723:18-23, 1732:14-1733:4, 1897:6-8; Bacon Tr. 1306:2-3, 1308:21-1310:7, 1311:13-18, 1313:19-20, 1313:24-1314:23; Strickler Tr. 1974:12-21, 1976:4-23, 1984:23-1985:2, 1988:4-15, 1989:7-11; Exh. 3229; Exh. 83; Pugsley Tr. 276:3-13, 434:20-435:11 (Pugsley sent orders in response to Liberty, Express, United, and Associated mailers to Bacon).) Wineoceros received orders from Kaylor and Bacon, through MCE. (Strickler Tr. 1974:17-1975:10.)

585. CPE, SHA, and Magazine Link sent "switch notices" to consumers, when the newspaper subscriptions they ordered in response to Orbital, Liberty, Express, United, and Associated

mailers could not be provided. (Kaylor Tr. 1691:12-22; Pugsley Tr. 249:15-251:24; Exh. 214 at 1-2 (CPE); Bacon Tr. 1405:20-22 (SHA); Kaylor Tr. 1698:11-12, 1714:19-21, 1730:2-12, 1732:6-13 (Magazine Link).) Magazine Link also sent switch notices on behalf of CAS, MCE, and CPE. (Kaylor Tr. 1730:2-12, 1732:6-13.)

586. Clarity Group performed the administrative and staffing work of CAS, MCE, and Magazine Link. (Kaylor Tr. 1719:9-23; Bacon Tr. 1323:24-25, 1324:25-1325:11.) Clarity Group hired former employees of CPE and SHA. (Bacon Tr. 1324:25-1325:11, 1328:16-20.)

587. Specialties was a conduit for payments to Bacon from CPE, SHA, and Clarity Group. (Bacon Tr. 1304:1-8, 1330:12-23, 1333:3-1335:14; Exh. 430; Exh. 1072 ($66,667 payment from CPE in August or September 2012); Exh. 1022 (Specialties formed August 15, 2012); Exh. 1043 at 37-60 ($690,333 in payments from CPE, Clarity Group, and SHA).)

588. Anchor submitted Liberty, Express, United, and Associated orders to CPE and SHA to be sent to publishers and paid for that work. (Babb Tr. 729:5-9, 729:21-23; Pugsley Tr. 282:24-283:14, 283:17-284:1, 299:9-10 (Anchor); Bacon Tr. 1299:7-9 (CPE); Bacon Tr. 1313:19-20 (SHA).)

589. CAS, Magazine Link, MCE, and CPC Solutions were entities that were intended to replace CPE. (Bacon Tr. 1324:24-1325:18, 1326:24-1327:14.) On at least one occasion, SHA billed Anchor for orders that CPE cleared. (Bacon Tr. 1318:22-1319:24; Exh. 1060.)

590. HCG Inc. and PPP OR were entities formed to support the subscription operation in 2014 and 2015. Parducci was the Registered Agent for the Publishers Payment Processing, Inc. entity that was incorporated in Oregon (Exh. 221; Exh. 230.) HCG Inc. is listed as the parent company of Express on Express's corporate records, which identify Strickler as the President, Secretary, sole incorporator, and sole director of Express. (Exh. 58 at 1-3.)

### iii) The Corporate Defendants shared operating and business addresses.

591. The operation was conducted from two primary locations: Pugsley's Eagle Point Property and the White City Building. (Pugsley Tr. 127:7-15, 302:15-17; Lovrien Tr. 833:21-834:1, 880:25-881:1, 883:8-15; J. Hoyal Tr. 2156:12-14.)

592. Between 2010 and 2015, the White City Building was owned by Reality Kats. (Simpson Tr. 2517:11-2518:7; J. Hoyal Tr. 3527:9-14.)

593. Liberty, Express, United, Associated, Adept, Crown, Atlas, and North West Data operated from Pugsley's Eagle Point Property between 2010 and 2014. (Pugsley Tr. 127:7-15, 302:12-17; Lovrien Tr. 833:21-834:1, 880:25-881:3.)

594. The call center (PPP NY and PPP Magazines) operated from the White City Building between 2011 and 2015. (Simpson Tr. 2519:13-14; J. Hoyal Tr. 2156:1-22; Lovrien Tr. 883:8-15.)

595. The call centers operated by prior iterations of the operation, including ACPA and GDS, also operated from the White City Building. (J. Hoyal 2156:19-25.)

596. CPE, CAS, MCE, Magazine Link, SHA, and Clarity Group operated from the White City Building between 2011 and 2015. (Kaylor Tr. 1678:3-5, 1700:14-15, 1716:15-17 (CPE, CAS, MCE, Magazine Link); Bacon Tr. 1308:21-1309:11 (CPE, SHA, Clarity Group).)

597. SHA, CPE, and Clarity Group operated from the same space within the White City Building. (Bacon Tr. 1308:21-1309:11.)

598. CAS, MCE, and Magazine Link shared a mailing address: Box 2866, White City, Oregon. (Exh. 428.)

599. CAS, MCE, and Magazine Link used Kaylor's residential address as their registered address. (Exh. 419 at 1-2 (CAS); Exh. 468 (MCE); Exh. 472 (Magazine Link); Kaylor Tr. 1701:13-14 (residence).)

600. PPP Magazines, CPE, SHA, Clarity Group, and Specialties all used Bacon's residential address as their registered address. Exh. 1021 (PPP Magazines); Exh. 506 (CPE); Exh. 1023 (SHA); Exh. 1022 (Specialties); Exh. 1016 (Clarity Group); Bacon Tr. 1289:10-16 (residence).)

601. The Corporate Defendants that operated from Pugsley's Eagle Point Property between 2010 and 2014 moved to the White City Building in 2015. (Pugsley Tr. 302:12-17; Lovrien Tr. 833:21-834:1; 835:6-14, 880:25-881:3.)

602. The Corporate Defendants' legal counsel, David Lennon, was also located in the White City Building. (Lennon Tr. 2725:3-5, 2725:21-25.)

603. Reality Kats and H&A both used the Hoyals' residential address as their business addresses. (Simpson Tr. 2512:23-2514:6; Exh. 537 at 1-4 (Reality Kats corporate records); Exh. 227 at 2-4 (Reality Kats financial account application); Exh. 1038 at 23-30 (same) (Reality Kats); L. Hoyal Tr. 1224:9-18, 1085:2-24 (L. Hoyal received Reality Kats mail at Hoyal residential addresses); L. Hoyal Tr. 1086:13-21; J. Hoyal Tr. 2021:19-21, 2020:18-25; Exh. 293; Dkt. 91 (Amended Answer of Defendants Jeffrey Hoyal an H&A) at 6, ¶ 19 (H&A).)

### iv)  The Corporate Defendants shared personnel.

604. The same employees performed the same work at Orbital, Liberty, Express, United, and Associated, from the same desks. (Lovrien Tr. 855:1-856:2; Pugsley Tr. 147:7-11, 239:1-240:5 (Orbital to Liberty); Lovrien Tr. 871:22-872:4, 872:10-11; Pugsley Tr. 148:2-3, 164:6-7, 240:6-25, 255:12-24 (Liberty to Express); Lovrien Tr. 862:21-23, 863:2-4, 865:24-866:5 (Orbital, Liberty, and United); Lovrien Tr. 870:15-19, 870:22-871:21 (United to Associated).)

605. The same employees performed the same work at CPE, CAS, MCE, Magazine Link, SHA, and Clarity Group. (Kaylor Tr. 1706:1-11; Bacon Tr. 1328:16-20.)

605.1. CAS used CPE employees to do CAS work. (Kaylor Tr. 1706:1-2.)

605.2. The same employees who worked for CAS and CPE also worked for Magazine Link and MCE. (Kaylor Tr. 1719:3-6.)

605.3. CPE and SHA employees who became Clarity Group employees essentially performed the same duties at Clarity Group as they had at CPE and SHA. (Bacon Tr. 1328:16-20.)

605.4. Shellie Burr was bookkeeper for Bacon and Kaylor's companies, including Magazine Link, CAS, CPE, and Clarity Group. (Kaylor Tr. 1706:6-11, 1729:13-16; Bacon Tr. 1315:20-1316:12; Parducci Tr. 576:10-12; Exh. 197, 430, 1060.)

605.5. Lovrien responded to consumer complaints forwarded to the subscription operation by state attorneys general and the BBB on behalf of Orbital, Liberty, Express, United, and Associated. (Lovrien Tr. 850:17-24; Pugsley Tr. 155:2-21; J. Hoyal Tr. 2064:8-14; Exh. 118; Exh. 1004.)

### v) The Corporate Defendants used common marketing materials and services.

606. The form of the mailers sent by Orbital, Liberty, Express, United, and Associated between 2010 and 2015 were substantially similar. (J. Hoyal Tr. 3543:8-12; Simpson Tr. 3091:10-17.)

607. The operation used the same customer database, controlled by Reality Kats, to populate the mailers sent to consumers between 2010 and 2015. (Simpson Tr. 2557:22-2558:16, 2573:16-2575:3, 2575:18-2576:3, 3049:14-23, 3052:8-13; J. Hoyal Tr. 2475:24-2477:13.)

608. The call center located in the White City Building responded to consumers calls in response to the Liberty, Express, United, and Associated mailers, as well as to the operation's "switch notices." (Bacon Tr. 1227:2-3, 1236:17-1237:2; Pugsley Tr. 291:8-292:13, 434:18-19; J. Hoyal Tr. 2156:1-22; Exh. 11; Exh. 518; *see also* Kaylor Tr. 1626:3-7, 1686:11-13.)

609. Liberty, Express, United, and Associated used the same website ("publisherspayment.com") to accept internet orders from consumers in response to the mailers; the website printed on the United and Associated mailers ("unitedpubex.com") redirected consumers to the website printed on the Liberty and Express mailers ("publisherspayment.com") to place orders. (Bacon Tr. 1275:17-19, 1278:18-1279:8; Exh. 500-501.)

610. Defendants used a common corporate counsel, David Lennon. (Lennon Tr. 2722:13-16.)

611. Defendants used a common computer system, known as "pubgroups," which contained information about mailers sent to consumers, purchases, and customer service contacts, and was used by data entry personnel to record customer orders and by call center representatives to look up orders and record consumer complaints. (Pugsley Tr. 155:22-156:10, 372:3-25; (Kaylor Tr. 1636:9-22 (call center order look up), 1642:22-1643:6 (call center complaints).) Lovrien, Pugsley, Parducci, Bacon, Kaylor, and Babb had access to the "pubgroups" system. (Lovrien Tr. 891:18-892:3 (Lovrien), 892:4-5 (Pugsley), 892:6-8 (Parducci), 892:9-12 (Bacon); 892:13-16 (Kaylor); Kaylor Tr. 1642:22-1643:15 (Kaylor, Bacon); Babb Tr. 719:25-720:10 (Babb).)

612. Pubgroups also hosted email accounts for Babb, Lovrien, Strickler, and other individuals. (Pugsley Tr. 159:18-160:2 (Babb, Lovrien); Strickler Tr. 1969:18-21 (Strickler); *see also* Exh. 15 (Babb, Lovrien).)

#### vi) The Corporate Defendants were economically interdependent.

613. Payments from consumers for subscriptions flowed from the mailing entity dba accounts, to the mailing entity main accounts, to HCG LLC. (Pugsley Tr. 202:16-203:6-24). Payments were then made from HCG LLC to Maximillian, then among the various Corporate Defendants, before the profits were disbursed equally to H&A and Reality Kats. (J. Hoyal Tr. 2077:5-2078:12, 2082:16-2083:1, 2084:10-2086:5, 2090:1-23, 2100:17-2101:9; Parducci Tr. 547:20-548:4, 548:15-25, 556:15-557:24; 558:14-21; 559:7-24, 560:18-561:2, 563:4-564:11, 565:21-25, 567:18-568:21, 574:7-576:2, 666:17-667:24; Exh. 109; Exh. 248; Exh. 327; Exh. 430; Exh. 1072; Exh. 3298 at 6, ¶¶ 18-19; *see also* FOF ¶¶ 293-312, 374-375.)

614. Orbital, Liberty, Express, United, and Associated were successor entities that absorbed the business of the preceding entities. (FOF ¶¶ 39, 42-44, 48, 52-55, 57-59.) Dbas transferred from one mailing entity to another. (J. Hoyal Tr. 2108:3-8.)

615. Consumer checks written in response to mailers sent by one mailing entity were deposited to bank accounts of a different mailing entity when the original mailing entity bank account was closed. (J. Hoyal Tr. 2108:1-21.)

616. The mailing entities paid Bacon and Kaylor's companies to send orders to publishers, at first directly and then through Anchor. (Pugsley Tr. 282:24-283:14, 283:17-284:1, 296:12-23; Babb Tr. 724:3-5, 729:21-23.)

617. The call center was not self-sufficient and had to be financially supported by the mailing entities. (J. Hoyal Tr. 2087:14-2088:4, 2090:24-2091:16.)

618. Maximillian paid Parducci for all the work she performed for the Corporate Defendants. (Parducci Tr. 528:22-529:7, 612:12-613:2.)

619. Maximillian, via Parducci, invoiced other Corporate Defendants at the direction of J. Hoyal and Simpson, to disburse those funds to other Corporate Defendants. (Parducci 574:7-576:2, Exh. 430.)

620. CPE, CAS, MCE, and SHA paid Maximillian. (Bacon Tr. 1336:4-11; Exh. 1072 (CPE); Exh. 430 (SHA); Kaylor Tr. 1699:20-1700:13, 1722:20-1723:2 (CAS and MCE).)

621. Between January 2011 and March 2015, Reality Kats and H&A each received approximately $15 million from the deceptive mailing enterprise, through Maximillian. (Simpson Tr. 2542:11-2543:2; Exh. 559 ($14.99 million); J. Hoyal Tr. 2082:16-2083:1, 2083:17-2084:20, 2090:1-12, 2100:17-1-2101:9; Parducci Tr. 565:11-15; L. Hoyal Tr. 1202:23-1204:13 (Maximillian distributed profits from the subscription operation equally to Reality Kats and H&A).)

### G. RESTITUTION FINDINGS

#### i) Consumer injury

622. Between April 2011 and March 2015, Defendants received payments totaling $13,861,574.45 from consumers for newspaper subscriptions, including subscriptions to *The Wall Street Journal*, *The New York Times* and regional newspapers. (Simpson Tr. 3390:18-3391:1

($12,269,509.15 in total revenue re: *The Wall Street Journal* and *The New York Times*); 3392:1-14 ($1,592,065.30 in revenue re: regional newspapers); Exh. 2150.)

623.    Of the consumer money received by the Defendants between 2011 and 2015, $1,668,800.43 was returned to consumers either through consumers canceling their payments ($214,832.50) (Lovrien Tr. 969:17-19, 981:23-983:13; Exh. 3282 at 3-4), or direct refunds ($1,453,967.93) (J. Hoyal Tr. 2472:7-2475:6; Exh. 1090A).

624.    Therefore, the consumer injury attributable to the newspaper mailers is approximately $12,192,774.02.

### ii)     Defendants' other expenses do not constitute reimbursements to consumers and are not accurate.

#### (1) Expenses related to submitting orders to publishers (remits) do not constitute money reimbursed to consumers.

625.    The term "remit" or "remit cost" generally refers to the amount of money sent by the operation to the publisher to obtain a subscription. (Haight Tr. 2863:10-12; J. Hoyal Tr. 2415:6-12; Simpson Tr. 2680:16-19.)

626.    The mailing entities paid the submitting entities the cost to be submitted to the publisher plus a "markup" to process the order, which was retained by the submitting entities. (*See* Bacon Tr. 1337:2-1339:1.) The submitting entities generally added a $5 per order "markup" for orders submitted using the insert card process. (Bacon Tr. 1362:3-7.)

627.    The remit values in Exhibit 2024 and 2150 do not take into account whether the order was actually fulfilled or not. The values assume that all orders were fulfilled by the publisher and that no payments were refunded. (Simpson Tr. 3398:23-3399:14, 3399:18-21.)

628.    The remit values in Exhibit 2024 and 2150 did not account for checks from the Defendants that were rejected by publishers (Simpson Tr. 3398:23-3399:5), or were deposited by publishers but then refunded by the publishers in a separate check made out to one of the deceptive mailing operation Defendants, or a dba. (Simpson Tr. 3399:22-25.)

629.    Publishers regularly rejected checks from Defendants. (J. Hoyal Tr. 2170:15-23, 2187:22-25; Strickler Tr. 1977:24-1978:1, 1978:9-1982:1; Exh. 3214 (*The New York Times* returned two Wineoceros checks); Lovrien Tr. 947:22-948:9; Exh. 461 at 31-33 (*The Washington Post* returned CAS check); Lovrien Tr. 948:10-950:23; Exh. 461 at 8-18 (*The Washington Post* returned eight additional CAS checks); Lovrien Tr. 957:1-958:16; Exh. 139 (*The Seattle Times* returned sixty-one CAS checks); Bacon Tr. 1417:6-23; Exh. 150 at 5 (Dow Jones refused to cash 230 CPE checks); Kaylor Tr. 1750:25-1751:6 (Kaylor received checks rejected by publishers); Exh. 152 (email message from Bacon to Pugsley and Lovrien informing them that CAS checks to *The Wall Street Journal* are not clearing); Exh. 160 at 2-3 ("Newspaper Clearing" report, reflecting average of 33% of checks sent to newspapers were clearing); Exh. 408 at 1, 4; Exh. 1013 (*The Washington Times* returned an unknown number of CAS checks to Kaylor with cease and desist letters); Exh. 462 at 7 (*The Dallas Morning News* rejected 108 CAS checks); Exh. 465 at 2 (Hearst Corporation returned seven CAS checks to *The San Antonio Express-News*, fifty-two CAS checks to *The San Francisco*

*Chronicle*, and ninety-three CAS checks to *The Houston Chronicle*); Exh. 1014 (Hearst Corporation returned an additional CAS check sent to *The San Antonio Express-News*); Exh. 1061 at 1 (Lovrien indicates that about 700 orders placed with *The Wall Street Journal* were rejected); Exh. 1063 (reflecting 3303 outstanding orders for *The Wall Street Journal* and Barron's, to be switched); Exh. 1065 (reflecting 2495 orders for *The Wall Street Journal* to be switched); Exh. 1068 (reflecting checks to "Barrons and WSJ not clearing"); Exh. 1070 (CAS records reflect 66 uncleared checks to *The Washington Post*).)

630.   On multiple occasions, Defendants received checks from publishers refunding Defendants for remits that Defendants had sent those publishers. (J. Hoyal 2170:24-2171:2 (*The New York Times*); Strickler Tr. 1978:9-1984:18; Exh. 3214 (*The New York Times* provided refund check of $34,861.50); Exh. 3229 (Strickler sent refund check back *The New York Times* a second time); Exh. 462 at 2-5 (*The Dallas Morning News* sent a check to CAS refunding CAS payments totaling $18,281.12); Exh. 465 at 2 (Hearst Corporation sent a check to CAS returning payments for orders to *The San Antonio Express-News* and *The Houston Chronicle* that were inadvertently cashed).)

631.   The remit values in Exhibit 2150 include fees charged by the Defendant clearing companies to the mail agents (Simpson Tr. 3394:1-3395:22, 3396:16-3397:5) such as $5 per order cleared by the Defendant clearing companies via the insert card process and $1 per order cleared via the traditional clearing firms. (Bacon Tr. 1361:23-1362:9.)

### (2)   Prior to this litigation, Defendants paid $250,000 into the Oregon consumer restitution fund and $3 million to the State of Oregon in 2015.

632.   In connection to the 2015 Oregon litigation, Defendants deposited $250,000 into the Oregon consumer restitution fund, which funded both the fund's administrator and restitution payments to consumers. (J. Hoyal Tr. 2450:4-25; Exh. 1078 at 5-6 ¶ 14.)

633.   Separate from the $250,000 deposited into the Oregon consumer restitution fund, Defendants paid $3 million to the State of Oregon in 2015 "for deposit into the Consumer Protection and Education Revolving Account, established by Oregon Revised Statutes 180.095, to be used as Oregon law may provide." (J. Hoyal Tr. 2452:9-22; Exh. 1078 at 8, ¶ 19 (transcript references identical Exh. 3021, which was not admitted); 2017 ORS 180.095(1).)

634.   Therefore, $3,250,000 will be deducted from the $12,192,774.02 consumer injury figure as reimbursement to consumers, equaling in sum $8,942,774.02.

## IV.   CONCLUSIONS OF LAW

### A.   JURISDICTION AND VENUE

635.   This Court has subject matter jurisdiction over the FTC's claims pursuant to 15 U.S.C. §§ 45(a) and 53(b) and 28 U.S.C. §§ 1331, 1337(a) and 1345.[1]

636.   Venue in this district is proper under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).[2]

---

[1] Dkt. 34 at 3, ¶ 4; Dkt. 76 at 2, ¶4; Dkt. 90 at 3, ¶ 4; Dkt. 91 at 3, ¶4; Dkt. 131 at 3, ¶ 4.

[2] Dkt. 34 at 3, ¶ 5; Dkt. 76 at 2, ¶ 5; Dkt. 90 at 3, ¶5; Dkt. 91 at 3, ¶ 5; Dkt. 131 at 3, ¶ 5.

## B. THE DEFENDANTS' MAILERS ARE DECEPTIVE

637. The Court has already determined that the Defendants' mailers are deceptive as a matter of law; they convey the false net impression that the mailer is from or authorized by the newspaper publication in question, that any current subscription would be 'renewed' automatically, and that the consumer was being offered the lowest price available. (*See* Opinion and Order on Summary Judgment (Dkt. 469), at 3.). The Court has also already determined that

   637.1 any disclaimers were inadequate to cure the mailers' deceptiveness (*id.* at 4-5.);

   637.2 the mailers were likely to and did mislead reasonable consumers (*id.* at 5-7); and

   637.3 the misrepresentations were material. (*id.* at 7.)

## C. THE CORPORATE DEFENDANTS ARE LIABLE AS A COMMON ENTERPRISE[3]

638. An act of one entity constitutes an act by each entity comprising a "common enterprise" and each may be held liable for the deceptive acts and practices of the others.[4]

639. The FTC Act disregards the separate corporate forms of corporate defendants if the structure, organization, and pattern of a business venture reveal a "maze of interrelated companies" with shared control, office space, employees, advertising, and services.[5] Other factors include the commingling of funds, economic interdependence, and the sharing of profits.[6]

640. Courts have also found a common enterprise where treating corporations separately would frustrate the consumer protection purpose of the FTC Act.[7]

---

[3] Corporate Defendants are also liable for their own violations of Section 5. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156-57 (9th Cir. 2010).

[4] *See e.g., FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1105 (9th Cir. 2014) (citing *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010)); *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012), *aff'd*, 2013 U.S. App. LEXIS 1078 (11th Cir. Jan. 16, 2013). Because the Court has stricken the answer of the Defaulting Defendants, the common enterprise question should be deemed admitted with respect to those Defendants.

[5] *See e.g., FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009); *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015); *see also FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011)*, aff'd in relevant part*, 763 F.3d 1094 (9th Cir. 2014).

[6] *See FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1116 (S.D. Cal. 2008), *aff'd*, 604 F.3d 1150 (9th Cir. 2010), *amended and aff'd*, 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010); *FTC v. NHS Sys., Inc.*, 936 F. Supp. 2d 520, 533 (E.D. Penn. 2013); *FTC v. Ivy Capital, Inc.*, No 2:11-CV-283 JCM (GWF), 2013 WL 1224613, at *13-14 (D. Nev. Mar. 26, 2013), *remanded on other grounds*, 616 F. App'x 360 (9th Cir. 2015).

[7] *See FTC v. U.S. Oil & Gas Corp.*, No. 83-1702-CIV-WMH, 1987 U.S. Dist. LEXIS 16137, at *61 (S.D. Fla. July 10, 1987); *see also Nat'l Urological Grp.*, 645 F. Supp. 2d at 1182 (finding a

641. The Defendants' subscription operation bears the hallmarks of a common enterprise:

    641.1   The subscription operation conducted business through a maze of different companies. (FOF ¶¶ 571-590.)

    641.2   Simpson and J. Hoyal oversaw and had ultimate control over the operation. (FOF ¶¶ 147, 149-155, 159, 164, 168, 193-242, 559-563.)

    641.3   The Corporate Defendants shared office space at Pugsley's property and the White City Building (FOF ¶¶ 591, 593-597, 601, 602), and used common business addresses (FOF ¶¶ 599-601, 603).

    641.4   The companies shared personnel, including officers and employees. (FOF ¶¶ 567-570, 604-605.)

    641.5   The deceptive mailers were substantively similar, regardless of which company sent or received them. (FOF ¶ 606.)

    641.6   The companies shared the same consumer call center (FOF ¶ 608), consumer targeting database (FOF ¶¶ 607) website (FOF ¶ 609), consumer order tracking computer system (FOF ¶¶ 611-612), and legal counsel. (FOF ¶ 610.)

    641.7   Funds moved freely among companies, often with no legitimate business purpose. (FOF ¶¶ 613, 619.)

    641.8   The call center and the mailing, receiving, and clearing companies were economically interdependent. (FOF ¶¶ 584, 587-588, 616-617.)

    641.9   The bulk of the profits from the operation were shared between Simpson and the Hoyals, through Reality Kats and H&A. (FOF ¶ 621.)

642. The Corporate Defendants have therefore operated as a common enterprise, and the Corporate Defendants are jointly and severally liable for each other's deceptive practices. (*See* FOF ¶¶ 559-621.)

**D.  INJUNCTIVE AND MONETARY RELIEF**

643. "In FTC cases, individual defendants are directly liable for their own violations of Section 5."[8]

---

common enterprise where the "corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a 'clear mechanism for avoiding the terms of the order. . .'") (quoting *Del. Watch Co. v. FTC*, 332 F.2d 745, 746-47 (2d Cir. 1964) (per curiam)).

[8] *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal. 2012) (citing *FTC v. Windward Mktg., Ltd.*, No. Civ.A. 1:96-CV-615-F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997).

644. In addition, an individual is liable for an entity's violations of the FTC Act, and properly subject to an injunction, if the individual: (1) participated directly in the unlawful conduct or (2) had the authority to control the corporate entity liable for the violation.[9]

645. Once either authority to control or direct participation is established, individuals are also personally liable for monetary relief for an entity's violation of the FTC Act if they had "actual knowledge of material misrepresentations . . . [were] recklessly indifferent to the truth or falsity of a misrepresentation, or . . . had an awareness of a high probability of fraud along with an intentional avoidance of the truth."[10]

### i)     All Defendants are liable for injunctive relief.

646. In order to be liable for injunctive relief, the FTC need not prove both participation and authority to control; either is sufficient.[11]

647. The FTC need not prove an individual defendant's knowledge of any deception to obtain injunctive relief against the individual.[12]

648. Except in limited circumstances not applicable here, the equitable defenses of waiver, estoppel, laches, and unclean hands are not available against the government.[13]

---

[9] *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014) (citing *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997)); *see also FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (citing *FTC v. Cyberspace.com*, 453 F.3d 1196, 1202 (9th Cir. 2006)).

[10] *FTC v. Grant Connect LLC*, 763 F.3d at 1101-02 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)); *see also, FTC v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994) (citing *Amy Travel*, 875 F.2d at 574); *Network Servs. Depot*, 617 F.3d at 1138-39; *Stefanchik*, 559 F.3d at 931; *Kitco*, 612 F. Supp. at 1292-93.

[11] *FTC v. Ross*, 897 F. Supp. 2d 369, 383 (D. Md. 2012).

[12] *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997) (citing *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1087 (C.D. Cal. 1994)); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1204 (C.D. Cal. 2000).

[13] *See, e.g., FTC v. Bronson Partners, LLC*, No. 3:04-CV-1866, 2006 WL 197357, at *2 (D. Conn. Jan. 25, 2006) ("The FTC may not waive the requirement of an act of Congress."); *FTC v. N.E. Telecomms., Ltd.*, No. 96-CV-6081, 1997 WL 599357, at *3 (S.D. Fla. June 23, 1997) ("[T]he doctrine of laches is not available against the Government in a civil suit to enforce a public right or to protect a public interest."); *United States v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528, 1546 (E.D. Cal. 1992) (holding that "the particular defenses at issue here—waiver, estoppel, and unclean hands—may not be asserted against sovereigns who act to protect the public welfare"); *SEC v. Gulf & W. Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980) ("The government is not ordinarily estopped by its past conduct from protecting the public interest."). While a handful of courts have held that the defenses of waiver, estoppel, laches, and unclean hands may be available in the case of government misconduct or other extraordinary circumstances, the Defendants have presented no such evidence here. *See, e.g., FTC v. DirecTV, Inc.*, Case No. 15—01129-HSG, 2015 WL 9268119,

649. Even if the defenses were applicable, there is no credible support for these defenses in the evidence presented at trial.

### (1) Direct participation

650. A corporate officer who "participates in 'acts crucial to the success' of an enterprise" has "directly participated for the purposes of individual liability."[14]

651. "Participation can include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations."[15]

652. Direct participation exists even when individual defendants claim they did not read relevant documents and had no knowledge of fraud, as long as they had at least "a general understanding" of the business's operations.[16]

653. Direct participation includes but is not limited to:

653.1   active supervision of employees as well as the review of sales and marketing reports,[17]

653.2   writing or reviewing marketing material, sales and marketing reports,[18]

653.3   writing call center scripts,[19]

653.4   overseeing finances,[20]

653.5   making personnel decisions,[21]

---

at *3 (N.D. Cal. Dec. 21, 2015); *FTC v. Hang-Ups Art Enters., Inc.*, No. CV 95-0027 RMT (JGx), 1995 WL 914179, at *4 (C.D. Cal. Sept. 27. 1995).

[14] *Ivy Capital, Inc.*, 2013 WL 1224613, at *14 (quoting *J.K. Publ'ns*, 99 F. Supp. 2d at 1206).

[15] *Ivy Capital, Inc.*, 2013 WL 1224613, at *14.

[16] *J.K. Publ'ns*, 99 F. Supp. 2d at 1183-84, 1206.

[17] *Ross*, 897 F. Supp. 2d at 383.

[18] *See e.g., Ross*, 897 F. Supp. 2d at 383; *FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. 1995) (reviewing weekly sales reports). *FTC v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1293 (D. Minn. 1985) (providing sample marketing materials and submitting deceptive advertisements); *FTC v. Am. Standard Credit Sys.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) (formulating, reviewing, approving, and disseminating marketing policies).

[19] *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009); *FTC v. Ideal Fin. Solutions, Inc.*, No. 2:13-cv-00143-JAD-GWF, 2015 WL 4032103, at *10-11 (D. Nev. June 30, 2015).

[20] *See MacGregor*, 360 F. App'x at 894.

[21] *See, e.g., Ross*, 897 F. Supp. 2d at 383; *FTC v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 U.S. Dist. LEXIS 17423, at *6 (N.D. Ill. Sept. 30, 2003).

653.6   receiving compensation,[22] and

653.7   responding to complaints.[23]

654.   Examples of the Individual Defendants' direct participation include but are not limited to:

654.1.   **Simpson**, with J. Hoyal, ran and owned the deceptive mailing operation. (FOF ¶ 205-208). Simpson was responsible for the deceptive mailer (FOF ¶ 32.4) and managed the execution of mailings (FOF ¶ 147). He oversaw marketing for the deceptive mailing operation, including designing and determining the form of the mailers and providing direction, review, and approval regarding changes to the mailers and accompanying envelopes. (FOF ¶¶ 11.9, 21, 152-153.) He managed and analyzed the database of consumer information used to target consumers (FOF ¶¶ 21, 22, 147, 154), determining which consumers received mailers, the dba name that appeared on the mailer, which publication was offered, for what term, and at what price. (FOF ¶¶ 11.9, 154-155.) This data analysis was "critical" to the mailing operation. (FOF ¶ 154.4.) He tracked the status of the mailings. (FOF ¶¶ 163, 168.) He developed the insert card process (FOF ¶ 157), helped recruit Bacon to clear orders for the operation (FOF ¶¶ 156, 158), and came up with the idea to expand the business model to include regional newspapers. (FOF ¶ 158.) He tracked the financial operations through reports that included number of bank deposits, payments made to Maximillian and HCG LLC, expenses, balances, amount of mail received, and entry of consumer checks into the system. (FOF ¶¶ 160, 163-164, 168.) He analyzed revenue data to determine if the mailers were profitable. (FOF ¶ 161.) He also approved the payment and issuance of invoices that would affect whether Reality Kats was paid, including those issued by Maximillian and HCG LLC. (FOF ¶ 166.) Simpson knew that Maximillian's accounts were used to transfer money out of the mailing operation, tracked Maximillian and HCG LLC's accounts, and instructed other Defendants to open bank accounts. (FOF ¶ 167.) Through Reality Kats, Simpson received approximately $15 million from the deceptive mailing operation between 2011 and 2015. (FOF ¶¶ 159, 621.)

654.2.   **J. Hoyal** oversaw the day-to-day activities of the operation (FOF ¶ 209), made high-level decisions for the operation (FOF ¶ 208), and, with Simpson, ran the operation (FOF ¶¶ 205, 207). He set up the structure of the operation (FOF ¶¶ 194-196) and directed the formation of the Corporate Defendants (FOF ¶ 197). He was "on site" at Pugsley's property and the White City Building on a daily or weekly basis (FOF ¶¶ 213-214.) J. Hoyal, along with Simpson, was responsible for the form and content of the mailer. (FOF ¶¶ 230-234.) J. Hoyal received regular financial and operational reports from Pugsley (FOF ¶ 216) and Parducci (FOF ¶¶ 215, 319.3-319.5) on all aspects of the operation. J. Hoyal took these actions through H&A (FOF ¶ 226), for which he is 50% owner, President and Registered Agent (FOF ¶ 30). On behalf of H&A, J. Hoyal opened bank accounts and held signatory authority over those

---

[22] *See FTC v. Benning*, No. C 09-03814 RS, 2010 WL 2605178, at *6 (N.D. Cal. June 28, 2010).

[23] *Neovi*, 598 F. Supp. 2d at 1117.

accounts, signed corporate documents, and managed, directed, participated in, and made decisions. (FOF ¶ 226.) J. Hoyal also served as trustee of Pugsley's trust, Stevo Trust, which owned Crown (FOF ¶ 75) and Simpson's trust, Scenic Trust, which owns Reality Kats (FOF ¶ 20). Through H&A, J. Hoyal and L. Hoyal received approximately $15 million from the deceptive mailing operation between 2011 and 2015. (FOF ¶¶ 227-229; *see also* FOF ¶¶ 281-282.)

654.3. **L. Hoyal** managed H&A's financial operations, including preparing invoices on behalf of H&A to the deceptive mailing operation and providing them to Parducci for payment through Maximillian (FOF ¶¶ 273, 275) and transferring funds H&A received from the deceptive mailing operation through related Hoyal entities to Reality Kats (FOF ¶ 280). L. Hoyal is 50% owner, Secretary, and Treasurer of H&A (FOF ¶¶ 31, 270.) L. Hoyal prepared and signed corporate documents on behalf of H&A and filed documents with the state of Oregon. (FOF ¶ 271.) She handled the financial operations of H&A, including opening bank accounts holding signatory authority, keeping the books, preparing balance sheets and profit and loss reports, paying bills, signing checks and wiring funds, receiving and depositing funds, and reviewing and reconciling bank statements. (FOF ¶ 272; *see also* FOF ¶ 11.7.) Through H&A, J. Hoyal and L. Hoyal received approximately $15 million from the deceptive mailing operation between 2011 and 2015. (FOF ¶¶ 281-282; *see also* FOF ¶¶ 227-229.)

654.4. **Pugsley** oversaw the sending of mailers to consumers, including providing World Marketing with the form of the mailer and the data to be printed on the mailers (FOF ¶¶ 325-329) and reviewing and revising the mailers (FOF ¶¶ 330-333). Pugsley also managed the receipt and processing of orders and payments from consumers in response to those mailers through her companies, Adept and Crown, from her Eagle Point Property between 2010 and 2014 and from the White City Building in 2015. (FOF ¶¶ 339-340.) Pugsley handled customer service issues and supervised customer service work. (FOF ¶¶ 343, 383.) Pugsley received reports from Lovrien, Babb, and Strickler about consumer orders entered, payments deposited, and customer service issues (FOF ¶¶ 343, 383.7) and provided Lovrien with templates for responding to complaints from state attorneys general (FOF ¶ 344). Pugsley worked with a programmer to develop "pubgroups," a custom computer system used by the operation to enter consumer order and payment information, look up order information, and record consumer complaints (FOF ¶¶ 347), had the highest level of access to this system (FOF ¶ 348), provided training on the system (FOF ¶ 349), registered the internet domain used to host the pubgroups system and the email accounts used by Babb, Lovrien, Strickler, and others (FOF ¶¶ 345-346), and used her personal credit card to pay for the internet domain (FOF ¶ 345). Pugsley received daily reports from the call center (FOF ¶ 397), and she provided direction to call center management, including Kaylor and Bacon, about refund processing, including expediting refunds for consumers who complained to law enforcement agencies or the BBB. (FOF ¶ 353.) Pugsley sent orders received by the operation in response to the mailers to other Corporate Defendant, who, through Bacon, forwarded these on to the publishers (FOF ¶¶ 354-356) and assisted in transferring funds to these Corporate Defendants for doing so (FOF ¶¶ 357, 359). Pugsley also reported on all aspects of

the subscription operation to Simpson, J. Hoyal, and Parducci. (FOF ¶¶ 365-370.) Pugsley received $10,000 per month as compensation for her work. (FOF ¶379.) All funds from the subscription operation received by Adept and Crown that were not used to pay expenses, including payroll compensation to Pugsley, were transferred to her farm or to her personal trust, Stevo Trust. (FOF ¶ 379.)

654.5. **Parducci** performed numerous and varying tasks for and on behalf of the Corporate Defendants. (*See, e.g.*, FOF ¶¶ 293-295, 297-299, 303, 307, 311, 313-14, 317, 319.3-319.6, 319.13-319.14.) She performed bookkeeping for multiple Corporate Defendants (FOF ¶¶ 303, 308, 314), compiled and distributed reports on the business activities of the Defendants (FOF ¶ 295), executed contracts to obtain services related to maintenance of consumer lead lists and data management software (FOF ¶ 311), provided regular reports about the financial aspects of the operation to other Defendants (FOF ¶ 319.3), paid expenses of the operation (FOF ¶¶ 297.3, 317), and discussed the logistics of the operation with other Defendants. (FOF ¶ 319.14.) In addition, she was the financial coordinator for the entire operation, arranging for and overseeing the transfer of funds among the Corporate Defendants (FOF ¶¶ 293-294, 298), and drew a substantial salary (between $150,000 to $250,000/year) for her work. (FOF ¶¶ 300, 302.) As the President of HCG LLC, she attended quarterly board meetings of its parent entity, Revista Trust. (FOF ¶ 469.)

654.6. **Babb** handled customer service calls (FOF ¶¶ 472-473, 475), so many that she needed to buy another battery for her wireless phone (FOF ¶ 475), and she catalogued consumer complaints (FOF ¶ 476). She also processed subscription orders, and prepared customer checks for deposit. (FOF ¶ 478.) She opened bank accounts and a post office box, signed corporate documents, and signed and deposited checks. (FOF ¶ 481.) In addition, Babb proofread mailer proofs. (FOF ¶¶ 479.)

654.7. **Lovrien** opened and sorted mail (FOF ¶¶ 398.1-398.2), responded to consumer and governmental complaints (FOF ¶¶ 417-419), reviewed and offered feedback on mailers (FOF ¶ 428), provided customer service logs to Pugsley (FOF ¶ 418), reviewed and forwarded multiple cease and desist letters from multiple publishers (FOF ¶ 420), served as the President or sole officer of multiple corporations involved in the scheme (FOF ¶¶ 38, 78, 402-403), forwarded to Bacon orders rejected by publishers so that they could be switched to different publications (FOF ¶ 430), maintained a master list of all publications marketed by the Defendants (FOF ¶ 429), was the office computer expert (FOF ¶ 426), and had the highest level of access to the pubgroups customer database (FOF ¶ 400). By March 2012, she was getting paid $10,000/month for her work on behalf of the operation. (FOF ¶¶ 412, 416.)

654.8. **Bacon** established and oversaw the call center in White City (FOF ¶¶ 488, 490), where her responsibilities including recruiting, hiring, training, supervising, and firing employees, monitoring employees' phone calls with consumers, and updating the employee handbook (FOF ¶ 491). Bacon was also the "point person" for the clearing firms (FOF ¶ 503.3), where she recruited, hired, and trained employees (FOF ¶¶ 500.2, 501.1, 502.1, 503.2, 503.4), sought permission from publishers, via phone

calls, to submit orders (FOF ¶ 505), shared those permissions with the mail houses, in the form of price lists (FOF ¶ 508), monitored whether publishers were in fact accepting the orders (FOF ¶ 516), and reviewed and approved the switch notices informing consumers that they would receive a publication other than the one they had ordered (FOF ¶¶ 518, 519).

654.9. **Kaylor** was the manager of the PPP NY call center (FOF ¶ 528), where she was responsible for taking and monitoring consumer calls, assisting customer service representatives with consumer questions, training customer service representatives, hiring and firing employees, and supervising the call center supervisor. (FOF ¶ 529.) Kaylor updated the employee handbook and drafted call center policies to be used by customer service representatives who answered calls from consumers about the deceptive nature of the mailer. (FOF ¶¶ 88, 531-533, 551.2.) Kaylor responded to consumer complaints and attorneys general inquiries received by the call center and implemented a policy to provide rush refunds only to consumers who had complained to attorneys general or the BBB. (FOF ¶¶ 538, 541.) Kaylor also submitted orders to newspapers, including calling the general customer service numbers of newspapers to ask if she could submit orders on behalf of others, recruiting contractors to fill out insert cards by hand, generating checks to newspapers, and arranging for the cards and payments to be mailed to the newspapers by friends and family. (FOF ¶¶ 544-546.) Kaylor sent switch notices to consumers informing them that their orders could not be fulfilled and would be switched to unordered publications, determined what publications to offer in the switch notices, and submitted replacement orders through third party companies. (FOF ¶ 551.)

654.10. **Strickler** worked for predecessor subscription companies as a consultant whose duties included "uncomfortable things for the management" like firing people. (FOF ¶ 437.) Starting in 2010, his duties included picking up, opening, and sorting mail. (FOF ¶ 438.) He also input consumer orders and processed consumer payments. (FOF ¶¶ 440-441.) He responded to consumer complaints. (FOF ¶ 443.) He set up and managed multiple bank accounts for Express and its multiple dbas. (FOF ¶ 448.) He would "check on the different departments [at Express] and be sure that everything was running smoothly." (FOF ¶ 449.) The different departments included customer service, data processing, and clearing. (FOF ¶ 449.) He executed the forms necessary for Express to register with the State of Oregon as an employer. (FOF ¶ 450.) He attempted to clear orders for the *New York Times* through his company Wineoceros. (FOF ¶ 459.) He engaged in a lengthy back and forth with the *New York Times* regarding the orders that he attempted to clear. (FOF ¶¶ 461-467.) He was paid $5000 per month for the work he did on behalf of Express, and he was paid $2000 per month to clear orders through Wineoceros. (FOF ¶¶ 446, 460.)

(2) **Authority to control**

655. Authority to control does not depend on an individual being personally involved in the deception.[24]

---

[24] *See FTC v. World Media Brokers*, 415 F.3d 758, 764-65 (7th Cir. 2005); *Publ'g Clearing House*, 104 F.3d at 1170-71 (requisite authority to control evidenced by the authority to sign documents for

656. Officers of a small, closely held corporation are presumed to have authority to control that corporation.[25] "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."[26]

657. "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."[27] Individuals have been held to possess authority to control when, among other things, they:

    657.1 created or organized the corporation;[28]

    657.2 managed or participated in the corporation's day-to-day operations;[29]

    657.3 hired, supervised, or fired employees;[30]

---

the company); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1271-72 (S.D. Fla. 2007) (authority to control evidenced by signatory authority over corporate bank accounts); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1080 (C.D. Cal. 2012) ("If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation.") (quoting *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207).

[25] *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer."); *see also FTC v. Freecom Communs, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005) ("Haroldsen was the controlling shareholder of the closely-held corporate defendants; in other words, he owned the corporate defendants. Consequently, a substantial inference exists that Haroldsen had the authority to control the deceptive acts and practices carried on the name of *his* corporations."); *Ivy Capital, Inc.*, 2013 WL 1224613, at *42; *John Beck Amazing Profits*, 865 F. Supp. 2d at 1080 (citing *Amy Travel Serv.*, 875 F.2d at 573) ("Status as a corporate officer is sufficient to establish individual liability."); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1204 (C.D. Cal. 2000) (citing *Publ'g Clearing House*, 104 F.3d at 1170) ("An individual's status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the required control."); *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1207 ("If a defendant was a corporate officer of a small, closely-held corporation, that individual's status gives rise to a presumption of ability to control the corporation.") (citing *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007)).

[26] *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973).

[27] *Amy Travel Serv., Inc.*, 875 F.2d at 573; *accord Neovi*, 598 F. Supp. 2d at 1117; *Am. Standard Credit Sys., Inc.*, 874 F. Supp. at 1089.

[28] *Grant Connect*, 763 F.3d at 1103; *Ross*, 897 F. Supp. 2d at 383.

[29] *POM Wonderful*, 777 F.3d at 498; *Ross*, 897 F. Supp. 2d at 379; *Medicor*, 217 F. Supp. 2d at 1056-57; *In re Nat'l Credit Mgmt. Grp., L.L.C.*, 21 F. Supp. 2d 424, 431, 461 (D.N.J. 1998).

[30] *POM Wonderful*, 777 F.3d at 498; *Grant Connect*, 763 F.2d at 1098; *FTC v. AMG Servs., Inc.*, No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416, at *8 (D. Nev. Sept. 30, 2016), *aff'd sub nom. FTC*

657.4 created, reviewed, or approved the corporation's marketing materials and representations to consumers;[31]

657.5 possessed authority to sign documents on the corporation's behalf, including contracts, checks, and bank account documents;[32]

657.6 participated in the corporation's management and strategy meetings;[33]

657.7 managed the corporation's finances;[34]

657.8 held themselves out as managers;[35] and

657.9 responded to, or were aware of, consumer complaints.[36]

658. Examples of Simpson, J. Hoyal, and L. Hoyals' authority to control include:

658.1. **Simpson**, through Reality Kats, managed the database of consumer information, the data analysis, and the execution of the mailings for the operation. (FOF ¶ 147.) He made major decisions about the deceptive mailing operation. (FOF ¶ 23.) He determined which consumer appeared on each mailer, what publication it would advertise, and at what price. (FOF ¶¶ 11.9, 154-155.) Simpson had ultimate control over all the consumer data and the pubgroups database. (FOF ¶ 154.) His control over the consumer data and database gave him power within the operation. (FOF ¶ 154.) Simpson directed the formation of the companies that made up the operation. (FOF ¶¶ 32.6, 149.) Simpson formed, and is the manager of, Reality Kats. (FOF ¶¶ 20, 146.) Simpson opened bank accounts for Reality Kats, held signatory authority over those accounts, and signed contracts for Reality Kats. (FOF ¶¶ 148, 166.) He also had the

---

*v. AMG Capital Mgmt., LLC*, 910 F.3d 417 (9th Cir. 2018); *Ross*, 897 F. Supp. 2d at 379; *Nat'l Credit Mgmt.*, 21 F. Supp. 2d at 461.

[31] *CFPB v. Gordon*, 819 F.3d 1179, 1193 & n.8 (9th Cir. 2016) (adopting authority-to-control test in case under Consumer Financial Protection Act, and holding individual defendant liable where he had "final decision-making authority for all marketing used by the operation" and reviewed all marketing materials); *POM Wonderful*, 777 F.3d at 498; *Grant Connect*, 763 F.3d at 1103; *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009); *Ross*, 897 F. Supp. 2d at 380.

[32] *FTC v. Ivy Capital, Inc.*, 616 F. App'x 360, 361 (9th Cir. 2015); *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974-75 (11th Cir. 2011) (per curiam); *World Media Brokers*, 415 F.3d at 765; *Publ'g Clearing House*, 104 F.3d at 1170; *AMG Servs.*, 2016 WL 5791416, at *7; *Nat'l Credit Mgmt.*, 21 F. Supp. 2d at 461.

[33] *Ivy Capital*, 616 F. App'x at 361; *Ross*, 897 F. Supp. 2d at 379-80.

[34] *World Media Brokers*, 415 F.3d at 765; *AMG Servs.*, 2016 WL 5791416, at *7; *Ross*, 897 F. Supp. 2d at 379.

[35] *In re Nat'l Credit Mgmt. Grp., LLC*, 21 F. Supp. 2d 424, 461 (D.N.J. 1998).

[36] *Id.*

authority to approve the payment and issuance of invoices. (FOF ¶ 148, 166.) Simpson instructed other Individual Defendants to open bank accounts. (FOF ¶ 167.) Many of the Individual Defendants considered Simpson to be one of their ultimate bosses. (FOF ¶ 151.)

658.2. **J. Hoyal** provided oversight and control over the deceptive mailing operation through H&A. (FOF ¶¶ 32, 226.) He recruited, hired, supervised, and set compensation for Bacon, Kaylor, Lovrien, Parducci, Pugsley, and Strickler. (FOF ¶¶ 198-204, 210). He approved major purchases and expenses for the operation (FOF ¶¶ 223-225) and signed off on the invoicing and payments among Corporate Defendants, including payments to H&A (FOF ¶¶ 219-222, 227-228, 299). J. Hoyal formed H&A (FOF ¶ 28), is 50% owner (FOF ¶ 30), is President and Registered Agent (FOF ¶ 30), opened bank accounts and held signatory authority over those accounts (FOF ¶ 226), signed corporate documents (FOF ¶ 226), and managed, directed, participated in, and made decisions for H&A. (FOF ¶ 226). J. Hoyal also served as trustee of Pugsley's trust, Stevo Trust, which owned Crown (FOF ¶ 75) and Simpson's trust, Scenic Trust, which owns Reality Kats (FOF ¶ 20).

658.3. **L. Hoyal** is 50% owner, Secretary, and Treasurer of H&A. (FOF ¶¶ 31, 270.) L. Hoyal prepared and signed corporate documents on behalf of H&A and filed documents with the state of Oregon. (FOF ¶ 271.) She handled the financial operations of H&A, including opening bank accounts holding signatory authority, keeping the books, preparing balance sheets and profit and loss reports, paying bills, signing checks and wiring funds, receiving and depositing funds, and reviewing and reconciling bank statements. (FOF ¶ 272.) She prepared invoices on behalf of H&A, provided them to Parducci for payment by Maximillian (FOF ¶ 273), and communicated with Parducci about invoices and payments related to H&A's share of the profits from the deceptive mailing operation (FOF ¶ 275).

659.  Although the Worker Defendants directly participated in the operation and agreed to become officers of many of the companies involved, it was clear that they were at all times working as employees under the ultimate control of Simpson and Hoyal. To the extent that there is a presumption that the Worker Defendants had the authority to control the business based on their positions as officers, that presumption has been overcome. However, the Court need not find both participation and authority to control to find the parties liable for injunctive relief; either is sufficient. Therefore, all Defendants either had authority to control or directly participated in the deceptive mailing operation to support liability for injunctive relief.

### ii) Defendants Simpson, J. Hoyal, L. Hoyal, and the Corporate Defendants are liable for monetary relief.

660.  "The FTC need not show that a defendant intended to defraud consumers in order for that individual to be personally liable."[37]

---

[37] *Grant Connect*, 763 F.3d at 1102 (citing *Publ'g Clearing House*, 104 F.3d at 1170-71).

661.  The "'extent of an individual's involvement in a fraudulent scheme alone is sufficient to establish the requisite knowledge for personal restitutionary liability.'"[38]

662.  Actual knowledge includes awareness of consumer and governmental complaints.[39]

663.  Reckless indifference includes ignoring "red flags" such as continuing operations in the face of consumer complaints, acting at the direction of someone known to have trouble with the law, high refund or chargeback rates, or operating through multiple corporations or dbas in order to evade detection.[40]

664.  The Ninth Circuit has held that "turn[ing] a blind eye" toward a business partner's fraud constitutes reckless indifference to the truth or falsity of representations to consumers.[41]

665.  Evidence of Simpson, J. Hoyal, and L. Hoyal's requisite level of knowledge include:

665.1  **Simpson** was the architect of the deceptive mailer. (FOF ¶¶ 32.4, 147, 153.) He maintained oversight over the mailer, reviewing and approving changes to it. (FOF ¶ 153.) His data analysis was tied to predicting consumer behavior and "how to . . . present the offers to people." (*See* FOF ¶¶ 154.2, 154.3.) For example, Simpson came up with the dbas that appeared on the deceptive mailers, which made consumers think they were dealing with companies with which they had a prior relationship. (FOF ¶ 155.) Simpson provided data that sometimes resulted in the mailer offering more issues than the publication actually printed in a year. (FOF ¶¶ 154.1, 177.) Simpson knew that he should not be involved in the mailer approval process because of the

[38] *Grant Connect*, 763 F.3d at 1102 (quoting *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1235 (9th Cir. 1999)); *accord Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 574 (holding "the degree of participation in business affairs is probative of knowledge").

[39] *See, e.g., Neovi*, 598 F. Supp. 2d at 1117 (holding that responding to "many consumer and governmental complaints" constitutes actual knowledge of "widespread fraud"); *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006); *FTC v. Bay Area Bus. Council*, 423 F.3d 627, 638 (7th Cir. 2005) ("To claim ignorance in the face of the consumer complaints and returned checks amounts to, at the least, reckless indifference to the corporations' deceptive practices."); *FTC v. Lights of Am., Inc.*, No. SACV10-01333 JVS (MLGx), 2013 U.S. Dist. LEXIS 133040, at *127 (C.D. Cal. Sept. 17, 2013).

[40] *See, e.g., Network Servs. Depot, Inc.*, 617 F.3d at 1141; *Cyberspace.com*, 453 F.3d at 1202; *Bay Area Bus. Council*, 423 F.3d at 638; *J.K. Publ'ns*, 99 F. Supp. 2d at 1206-07; *FTC v. Loewen*, No. C12-1207 MJP, 2013 WL 5816420, at *7 (W.D. Wash. Oct. 29, 2013) ("The Court is nevertheless satisfied that [defendant's] awareness of a high probability of fraud has been established by uncontroverted evidence that [he] changed D/B/As to avoid bad publicity . . . [and that he] was aware of exceptional refund procedures.").

[41] *Network Servs. Depot, Inc.*, 617 F.3d at 1141; *see also FTC v. DiscountMetalBrokers, Inc.*, No. 2:16-cv-2112-ODW(JC), 2017 U.S. Dist. LEXIS 164878, at *15 (C.D. Cal. Oct. 4, 2017) (holding defendants' "blind trust" in someone despite their knowledge that he received consumer complaints and "had 'issues' regarding his past business endeavors . . . demonstrates the requisite level of reckless indifference to establish liability").

2004 Oregon Consent Judgment he signed, and he did not ensure that the mailers used by the deceptive mailing operation contained the language required by the Oregon Consent Judgment. (FOF ¶ 173.) Simpson tracked the sending of the mailers through reports about the amount of mail that went to the mail house, when the mail was paid for, and when the mailers dropped. (FOF ¶ 168.) Simpson knew about complaints from the BBB and attorneys general concerning the mailers (*see* FOF ¶ 174); when newspapers' cease and desist letters were received by the mailing operation (FOF ¶ 175); and that newspapers' issued fraud alerts. (FOF ¶ 175.) Simpson was aware that the insert card system, a system that he devised, was causing "huge blowback" in the industry (FOF ¶¶ 157, 178) and knew that newspaper orders were being switched to other publications as a result. (FOF ¶ 179.) Simpson requested that Bacon prioritize "clearances" for *The Wall Street Journal*, even though Bacon's company, CPE, had received a cease and desist letter. (FOF ¶ 553.1.) He was aware that the operation continued to send mailers or switch orders for newspapers that sent cease and desist letters and that Defendants did not respond to cease and desist letters received from publishers. (FOF ¶ 175). Simpson was informed that consumers did not understand that the mailers were from third parties, thought the mailers were from the publishers, and made their checks payable to the publications. (FOF ¶¶ 192, 243.) Even prior to 2009, Simpson was aware that predecessor operations he and J. Hoyal controlled had received cease and desist letters from publishers describing the mailer as "fraudulent" and "misleading" (FOF ¶ 8), were the target of enforcement actions in which the mailer was alleged to be deceptive (FOF ¶¶ 9, 268), and were involved in litigation with publishers in which the mailer was alleged to be deceptive. (FOF ¶¶ 10, 268.) Simpson had an ownership interest in ACPA, the predecessor call center that received calls about the deceptive nature of the mailers similar to those received in the PPP NY call center. (FOF ¶¶ 5.3, 532-533, 535.)

665.2 **J. Hoyal** has known that the operation's mailers, which remained substantially unchanged for more than 15 years (FOF ¶¶ 6, 11.1.1-11.1.2, 153) and for which he shared responsibility with Simpson (FOF ¶¶ 230-234), are deceptive. He talked with consumers who were confused by the mailers and who had to have specific fine print on the mailers pointed out to understand that the mailer was not a bill for a subscription. (FOF ¶ 244.) J. Hoyal testified that he was not surprised that consumers thought the mailer was from the publisher or looked like a bill. (FOF ¶ 245). In 2009, J. Hoyal and Simpson were informed that consumers did not understand that the mailers were from third parties, thought the mailers were from the publishers, and made their checks payable to the publications. (FOF ¶¶ 192, 243.) Even prior to 2009, J. Hoyal was aware that predecessor operations he and Simpson controlled received cease and desist letters from publishers describing the mailer as "fraudulent" and "misleading" (FOF ¶ 8), were the target of enforcement actions in which the mailer was alleged to be deceptive (FOF ¶¶ 9, 268), and were involved in litigation with publishers in which the mailer was alleged to be deceptive. (FOF ¶¶ 10, 268.) Between 2010 and 2015, J. Hoyal was aware of consumer complaints about the mailer, including the content of consumer complaints forwarded to the operation by attorneys general and the BBB, and discussed these complaints with Simpson, Pugsley, and Lovrien. (FOF ¶¶ 216.8, 246-250, 252.) J. Hoyal provided guidance concerning how to draft written responses to consumer complaints (FOF ¶ 251). He was aware that newspaper publishers rejected orders submitted by the operation (FOF

¶ 253), returned checks submitted by the operation (FOF ¶ 254), and provided refunds for operation checks they deposited (FOF ¶ 255). He was aware that the operation switched rejected newspaper orders to magazine subscriptions (FOF ¶ 242) and received regular reports and information about how many orders were switched (FOF ¶¶ 215.3, 216.6, 216.7.) J. Hoyal has received hundreds, if not thousands, of cease and desist letters over the years, including from the publishers of *The Wall Street Journal, The New York Times, The Washington Post, The Honolulu Star Advertiser*, and numerous other regional newspapers. (FOF ¶¶ 256-258, 262-267, 391.) He was also informed of fraud alerts issued by newspaper publishers. (FOF ¶ 260.) J. Hoyal was aware that that the operation continued to send mailers for *The Wall Street Journal* after receiving cease and desist letters in 2010, 2011, 2012, and 2013 and receiving a fraud alert in December 2011. (FOF ¶¶ 259-261.) J. Hoyal was also aware of numerous other indicia of fraud, such as bank account closures (FOF ¶ 216.9), refunds (FOF ¶¶ 215.2, 216.4), and stop payments (FOF ¶ 216.2).

665.3 **L. Hoyal** was aware that the funds H&A received from Maximillian were from the deceptive mailing operation (FOF ¶ 276) and that H&A split the profits of the operation equally with Reality Kats (FOF ¶ 277). L. Hoyal was also aware of the nature of the deceptive mailing operation because she participated in a predecessor iteration of the operation. (FOF ¶¶ 283-292.) L. Hoyal operated Certified List Management, a company she formed to help Simpson purchase consumer lists (FOF 283) and Mail Industries, through which she managed and tracked financial operations and distributed the profits to Simpson, Ackerman, and J. Hoyal (FOF ¶ 288). Crain Communications sued the predecessor operation, including Mail Industries and L. Hoyal personally, in 2006. (FOF ¶ 292.) L. Hoyal trained Parducci to track the financial operations and distribute profits through Maximillian. (FOF ¶¶ 274, 291.)

666. This case is brought in equity, which gives the Court discretion in fashioning a fair remedy including any monetary award. Simpson, J. Hoyal, and L. Hoyal each have the requisite level of knowledge to be held liable for monetary relief. The Worker Defendants may have ignored significant "red flags," but they did not have the authority to make, and did not make, significant independent decisions regarding the operation as a whole. Simpson and Hoyal received the bulk of the profits from the operation and served as the real owners of the operation. Justice would not be served by holding the Worker Defendants liable for the monetary award in this case.

## E. THE FTC DOES NOT NEED TO PROVE "BAD FAITH" TO ESTABLISH LIABILITY

667. The FTC is not required to prove that defendants intended to deceive consumers or acted in bad faith to establish liability.[42]

---

[42] *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1202 (9th Cir. 2006) ("[W]hether an individual acts in good or bad faith is immaterial to liability under FTCA § 5.") (citing *Feil v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960)); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988) ("An advertiser's good faith does not immunize it from responsibility for its misrepresentations."); *FTC v. Infinity Grp. Servs.*, No. SACV 09-00977 DOC (MLGx), 2009 WL 10672410, at *3 (C.D. Cal. Dec. 11, 2009) ("Good faith is not a defense to violations of Section 5 of the FTC Act."). Some courts have permitted evidence of a defendant's good faith at the remedy

668. "Good faith is also irrelevant to the question of knowledge."[43]

669. It is "well established that 'reliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability."[44] This Court has ruled that reliance on advice of counsel is not a valid defense, either to liability or to the question of knowledge.[45]

**F. REMEDIES**

### i) Comprehensive injunctive relief is warranted.

670. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes a court to issue a permanent injunction.[46]

671. A permanent injunction is justified when there is "some cognizable danger of recurring violation,"[47] or "some reasonable likelihood of future violations."[48] Some of the factors considered include the deliberateness and seriousness of the present violation, the

---

phase of litigation, but only after liability has been established. *See, e.g., FTC v. Braswell*, No. CV 03-3700 DT (PJWX), 2005 WL 4227194, at *12 (C.D. Cal. Sept. 27, 2005); *FTC v. Hang-Ups Art Enters., Inc.*, No. CV 95-0027 RMT (JGx), 1995 WL 914179, at *3 (C.D. Cal. Sept. 27, 1995); *Feil*, 285 F.2d at 896; *Publ'g Clearing House*, 104 F.3d at 1171.

[43] *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1084 (C.D. Cal. 2012) (citing *Feil v. FTC*, 285 F.2d 879, 896 (9th Cir. 1960), and *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988)).

[44] *Grant Connect, LLC*, 763 F.3d at 1102 ("It is well established that 'reliance on advice of counsel [is] not a valid defense on the question of knowledge' required for individual liability."); *accord Amy Travel*, 875 F.2d at 575; *see also Affordable Media, LLC*, 179 F.3d at 1235 (defendants' claim to have done due diligence regarding truth of claims does not defeat "knowledge"); *see also Cyberspace*, 453 F.3d at 1202.

[45] (Tr. 1257:18-1258:7.)

[46] *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112-13 (9th Cir. 1982); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *see also FTC v. Evans Prod. Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985).

[47] *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953))

[48] *See AMG Services, Inc.*, Case No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416, at *10 (D. Nev. Sept. 30, 2016) (citing *CFTC v. Co Petro Mktg. Grp., Inc.*, 502 F. Supp. 806, 818 (C.D. Cal. 1980), *aff'd*, 680 F.2d 573 (9th Cir. 1982)), *aff'd*, 910 F.3d 417 (9th Cir. 2018).

defendant's past record with respect to deceptive and unfair marketing practices,[49] and the adaptability or transferability of the unfair practice to other products."[50]

672. "A large-scale systematic scheme tainted by fraudulent and deceptive practices gives rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint."[51]

673. "It is settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the Defendants 'would be free to return to '(their) old ways.'"[52]

674. Moreover, "[a] court may frame an injunction based on violation of the FTC Act broadly enough to prevent the defendant from engaging in similar illegal conduct in the future."[53] "Fencing-in" relief includes injunctive provisions that go beyond the specific the conduct declared unlawful.[54]

675. Courts consider a variety of factors in assessing the appropriateness of particular fencing-in relief, including the seriousness of the violation, the deliberateness of the action, the defendant's past record, and the adaptability or transferability of the illegal practice to other

---

[49] See Sears, Roebuck and Co. v. FTC, 676 F.2d 385, 392 (9th Cir. 1982) (citations omitted); see also AMG Services, 2016 WL 5791416, at *10 ("Nonexhaustive factors include the degree of scienter involved, whether the violative act was isolated or recurrent, whether the defendant's current occupation positions him to commit future violations, the degree of harm consumers suffered from the unlawful conduct, and the defendants' recognition of his own culpability and sincerity of his assurances, if any, against future violations.") (citing SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980)).

[50] Sears, Roebuck and Co., 676 F.2d at 392.

[51] FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 723 (5th Cir. 1982)) (quoting SEC v. Manor Nursing Center, Inc., 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

[52] Allee v. Medrano, 416 U.S. 802, 810 (1974) (quoting Gray v. Sanders, 372 U.S. 368, 376 (1963)); accord H.N. Singer, 668 F.2d at 1113 (affirming injunction and asset freeze issued after defendants ceased operations); Am. Standard Credit Sys., 874 F. Supp. at 1087) (granting injunction where conduct ceased); see also Fedders v. FTC, 529 F.2d 1398, 1403 (2d Cir. 1976) ("The fact that [defendant] may have discontinued the offending practice before the Commission issued the complaint in this case, however, does not bar a cease-and-desist order, where the public interest otherwise requires it.")

[53] FTC v. Neovi, Inc., No. 06-CV-1952 JLS (JMA), 2010 U.S. Dist. LEXIS 101583, at *7 (S.D. Cal. Sept. 27, 2010) (citing FTC v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965)).

[54] See e.g., FTC v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965) ("Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (quotation omitted); FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952) (holding that the FTC may "close all roads to the prohibited goal"); Siegel Co. v. FTC, 327 U.S. 608, 612-13 (1946) (allowing for fencing-in provisions except "where the remedy selected has no reasonable relation to the unlawful practices found to exist"); see also Telebrands Corp. v. FTC, 457 F.3d 354, 357 n.5 (4th Cir. 2006).

products.[55] Courts typically look to the "circumstances as a whole and not to the presence or absence of any single factor."[56]

676. Fencing-in relief can include enjoining misrepresentations about related products or services,[57] enjoining defendants from future participation in otherwise lawful conduct,[58] enjoining the defendants from maintaining or using customer information,[59] and monitoring and compliance provisions.[60]

677. The First Amendment does not protect deceptive commercial speech, and the Court has the authority to enjoin it.[61]

---

[55] *Sears, Roebuck & Co. v. FTC*, 676 F.2d at 391-92.

[56] *Id.* at 392 (citing *Porter & Dietsch, Inc. v. FTC*, 605 F.2d 294, 304-05 (7th Cir. 1979), *cert. denied*, 445 U.S. 950, (1980); *Jay Norris, Inc. v. FTC*, 598 F.2d 1244, 1250 (2d Cir.), *cert. denied*, 444 U.S. 980 (1979)).

[57] *See e.g., Colgate-Palmolive Co.*, 380 U.S. at 394-95; *Telebrands Corp.*, 457 F.3d at 361-62; *Kraft, Inc. v. FTC*, 970 F.2d 311, 326-27 (7th Cir. 1992); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 704-10 (3d Cir. 1982); *FTC v. Good Ebusiness*, LLC, No. 2:16-CV-01048, 2016 WL 3704489, at *8 (C.D. Cal. July 12, 2016).

[58] *FTC v. Gill*, 265 F.3d 944, 957-58 (9th Cir. 2001) (ban on offering credit repair services); *FTC v. John Beck Amazing Profits LLC*, 888 F. Supp. 2d 1006, 1015-16 (C.D. Cal. 2012) (ban on telemarketing and production or dissemination of any infomercial); *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1084 (E.D. Mo. 2007) (ban on marketing of business opportunities); *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 536 (S.D.N.Y. 2000) (ban on all multi-level marketing); *FTC v. Int'l Computer Concepts, Inc.*, No. 5:94CV1678, 1995 WL 767810, at *7 (N.D. Ohio Oct. 24, 1995) (ban on involvement in business opportunities and franchises); *FTC v. Dinamica Financiera LLC*, No. CV-09-03554 MMM (PJWx), 2010 WL 9488821, at *12 (C.D. Cal. Aug. 19, 2010) (ban on mortgage loan modification and foreclosure relief services); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1009-10 (N.D. Cal. 2010) (ban on telephonic billing); *FTC v. Medicor, LLC*, No. CV 01-1896 CBM (EX), 2002 WL 1925896, at *1-2 (C.D. Cal. Jul. 18, 2002) (work-at-home medical billing opportunity ban).

[59] *See John Beck*, 888 F. Supp. 2d at 1016 (ordering destruction of consumer lists); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-CV-61840, 2011 WL 1233207, at *21 (S.D. Fla. Mar. 30, 2011) (enjoining defendants from using customer information obtained in connection with deceptive practices).

[60] *See John Beck*, 888 F. Supp. 2d at 1016; *Ivy Capital, Inc.* No. 2:11-CV-283 JCM GWF, 2013 WL 3270534, at *3 (D. Nev. June 26, 2013); *FTC v. Mortg. Relief Advocates LLC*, No. CV145434MWFAGRX, 2015 WL 11257575, at *9 (C.D. Cal. July 1, 2015).

[61] *FTC v. Stefanchik*, No. 04-1852, 2004 WL 5495267, at *2 (W.D. Wash. Nov. 12, 2004) ("The law is well settled that, once speech is deemed to be false, misleading, and commercial, it is not constitutionally protected."), *aff'd*, 559 F.3d 924 (9th Cir. 2009); *see also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 638 (1985) ("The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading.").

678.   Consistent with the First Amendment, the Court can also impose fencing-in relief to ensure that the Defendants do not engage in future deceptive conduct.[62]

679.   There is therefore a reasonable likelihood of recurrence unless there is a permanent injunction to prevent the practices engaged in by the Defendants, and thus a ban on direct mail as well as additional fencing in relief is appropriate.

   679.1   The Defendants' deceptive mailing operation spanned decades, evolving over multiple iterations despite complaints (FOF ¶¶ 86-88, 174, 246-252, 344, 383-384, 417-419, 443-444, 472-476, 493-497, 532-538), government and private lawsuits (FOF ¶¶ 9, 10, 14, 15, 268, 292), and cease and desist letters (FOF ¶¶ 8, 175, 256-258, 262-267, 389-391, 420, 520-523, 553).

   679.2   Simpson continues to be involved in mailers (FOF ¶¶ 18, 180-183), and others considered resuming the operation (FOF ¶¶ 17, 394), all despite signing the Oregon AVC prohibiting such conduct (FOF ¶¶ 14 (all Individual Defendants except L. Hoyal), 173, 313, 393).

   679.3   The assets of the operation were transferred in 2015 to the Hoyals' nephew, including business names and the underlying records "to effectively run and maintain a subscription agency business." (FOF ¶¶ 16, 313.)

680   The FTC is ordered to file a proposed form of permanent injunction.

   ### ii)   Monetary relief.

681.   Under Section 13(b) of the FTC Act, this Court has the authority to order equitable monetary relief to remedy the Defendants' violations of the FTC Act.[63]

682.   Resitution is the form of ancillary relief that is warranted in this case. Equity requires monetary relief in the full amount of consumers' loss – *i.e.*, what consumers paid, less refunds and chargebacks already returned to them.[64] Defendants' operating expenses or any

---

[62] *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 373 (9th Cir. 1982) ("Any remedy formulated by the FTC that is reasonably necessary to the prevention of future violations does not impinge upon constitutionally protected commercial speech.") (quoting *United States v. Reader's Digest Ass'n*, 662 F.2d 955, 965 (3d Cir. 1981)); *see also Kraft*, 970 F.2d at 326 ("The FTC has discretion to issue multi-product orders, so-called 'fencing-in' orders, that extend beyond violations of the Act to prevent violators from engaging in similar deceptive practices in the future."); *FTC v. Wellness Support Network, Inc.*, No. 10-CV-04879-JCS, 2014 WL 644749, at *21 (N.D. Cal. Feb. 19, 2014) (rejecting First Amendment defense, noting that the FTC Act "authorizes imposition of comprehensive prophylactic injunctive relief").

[63] *Stefanchik*, 559 F.3d at 931 (quoting *Pantron I*, 33 F.3d at 1102); *H.N. Singer, Inc.*, 668 F.2d at 1111.

[64] *Stefanchik*, 559 F.3d at 931-32; *see also FTC v. Gill*, 265 F.3d 944, 958 (9th Cir. 2001) ("We have held that restitution is a form of ancillary relief available to the court in these circumstances to effect complete justice."); *FTC v. Inc21.com Corp.*, 475 F. App'x 106, 110 (9th Cir. 2012) ("The district

claimed benefit to consumers from the subscriptions are not considered.[65] However, the consumer restitution amounts paid to the State of Oregon in 2015 are a proper deduction in the amount of $3,250,000.

683.    As a result, the proper measure of recovery is $8,942,774.02, which represents Defendants' unreimbursed revenues from the deceptive mailing operation minus the consumer restitution amounts already paid to the State of Oregon.

## V.    CONCLUSION

684.    The Court places all Defendants under a permanent injunction and orders equitable monetary relief against Simpson, J. Hoyal, L. Hoyal, and the Corporate Defendants in the amount of $8,942,774.02.

It is so ORDERED and DATED this ____18____ day of April, 2019.

MARK D. CLARKE
United States Magistrate Judge

---

court properly calculated … restitution in the full amount of funds lost by consumers."); *FTC v. AMG Services, Inc.*, No. 2:12-cv-00536-GMN-VCF, 2016 WL 5791416, at *11 (D. Nev. Sept. 30, 2016) ("Consumer loss is calculated by 'the amount of money paid by the consumers, less any refunds made.'").

[65] *See e.g., FTC v. Dantuma*, 748 F. App'x 735, 738 (9th Cir. 2018) (no reduction for consumers who were "satisfied" or obtained a benefit) (citing *Gill*, 265 F.3d at 958); *see also FTC v. Publishers Bus, Servs., Inc.*, 540 F. App'x 555, 556-58 (9th Cir. 2013) (rejecting the argument that the cost of magazines should be offset against restitution).